KEVIN BARRY Mc DERMOTT, Esq.
Bar# 109182
LAW OFFICES OF KEVIN BARRY Mc DERMOTT
300 Spectrum Center Drive, Suite 1420
Irvine, California 92618

Telephone: (949) 596-0102
Facsimile:  (949) 861-3825
E-mail: warlawyer@aol.com

Counsel for Defendant
MICHAEL JOHN MIRANDO

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16 CR 0215 PA |
| Plaintiff, | DEFENDANT'S TRIAL MEMORANDUM |
| v. | |
| MICHAEL JOHN MIRANDO, | Trial date: April 25, 2017 |
| Defendant. | Courtroom: 9A |
| | Hon. Percy Anderson |

## INTRODUCTION

At 0545 on the 7th of October 2016, ten Special Agents of the Federal Bureau of Investigation, dressed in armor and bearing automatic weapons, pounded on the door of the home of Defendant Michael Mirando in Portland Oregon where he was living with his wife and his then fifteen month old son. The noise roused the Defendant from his bed and, believing that someone was trying to break into his home, Defendant descended the stairs of his home to the front door armed with semi-automatic pistol. Upon seeing flashing blue lights, Defendant thought Portland police were at his door. Defendant put his weapon away and opened the front door. There he observed the

dozen agents with "FBI" emblazoned on their bullet proof vests. The agents served an arrest warrant signed by a magistrate based in the Central District of California and placed Defendant in handcuffs. He was transported to the lock up at the Federal courthouse in Portland where he was eventually presented to a magistrate in chains and handcuffs and was released that afternoon on a promise to appear and requirements that compelled the surrender of his passport and his possession of any weapons.

Until the date of his arrest, he had no contact with any federal agent, agency or investigator. He was never informed that any conduct on his part was under investigation by the Federal government. He was never served with a search warrant, subpoena and any written demand from any agency. Only upon reading the indictment, issued by a grand jury in Los Angeles six months earlier on April 5, 2016, did Defendant learn that he had been investigated for and was being charged with violating a federal statute, 18 U.S.C. 1347, that outlawed defrauding private medical insurance companies. It was at this point that he realized that two former business associates had made good with their threats to report alleged medical insurance billing violations that his company was making. These threats were made during the course of state civil litigation over the control of a company that Defendant had largely been responsible for creating. When Defendant refused to submit to their extortionate demands during the civil litigation, they went to the FBI and found a receptive audience and an investigation was initiated in 2013.

That investigation led to this indictment.

## PROCEDURAL BACKGROUND

Defendant Michael Mirando was arraigned in Portland on October 7, 2016 and released to Pre-Trial Services. He was further ordered to appear in the Central District of California on October 21, 2016. After appearing in the Central District on that date, the case was assigned to this Court. It was further set for a pre-trial hearing on October 24, 2016. Upon stipulated motion, this Court moved the pre-trial hearing to October 31,

2

2016. This Court originally set trial for December 13, 2016. However, upon learning of the status of discovery in the case, this Court set a pre-trial hearing date for November 14, 2016.

On that date, the Court allowed the parties to submit a stipulation as to a perspective trial date. The parties submitted a date of April 25, 2017 and the Court agreed.

On November 1, 2016, November 11, 2016, January 9, 2017 and January 25, 2017, the United States provided Defendant almost 60,000 pages of discovery, reflecting almost three years of investigation work. These dates were the first occasion that Defendant had access to any evidence related to the charges.

As stated in open court, Defendant had reciprocal discovery, largely evidence obtained from the civil litigation between Defendant and two prospective witnesses for the United States. This discovery occurred on January 9, 2016 and was over 500 pages.

On April 4, 2016, the parties failed to agree on a plea in the matter.

## STATEMENT OF THE FACTS

Stanton Crowley and James Cast were friends since high school. Neither had spent much time in post high school studies and, after a series of menial jobs, landed positions within a company called National Cardio Labs LLC, ["National"], in the late 1990s. This company was headed up by Robert Parsons, the son-in-law of the man who created a device known as a "Holter Monitoring Device," a heart monitoring device that has evolved over the years due to different iterations, designs and manufacturers. These devices are used by physicians with equipment, computer programming and electrodes provided by National to measure, among other things, heart activity. Upon the request of the physician, the patient would attach the device to his waist line with electrodes attached to the chest. The patient would wear the device for a period of 24-48 hours. The doctor would remove the flash drive from the device, download the info into the computer and send the results back to National for interpretation. Cast and his wife

were directly involved with billing process at National. Crowley's duties at National were to interpret the results of the testing received from the physicians, as well as billing. Around 2002, Cast and Crowley were terminated from National when it was learned that they had created a competing company with another high school classmate. National filed suit against this competing company and its principals claiming theft of trade secrets among other causes of action. At a point in the litigation, Cast extorted Parsons for $100,000 in order to buy Cast's silence regarding the billing practices at that company. That did not assuage Cast. He and Crowley in early 2004 proceeded to obtain qui tam counsel and began a relationship with the FBI who brought an investigation to indictment against Parsons and National. The qui tam was filed in January 2004 and the indictment against Parsons was unsealed in January 2007. When the qui tam settled in 2010, Cast and Crowley each received approximately $200,000.[1]

    While Cast and Crowley were carrying on their litigation against National, Crowley had befriended Defendant in 2002. Both lived in the same housing development in Aliso Viejo and shared common hobby interests despite the fact that Crowley was 13 years the senior of Defendant. In late 2004, Crowley approached Defendant with an offer to create a heart monitoring device business. In March 2005, Crowley and Defendant entered into a partnership agreement. Shortly thereafter Crowley brought Cast into the picture and the three began to operate as "Holter Labs LLC", ["Holter"]; records for the State of California reflect filings from Holter commencing January 2005.

    The business model was very similar to National with the exception that any Medicare or Medicaid insurance would be off limits to the new company as Parsons had been arrested for and pled to charges of false billing practices against a government insurance entity. Cast and Crowley were adamant about steering clear of government

---

[1] The offices of the FBI that Cast and Crowley went to during the Parsons case is the same office involved in this case.

insurance. Defendant, an employee with Intel as server and network systems engineer, had zero experience in the medical field. He also had no knowledge of the activities of Cast and Crowley against their former employer.

Over the course of the next several years, Cast and Crowley taught Defendant the medical billing business from the ground up to include how to bill, who to bill and when to bill. Defendant would recruit physicians through mailers and other means to use the devices. Holter would provide the equipment and the software to download into the physicians' computer. Holter would interpret and return the results to the physician. Insurance companies would be billed.  Cast fell out of the picture early 2006 as Crowley and Defendant both agreed that Cast was not pulling his weight and had failed to live up to his promises he made entering into the agreement to form Holter, to include investment monies as he failed to invest any money in the company.

Almost two and half years later in 2008, Defendant began to receive a series of e-mails from Cast wishing to reassert his ownership interest in Holter. That Cast would try to reinsert himself into Holter probably had something to do with the fact that he had already run through all of the money that he had collected on the qui tam case. About the same time, Crowley began to spend less time at work and Defendant was shouldered with more of the responsibility of keeping the company operating. By 2009, Defendant was no longer with Intel and was committed full time to Holter.

By 2011, the relationship had splintered and Defendant elected to move his family to Oregon in late 2011.  He and Crowley agreed to maintain the business via internet rather than under the same roof and, for a period of a year, this process seemed to work. What was not known to Defendant was that Cast and Crowley had been meeting to discuss wresting the company from Defendant. In fact, Crowley met with another local associate on the evening Defendant left California and helped form another heart monitoring business, Specialized Medical LLC, a company that was formed formally with the State of California in December 19, 2011.

Defendant sensed that a scheme was in the works and began to establish separate banks accounts that Crowley did not have access to. Moreover, he began treating Crowley as an employee rather than as a partner and in 2012 sent Crowley a 1099 tax form for the income received by Crowley. This act triggered a review by the IRS as an investigation into his income revealed almost $500,000 in delinquent state and federal taxes. It was learned that Crowley intentionally failed to file tax returns at least going back to 2008.

For a period of at least a year, Cast and Crowley schemed to steal the company from Defendant and, in October 2012, Crowley emptied a bank account of Holter of $24,000 that both Defendant and Crowley had access to. Shortly thereafter Cast retained counsel to file a civil suit against Holter and Defendant. That verified suit was filed on October 24, 2012, less than two week after account was emptied. Crowley kept in the background and did not become a named plaintiff until later in the litigation.

Less than a week later, Cast accessed the server files of Holter and extracted a copy of the Holter billing records.

When the lawsuit was not progressing as well as they hoped, Cast and Crowley began to send Defendant e-mails and voice messages threatening to accuse him of fraudulent billing and to report him to the authorities. The e-mails by Cast became so strident that by September 2013 he was demanding a $240,000 payoff from the Defendant or he would report him. It was a false threat as Crowley met with an FBI agent on September 17, 2013 and the FBI opened an investigation two days later.

Within days of the initial meeting, Crowley turned over a thumb drive of all of the documents that had been taken from the Holter servers to the FBI. To this date, no warrant has ever been served on Defendant or the company.

Ultimately, the lawyers representing Cast and Crowley in the civil suit obtained court orders allowing the attorneys to cease representation and to withdraw from the case. In short order, the case was dismissed in Defendant's favor and while attempting to avoid a judgment for costs given by the state court judge, Crowley filed for

bankruptcy protection. The bankruptcy trustee sold Crowley's claim to the company to Defendant for $60,000 in April 2016.

In April 2016, an indictment was obtained against Defendant. The counts in the indictment allege 15 improper billings from 2011 through 2013. Six months later the indictment was unsealed and served on Defendant. A week after the arrest, the FBI contacted James R. Brown, the individual who replaced Crowley as the interpreter of the Holter device data. It was the first time that he had ever been contacted and, as of the present date, has never been interviewed by the FBI. He has been involved with Holter in a technical capacity since 2006.

A review of the discovery provided to the Defendant at this point seems to create an issue as to the use of certain billing codes. This investigation did not uncover billing for patients or services that were not performed. None of the current charges against Defendant occurred after Cast and Crowley were no longer part of the company and Mr. Brown began the task of interpreting Holter data. To date, Holter Labs LLC has processed over 18,000 claims and not a single insurance company has ever contact the Defendant at any point in time to discuss his billing methods.

The Defendant asserts that he did not knowingly defraud any insurance company. Any billing he performed resulted from the training received from Cast and Crowley. At no time during its investigation did the FBI request an interview with Defendant to discuss Holter Labs.

## STATEMENT OF THE LAW

### a. General Discussion of the Statute

The health care fraud statute, 18 U.S.C. § 1347, was amended on March 23, 2010 by adding a subsection (b). As amended, Section 1347 provides that:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice —(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both. (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

18 U.S.C. § 1347, as amended by Pub. L. 111-148, Title VI, § 10606(b), Mar. 23, 2010, 124 Stat. 1008.

To establish a defendant's guilt under § 1347, the government must prove, beyond a reasonable doubt, that the defendant "`(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud.'" *United States v. Semrau*, 693 F.3d 510, 524 (6th Cir. 2012), (quoting *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009)).

As a general rule, when used in the context of criminal charges, a "willful" act is one undertaken with a "bad purpose." To establish a "willful" violation of this statute requires the Government prove that the defendant acted with knowledge his conduct was "unlawful." *United States v. Dearing*, 504 F.3d 897, 901, (citing *Bryan v. United States*, 524 U.S. 184, 191-2, 118 S.Ct. 1939 (1998).

/

### b. Evidentiary Issues

Fed. R. Evid. 608(b) provides:

**(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

**(1)** the witness; or

**(2)** another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

The Second Circuit Court of Appeals and the district courts of the Second Circuit have routinely held that the total failure to pay income taxes are admissible on the issue of the witness' truthfulness. *See Chnapapkova v. Koh*, 985 F. 2d 79, 82 (2d Cir. 1993). The Fifth Circuit has also held that a failure to report income or a failure to report tax returns is potentially admissible to challenge a witness' credibility. *United States v. Bustamonte,* 45 F.3d 933, 945 (5th Cir. 1995).

In this case, two prospective government witnesses, Cast and Crowley, have previously admitted their failure to file tax returns. When presented with a 1099 in 2012, Crowley vehemently protested to Defendant that he did not want any such filing as he had not been reporting income to the IRS for many years.

Additionally, government witness Cast has the issue of false statements made in a bankruptcy petition. As described above, Cast filed a civil suit by verified attestation on October 24, 2012 alleging that he was an equal partner in Holter and was so since Holter's inception in 2005. He alleged that his interest in the company would exceed

seven figures. Yet, when filing for bankruptcy protection in 2006, Cast makes no mention of his ownership interest in Holter.

That is not the only material omission in the petition. Cast had been the relator in the qui tam suit and National. The suit was filed in 2004 and was not settled until 2010. The existence of the qui tam lawsuit was never addressed in the bankruptcy petition, an asset that resulted in a settlement of $1,100,000 for Cast, Crowley, their lawyer and one other individual. Evidence of such material omissions is clearly proper impeachment evidence. See *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984) (if the government's case rests on the credibility of a witness, the defendant must be accorded broad latitude in cross-examination). *See, e.g., United States v. Sperling*, 726 F.2d 69, 74-75 (2d Cir.) (false credit card applications), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *United States v. Carlin*, 698 F.2d 1133, 1137 (11th Cir.) (false license applications), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Reid*, 634 F.2d 469, 473-74 (9th Cir.1980) (prior false statements), cert. denied, 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981).

Dated: April 14, 2017                    */s/ Kevin Barry Mc Dermott*
                                          Counsel for Defendant Mirando

# CERTIFICATE OF SERVICE

I hereby certify that on or about April 16, 2017, I caused the forgoing DEFENDANT MIRANDO'S TRIAL MEMORANDUM to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the U.S Attorneys assigned to this case.

Dated: April 16, 2017          //s *Kevin Barry McDermott*
Attorney for Defendant
MICHAEL JOHN MIRANDO