# EXHIBIT A

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

1    October 9, 2017

2

3    Mr. Ed Robinson

4    Attorney at Law

5    21515 Hawthorne Boulevard, Suite 730

6    Torrance CA 90503

7

8    Re:  *US v. Mirando*

9

10   Dear Mr. Robinson:

11

12   Attached please find my report regarding loss calculations. You requested that I serve as a

13   rebuttal expert to:

14

15   I. Review the medical billing, medical and other relevant documents, facts, indictment counts,

16   summary of evidence, and provide:

17

18      1.   Opinions on the validity of the Government's methodology to prove fraud; (determine

19           which data is or is not fraudulent on a claim-by-claim basis to add it up and accurately

20           calculate total loss).

21

22      2.   An overview of the types of alleged fraud and any errors in the Government's

23           methodology to prove what amount of fraud was caused by Mr. Mirando;

24

25   II. Review the Presentence Investigation Report developed under the U.S. Sentencing Guidelines

26   (USSG) §2B1.1 standard, evaluate it using U.S. Sentencing Commission (USSC) methods and

27   my knowledge training education and experience in the healthcare insurance and provider

28   industry, and provide findings regarding loss.

29

30   I specifically reserve the right to add to, amend or subtract from the report as new evidence

31   becomes available or the opinions of other experts are reviewed and considered.

32

33   Based on the information available to me with a reasonable degree of certainty:

34

35      1.   The PSR / PIR has mathematical errors of 6% to 12% in the summation of Counts 1-15

36           of fraud (*see* Conclusions, page 52).

37

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

2. There are only seven (7) patients analyzed in the indictment and four (4) in the PIR / PSR which represent 137 claims out of over 31,000 claims in the data produced by the Government (*see* Conclusions, page 52).

3. The Government's methodologies do not form the basis for a statistically valid method to extrapolate to over $7 million in fraudulent bills and $2 million in fraudulent receipts and results in a 19% certainty level regarding total fraud rather than the industry standard of 51% reasonable degree of certainty (*see* Conclusions, page 52).

4. Duplicate charges are overstated. There are 90 actual duplicates which could be fraud or could be simply duplicate requests for payment.  There are over 31,000 claims and a small percentage of these claims are 'adjacent' to each other by date of service (*see* Conclusions, page 52).

5. There were no audits conducted by any insurance company that confirmed the existence of fraud, and I have no data to conduct a statistically valid sample and project fraudulent claims in a damages analysis, beyond $10,695.06 (*see* Conclusions, page 52).

6. It appears inconclusive which device was used to perform alleged fraudulent 'unable to perform' procedures (*see* Conclusions, page 52).

7. Without a complete analysis of physician interviews, patient documentation and diagnosis, claims data and reimbursement tied by individual medical service, it is impossible to determine how much if any fraud was committed beyond seven patients analyzed (*see* Conclusions, page 52).

8. Based on the information available to me, I do not know if Mr. Mirando or others submitted the insurance claims produced by the Government, but in total Holter Lab's cannot in my opinion be held to damages or loss calculations beyond the amount of $10,695.06 (*see* Conclusions, page 53).

9. Since the suspect and duplicate claims are unproven in my opinion to be fraud, $2,587,360.23 for these amounts, minus $1,339.180.04 in unpaid claims as an offset, minus $538,515.73 in unproven duplicates, minus $2,574,940 for unable to perform procedures, plus the accurate fraud counts mathematical total of $10,695.06 equals a negative number of ($1,854,580.95) which means that subject to further audits, the payors (health insurance firms) in this case may owe Holter Labs for unpaid claims.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

| | | Billed | Intended Loss | Paid (Actual Loss) | | Total | |
|---|---|---|---|---|---|---|---|
| Suspect + Dup | | $8,008,875.45 | $2,482,751.39 | $ | 2,587,360.23 | $ | 2,587,360.23 |
| Less : Unpaid | | | | $ | 1,339,180.04 | $ | 1,339,180.04 |
| | | Subtotal - Suspect + Duplicates Less Offset | | | | $ | 1,248,180.19 |
| | | | | | | | |
| Less: unproven duplicates | | | | | | $ | 538,515.73 |
| | | Subtotal - Above Less Unproven Duplicates | | | | $ | 709,664.46 |
| Less: unproven unable to perform | | | | | | $ | 2,574,940.47 |
| | | Subtotal - Above Less Unproven Unable to Perform | | | | $ | (1,865,276.01) |
| Add: accurate mathematical total for Counts 1-15 | | | | | | $ | 10,695.06 |
| | | Negative number means payors owe Holter Labs | | | | $ | (1,854,580.95) |

*Figure 1* - Summary of Calculations, with Mathematical Corrections by Arrigo

In my opinion net damages are zero (mathematically a negative number which may indicate payors owe money for unpaid claims). Though in my opinion the Government methodology could have been stronger, I left the amounts of $10,695.06 (the correct mathematical total) my calculations (*see* Conclusions, page 53).

10. I am also aware from other loss and damages calculations where I was retained by counsel for the Relator in San Francisco that the 'foreseeable' loss in health care fraud cases, is the amount billed to an insurer, if not rebutted, <u>however</u>, the parties may introduce additional evidence to support arguments that the amount billed overestimates or understates the defendant's intent (*See* U.S. v Popov and U.S. v. Prakash).[1] (*see* Conclusions, page 53)

11. Therefore, in my opinion the actual, foreseeable amount of fraud is at most 31% of the billed amounts based on widely known industry practices and even data published by the Government itself (*see* Conclusions, page 54).

12. Intended fraud in this case is, at most 31% of the billed amount, and it is not reasonable to add 18 points to the sentencing guideline formulas, and, based on the statistically

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

invalid and unreliable methodology employed by the Government the payors in this case may owe Holter Labs money (*see* Conclusions, page 54).

13. The PIR / PSR states in paragraph 37 that the unable to perform payments are $3,025,329.47 and that this is due as restitution.  This is **not** correct (*see* Conclusions, page 54).

    i. First as noted elsewhere in this report the sample size used by the Government produces an unreliable 19% confidence level vs. the standard of 51%

    ii. Second, even if it were accepted using appropriate sampling methods that all paid claims for 'unable to perform' procedures were fraudulent the correct total is $2,930,852.64 which is an error of 3.22% in the Government's calculations.

    iii. Third, as noted elsewhere the Government fails to link all of the claims associated with the procedures and CPT codes in question to the exact device that was used to perform the procedure.  I have no data to conclude any amount for 'unable to perform' codes and presume that in the absence of provable data and statistically valid methods that this is zero.

14. As noted in Exhibit F - Supplemental Illustrations (PowerPoint):

    a. Of over 40,000 documents produced by the Government, a single page states that the Government interviewed a witness who stated that the Datrix 512 could not possibly perform some of the medical diagnostic procedures in question due to its frequency.  FDA 510(k) filings do not confirm that this is true as other devices with the same frequency are indeed used to perform these procedures

    b. According to the American Medical Association, there are 14 steps involved in delivering care which would be used to determine the veracity or fraudulent nature of any claim. The Government methodology only sheds light onto partial information for four (4) of these fourteen (14) steps.

Respectfully,

*Michael F Arrigo*

Michael F. Arrigo

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

1

# United States of America, Plaintiff,
## v.
# Michael Mirando, Defendant

# Rebuttal Expert Report Regarding Loss

# Prepared by Michael F. Arrigo

DATE PREPARED:
OCTOBER 9, 2017

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

5

I.  Opinions ..........................................................................................................................9

   A.  Health Insurance Routinely Pays Only Thirty Percent of What is Billed; Mirando's Business was in-line with Industry Averages of 30 Cents on the Dollar....................................... 9

   B.  Any Intended Loss Calculation Must Therefore Presume that Health Care Providers Anticipate being Paid a Fraction of the Amount Billed in Healthcare Claims .......................... 10

   C.  Health Insurance Denial Rates Are Five to Twenty-Five Percent; Mirando's Business Was Below Industry Norms at 11% .................................................................................................. 10

   D.  Maximizing Legitimate or Allegedly Fraudulent Claims Requires Aggressive Appeal Tactics; Appealing Denials is Complex and Costly. ...................................................................... 11

   E.  Re-Billing is Common When Claims Are Denied and it Creates Duplicate Claims; Mirando's Duplicate Rate is Below Industry Norms .................................................................. 12

   F.  Providers Who Attempt to Perform Complex Medical Billing on Their Own Have Higher Denials and More Regulatory Inquiries.  Mirando Was Ill-Advised to do his Own Coding and Billing.................................................................................................................................................. 12

   G.  Weaknesses in the Government's Calculations Regarding Damages................................. 14

   H.  Government Sampling Method Provides 19% Confidence Level vs. 51% Minimum Standard Certainty .............................................................................................................................................. 15

   I.  No Offset for Unpaid Claims in Government Loss Calculations ......................................... 16

      a.  Appears to be valid ........................................................................................................ 16

      b.  Duplicate date of service ............................................................................................... 16

      c.  Unable to perform .......................................................................................................... 17

   J.  The Government's Omission of Payment to Charge Ratio, Unreliable Sampling Methods, Overstated Intended Loss by Between $5.5 and $7.9 Million ...................................................... 19

   K.  The Government Methodology Leads to Unreliable Conclusions Based on Statistically Invalid Sample Sizes and Extrapolations that Overstate Intended and Actual Loss.................. 21

   L.  The Government PSR contains Mathematical Errors of between 6% and 26% ................ 21

   M.  Summary of Losses – 18 Level Increase for Sentencing is Not Reasonable .................. 22

   N.  Summary of Losses Billed as Intended vs. Paid as Actual, Foreseeable ........................... 23

   H. Offset of Actual Foreseeable Loss by Unpaid Claims .......................................................... 23

   I.  Government drew conclusions about total value of medical procedures based on allegedly 'suspect' CPT codes, procedures - failed to link to data to prove fraud...................................... 25

   O.  Findings of Total Loss ............................................................................................................ 25

II.  Expert Qualifications, Publications, Testimony, Compensation ..........................................26

   A.  Education................................................................................................................................... 26

   B.  Experience................................................................................................................................. 26

   C.  Specialized Knowledge, Publications and Prior Testimony ................................................ 27

      Publications.............................................................................................................................. 28

      Prior Testimony...................................................................................................................... 28

      Testimony has Never Been Excluded .................................................................................. 29

   D.  Compensation .......................................................................................................................... 29

III.  Summary of Facts and Data Considered ............................................................................29

   A.  Scope of Discovery Provided by the Government................................................................. 29

   C.  Mirando was not trained as biller and coder by Nationally Credentialed Organizations..... 29

   G.  FDA Data Regarding Datrix 512 Frequencies and FDA 510(k) for Similar Devices ......... 30

H. Industry Standard Definitions of Duplicate Claim, Whether Those Claims are Payable. ... 31

I. Prior Decisions in the 9th Circuit that Indicate Intended Loss, Foreseeable Loss May be Based on Factors Such as Payment to Charge Ratio ................................................................. 31

IV. Discussion ................................................................................................................................. 31

A. Gaps in the Government's Sampling Methodology for Damages Calculations ................. 31

Unreliable Sampling Methodology and Extrapolation ............................................................. 31

B. Failure to Link of Claims to Supporting Documentation and Physician's Records ........ 32

Limited Degree of Certainty and High Margin of Error in Government Methods ................... 33

Even if Lower Standard of Reasonable Degree of Certainty is Used, Government Sampling is Unreliable ................................................................................................................................. 37

Data is Unavailable to Prove that "Unable to Perform" and Suspect Codes are Damages ...... 37

Unbiased Method to Calculate Damages Must Consider all Possible Outcomes – Favorable and Unfavorable ...................................................................................................................... 39

Determining Medical necessity as a basis for paying or denying insurance claims ................... 39

Federal Government Guidelines .............................................................................................. 39

Payor Policies for Specific Types of Diagnostic Facilities and Procedures ........................... 40

Medicare, Private Payors, Independent Diagnostic Testing Facilities (IDTFs) ...................... 40

Physician Documentation Trumps Payor Policy and Government Guidelines ........................ 41

Diagnosis Codes that Support Medical Necessity .................................................................. 44

National Coverage Determinations and Local Coverage Determinations ............................... 44

Clinical Documentation as Basis for Diagnosis ..................................................................... 44

Prior Tests to Establish Medical Necessity for Additional Tests or Procedures ..................... 44

Payor Denials ......................................................................................................................... 45

Incomplete or Inconclusive Analysis by FBI ............................................................................ 45

Failure to Prove Lack of Medical Necessity – No Issues with Clinical Documentation, Coding ............................................................................................................................................... 45

Failure to Prove Lack of Medical Necessity - No Evidence of Insurance Audits ..................... 46

Failure to Prove That a Datrix DR512 Was Used – No Final Reports Indicating DR512 .......... 46

Failure to Prove That a Datrix DR512 Was Used – No Form 855B ........................................ 46

Failure to Prove That a Datrix DR512 Was Used – No Audit Trail ........................................ 47

Patient Interview with Belen Perazzo Barber .......................................................................... 47

Cross Check with Aetna Records for Patient Belen Perazzo Barber ........................................ 47

Medical Necessity of Treatment Frequency for Patient Belen Perazzo Barber ........................ 48

FBI Interview with Jon Barron, Founder of Datrix .................................................................. 48

Device Frequency and Bandwidth .......................................................................................... 48

FDA 510(K) Pre-Market Notifications .................................................................................. 49

V. Conclusions .............................................................................................................................. 52

Exhibit A – Curriculum Vitae ....................................................................................................... 55

Exhibit B – Principles and Methods .............................................................................................. 56

Data and Methods for Calculating Charges v. Payments ........................................................ 56

Clinician's Medical Documentation and Medical Coding Review, Where Applicable ............. 60

Medical Coding ..................................................................................................................... 60

Fundamental Purpose of Clinical Documentation .................................................................. 60

Documentation of Medical Necessity Required for Medical Coding and Payment ................. 61

Patient Condition and Diagnosis ............................................................................................ 62

Prepared by Michael F. Arrigo, October 9, 2017

1      Billing, Claims Denials and Medical Review................................................................. 62
2    Medical Policy and Coverage Determinations from the Payor ................................... 63
3    Outpatient Prospective Payment System (OPPS), Medicare GAF ............................. 65
4    National Percentile Levels to Establish Customary Medical Charges......................... 65
5    Authoritative Economic, Scientific and Standards Organizations for CPT, ICD ...................... 68
6       Current Procedural Terminology or CPT Codes for Outpatient Procedures ......................... 68
7       International Classification of Diseases (ICD) for all diagnoses and inpatient procedures..... 69
8    Methodology for Analysis of Duplicate Claims .......................................................... 69
9    Methodology for Unpaid Claims Analysis ................................................................... 71
10  Exhibit C – Test Results.........................................................................................................81
11    Mathematical Errors in Government Presentencing Information Report ....................... 81
12    Billed vs. Intended vs. Actual / Foreseeable Loss for "unable to perform" procedures ............. 85
13    Billed vs. Intended vs. Actual / Foreseeable Loss for "Duplicates" ............................. 87
14    Observations:.................................................................................................................. 88
15    Analysis of Alleged Fraud Proof Points from the Government ...................................... 89
16    Summary of Gaps in the Government's Sampling Methodology...................................... 91
17  Exhibit D – Materials Reviewed .........................................................................................96
18    A.   Provided by Counsel .................................................................................. 96
19      Section 3 ...................................................................................................................... 96
20      Section 4 Production 1 ................................................................................................. 97
21      Section 5 Production 2 ............................................................................................... 104
22      Section 6 Production 3 ............................................................................................... 111
23      18 Claims Data and Patient Documentation ............................................................. 111
24    B.   Citations and Documents Independently Reviewed ........................................ 117
25  Exhibit E – Prior Testimony................................................................................................118
26  Exhibit F – PowerPoint Illustrations ................................................................................119

27

28

Prepared by Michael F. Arrigo, October 9, 2017

# I.    Opinions

## A. Health Insurance Routinely Pays Only Thirty Percent of What is Billed; Mirando's Business was in-line with Industry Averages of 30 Cents on the Dollar.

Based on a reasonable degree of certainty it is my opinion that:

1. Based on my knowledge, training, education, experience, industry practices and recent testimony, it is common knowledge that health care providers receive approximately 30 cents on the dollar of every claim they submit for payment to health insurers.

   a. This ratio is sometimes called the **payment to charge ratio** (or alternately if numerator and denominator are reversed charge to payment ratio)[2] and is a common metric used by health care providers and their billing personnel to measure their success in collecting reimbursement on health care claims.

   b. In statistics released by the U.S. Department of Health and Human Services (HHS) Centers for Medicare and Medicaid (CMS) in 2013 covering 3,337 U.S. health care providers illustrate that on average, health care <u>providers knowingly billed 3.77 times what they were actually reimbursed</u>.[3,4] Calculating the payment to charge ratio based on this data yields a percentage of 27% as follows:

      CMS Data on Pay to Charge Ratio National Average

      $$\frac{1.00}{3.77} = 0.265 \sim 27\%$$

   c. For many health care providers, there is a wide difference between billed charges and the amounts that those providers expect to receive for services.[5,6]  Provider charges are based on a pre-determined price list where the charges for each service or product they may offer.  Reimbursement rates, on the other hand, are the payments that providers are actually willing to accept for a specific service or product.[7,8]  As a result, only those who do not pay for hospital care via an intermediary payer (i.e., the uninsured) are actually subject to the listed charges.  In practice, health care providers routinely accept reduced rates from the poor or uninsured.  The cumulative result is that charges vary significantly and unless a Usual Customary and Reasonable (UCR) charge analysis is performed, charges are

9

not relevant in determining the amount individuals or insurers actually pay for health care services. [9]

    d.  In San Francisco Spine v. ClaimWorks,[10], [11] I opined that based on both my experience and the statements of SF Spine that health care providers typically receive 25% to 30% of the dollar value of every claim submitted.

    e.  Holter Labs billed nearly $11.5 million (including both legitimate charges and those the government all edges are fraudulent) and received $3.5 million, which is a 31% pay to charge ratio.

$$\frac{\text{total payments}}{\text{total charges}} \quad \frac{\$3,546,505.21}{\$11,499,638.96} = 0.3084 \sim 31\%$$

### B. Any Intended Loss Calculation Must Therefore Presume that Health Care Providers Anticipate being Paid a Fraction of the Amount Billed in Healthcare Claims

Using Mirando's' business payment to charge ratio of 30.8% or ~ 31% for Holter Labs is a reasonable method to determine intended loss since:

1. It is in-line with industry norms of 27% to 30%
2. U.S. Government published data establishes that the government and health care providers all know that at most they expect to receive approximately 30% of what they bill, and therefore bill 3.77 times that number (nearly four times what they expect to be paid).

### C. Health Insurance Denial Rates Are Five to Twenty-Five Percent; Mirando's Business Was Below Industry Norms at 11%

Kaiser Health News' Phil Galewitz September 2011.  Denial rates for insurance policies purchased in the individual market—published for the first time as a result of the provisions in the Affordable Care Act— finds that insurers deny coverage at different rates depending on geographical location and for almost any reason. For instance, a review of the 20 most populous states find that "denial rates routinely exceed 20 percent and often are much higher" and seem to contradict industry claims to the contrary.[12]

1   The numbers vary depending on the report. The industry average denial rate may be between

2   five and ten percent, says the American Academy of Family Physicians (AAFP). Meanwhile, a

3   contrasting 2011 Government Accountability Office (GAO) study maintains that up to one

4   quarter of claims are denied.[13]

5

6   McKesson, a leading pharmaceutical supply chain company and healthcare software provider

7   reports that medical billing denial rates range from 5-10%, with better performers averaging 4%. Some

8   organizations even see denial rates on first billing as high as 15-20%[14]

9

10  The denial rate for Holter Labs is 11.2% vs. industry norms of up to 32%[15]

11

12  $$\frac{\text{total unpaid claims}}{\text{total charges}} \quad \frac{\$1,288,574.04}{\$11,499,638.96} = 0.1120 \sim 11\%$$

13

14  **D. Maximizing Legitimate or Allegedly Fraudulent Claims Requires Aggressive**
15  **Appeal Tactics; Appealing Denials is Complex and Costly.**
16

17  I question the validity of this statement because the very nature of health care billing is complex. It

18  is clear to me that Mr. Mirando was never properly trained in medical coding and billing and made

19  incorrect assumptions about proper coding and billing.  Medical coding is by its very nature

20  complex and the appeals process is complex.  The According to the American Health Information

21  Management Association (AHIMA) there are five levels of complexity in the appeals process and

22  at least five steps that must be taken to appeal a denied claim.[16]  The decision to appeal can be

23  complex, and organizations must ensure that the documentation contains solid evidence and

24  support for their appeal. There may be cases where the internal impact of the appeal process

25  outweighs the appeal itself. For example, organizations must determine if they want to use time and

26  staff to argue a random denial of $100 when it could take hundreds of dollars in staff and legal

27  resources to defend it. At times, it can be a matter of principle. Organizations may find that the

28  decision to appeal a denial may need to be made on a case-by-case basis. [17]

29

30  For less efficient health care providers, one out of every five medical claims have to be reworked

31  or appealed. Rework costs average $25 per claim,[18] and success rates vary from 55-98%,

32  depending on the medical denial management team's capabilities.

33

11

### E. Re-Billing is Common When Claims Are Denied and it Creates Duplicate Claims; Mirando's Duplicate Rate is Below Industry Norms

It has been standard industry practice to re-transmit claims to insurers every 30 to 60 days.[19] About a decade ago, this standard practice received significant scrutiny from the government, which questioned the intent — and the fact that automatically re-billing has the potential to inadvertently produce double (or more) payments for a single claim.[20]   Automatic re-billing is more than a compliance issue, however; it tends to produce a significant number of duplicate claims.[21]   Although the practice of rebilling is discouraged, it is common.[22]

A duplicate claim is one that's resubmitted for a single encounter on the same date, by the same provider, for the same beneficiary, for the same service or item. It's denied as a duplicate with error code CO18. Duplicates are one of the largest reasons for Medicare Part B claim denials, According Government Accountability Office (GAO) study it's as much as 32%. **CMS notes, however, that claims rejected as duplicates may be valid claims for payment, if the correct condition codes or modifiers are applied to demonstrate a claim isn't really a duplicate**.[23]

The duplicate claim rate for Holter Labs is 5%

$$\frac{\text{total unpaid claims}}{\text{total charges}} \quad \frac{\$538,515.73}{\$11,499,638.96} = 0.0468 \sim 5\%$$

### F. Providers Who Attempt to Perform Complex Medical Billing on Their Own Have Higher Denials and More Regulatory Inquiries.  Mirando Was Ill-Advised to do his Own Coding and Billing.

1. The level of complexity in medical coding and billing suggests that Mirando's decision to do his own coding was neither wise nor in his best interests.   Reviewing Mirando's records, denial ratios, duplicate claims ratios and other factors revealed errors on multiple levels.  Using a certified coder on his staff or outsourcing billing to properly use the right CPT code, modifiers, supervisory guidelines, and claims scrubbers to find problematic claims before they were submitted would certainly have lowered Holter Lab's error rate and decreased the probability of scrutiny regarding licensure levels, supervision inquiries, and ultimately, accusations made by the Government.

Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

2. The complexity of the coding and modifiers are very situational and require focus as well as expertise that in my opinion no one without medical training or a certification in coding should ever undertake without assistance. As a result, based on my analysis, Mirando's coding practices demonstrate a lack of coding knowledge. Using methodology discussed below, the available information suggests, based on the information available to me, a certified medical coder our outsourced billing company would have been proactive in identifying issues before they became denials or red flags for audits.

3. I am currently retained by an Independent Diagnostic Testing Facility (IDTF) that performs the same procedures as Mr. Mirando's Holter Labs performed, and I have arrived at similar conclusions when performing loss calculations for health care providers in recent retentions where there is complex data.

4. Despite the fact that Mirando had no billing expertise other than Stan Crowley's non-certified coding guidance, there were not audits of any of Holter Lab's claims. In fact, Medicare which generally has the highest denial rate and most aggressive audit and anti-fraud policies of any payor sent Holter Labs a letter in 2014 indicating that after an on-site visit on August 15, 2014 that it met CMS requirements and no further documentation was needed. See the figure below.

13



PO BOX 100190 | COLUMBIA, SC 29202-3190 | PALMETTOGBA.COM | ISO 9001

September 19, 2014

Holter Labs Inc
Attn: James Brown
684 W Shiloh Unity Rd
Lancaster SC 29720

DCN: 14202003000521

On 08/15/2014, an On-Site visit was completed at your Independent Diagnostic Testing Facility (IDTF), which is located at 684 W Shiloh Unity Rd. After conducting the visit and reviewing all of the information that was provided, we find that no additional documentation is needed. The IDTF facility listed above has met the current CMS requirements to enroll in the Medicare program as an IDTF provider. Approval or denial of the IDTF application is not determined based on whether or not the supervising physician is employed by the IDTF.

*Figure 2* - Letter from Medicare Administrative Contractor Palmetto GBA to Holter Labs - provided by counsel. Annotations added by Michael Arrigo

## G. Weaknesses in the Government's Calculations Regarding Damages

The Government extrapolates from only seven (7) patients to over $7 million in billed claims and $2 million in net payments received by Holter Labs in the indictment and a smaller list of four patients in the fraud Counts in the PIR / PSR. However, when one looks at the specific claims one can argue that many if not most of the fraudulent accusations would have to be proven by much larger sample sizes. Based on an independent analysis of the Government's data and calculations and my assessment of the data produced:

1. The only way to clearly establish healthcare billing fraud or the absence of fraud is to look at the patient's medical records, what was prescribed by a physician, the coding, billing, whether the claim was paid or denied, any reasons for denial, and the payor's policies compared to industry wide generally accepted best practices. The Government does not produce a statistically valid sample of data to conclusively prove without reasonable doubt that there is over $7 million in fraudulent billing and over $2 million in fraudulently gained payments.

14

1   2. There are only $1,003.52 (one thousand and three dollars and fifty-two cents) of true

2      duplicate claims, not $1.1 million as asserted in the PIR / PSR on page 7, paragraph 34.

| Independent Analysis of Government Produced Claims Data | | | |
|---|---|---|---|
| Row Labels | Count of Analysis of claim | Sum of BILLED AMT | Sum of PAID AMT |
| ⊞ - | 7661 | $ 1,578,367.28 | $ 399,250.32 |
| ⊟ Duplicate date of service | 5107 | $ 1,079,433.86 | $ 369,883.36 |
| | 5017 | $ 1,059,533.96 | $ 368,879.84 |
| Duplicate Same Date of Service | 90 | $ 19,899.90 | $ 1,003.52 |
| ⊟ Unable to perform | 17516 | $ 7,369,392.69 | $ 2,655,446.11 |
| | 17516 | $ 7,369,392.69 | $ 2,655,446.11 |
| ⊟ Unknown | 1476 | $ 289,313.10 | $ 80,095.37 |
| | 1476 | $ 289,313.10 | $ 80,095.37 |
| ⊟ (blank) | | | |
| Grand Total | 31760 | $ 10,316,506.93 | $ 3,504,675.17 |

3
4   *3. Figure 3 - Independent analysis of alleged fraud by the government – uses government totals of $10.3 million, $3.5 milion*
5      *but points out that true duplicate claims are only $1,003.52 from 90 claims.*

6

7   In the data above, 7,661 in total claims had no categorization, 5,017 are alleged duplicates but only

8   ninety (90) are true duplicates with the same date of service, which may be explained as duplicate

9   claims inquiries, eligibility checks, or duplicates but there is insufficient data to be able to know

10  definitively.  There are 17,516 claims the that match the Government's alleged 'unable to perform'

11  category, an additional 1,476 in claims with an unknown categorization and a total of 31,760 in

12  claims.  The methods to examine these claims are detailed in the Discussion section, and **Exhibit B**

13  – Principles and Methods and **Exhibit C** – Test Results.

14

15  H. Government Sampling Method Provides 19% Confidence Level vs. 51% Minimum

16     Standard Certainty

17

18  1. There are alleged unable to perform claims of $7.3 million billed and $2.7 paid 'suspect'

19     and 'impossible to perform' claims that are **not** beyond a reasonable doubt (95% to 99%

20     certainty) or even a lower standard of 'reasonable degree of certainty' (51% probability)

21     which must be excluded from my damages calculations.

22  2. The PIR / PSR states in paragraph 37 that the unable to perform payments are

23     $3,025,329.47 and that this is due as restitution.  This is **not** correct.

15

Confidential Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

    iv. First as noted elsewhere in this report the sample size used by the Government produces an unreliable 19% confidence level vs. the standard of 51%

    v. Second, even if it were accepted using appropriate sampling methods that all paid claims for 'unable to perform' procedures were fraudulent the correct total is $2,930,852.64 which is an error of 3.22%

    vi. Third, as noted elsewhere the Government fails to link all of the claims associated with the procedures and CPT codes in question to the exact device that was used to perform the procedure. I have not data to conclude any amount for 'unable to perform' codes and presume that in the absence of provable data and statistically valid methods that this is zero.

### I. No Offset for Unpaid Claims in Government Loss Calculations

The government excluded in its damages calculations unpaid claims which may be legitimate (i.e. they are health care claims submitted by Holter Labs which are for non- 'suspect' CPT codes totaling $ **1,339,180.04.**

Of a total of $10,316,506.93 in total claims in the Government's analysis here are my comments about each category:

    a. Appears to be valid - The Government admits that 7,661 individual claims totaling $1,578,367.28 in billings and $399,250.32 in receipts associated with those claims appears to be valid. This is mostly, if not all associated with Holter Labs after the business was moved to Oregon and after the two former Partners of Mirando were out of the business.

    b. Duplicate date of service – The Government produced data indicating that there are 5,107 claims with duplicate dates of services totaling $1,079,433.86 in billings and $369,883.36 in allegedly fraudulent gains.

        vii. However as detailed herein, 'duplicates' are considered multiple bills that may be i) adjacent dates ii) different CPT codes. As the PowerPoint analysis shows, these 'duplicates' do not appear (based on the Governments small sample size) to be problematic from the perspective of the National Correct

16

Coding Initiative (NCCI) standard. The combinations of codes and
procedures appear to be acceptable based on NCCI which is a nationally
accepted standard.

    viii.   There are only ninety (90) claims out of 31,760 that are true duplicates for
the same date of service totaling $19,889.90 in claims and a net of $1,003.52
in receipts to Holter Labs.

   c.   Unable to perform – the Government produced data includes 17,516 claims totaling
$7,369,392.69 in claims billings and net receipts associated with those claim of
$2,655,446.11. "Unable to perform" means the Government believes these services
will billed but the medical device could not perform that diagnostic service.
However, there is no evidence available to me as to what device was used to provide
these services. This device type would not be included in the claim file, not be
included in the payment to Holter and not even included in the physician's order. It
would have to be determined by interviewing each physician who performed the
procedure individually for 17,516 claims. To produce a statistically valid sample to
even attempt to project that claims are fraudulent based on a 99% certainty with 5%
error, six-hundred and forty-two claims (642) would have to be sampled to say
without a reasonable doubt that these are fraudulent. The government only sampled
seven (7) patients and not all of them necessarily received 'unable to perform'
categories of services. Second, based on the 510(k) FDA forms, it is not necessarily
'impossible' for the device to perform these services. It has the same frequency and
bandwidth as other devices certified to perform these services. (See Exhibit E).

   d.   Unknown – the Government data has 1,476 claims totaling $289,313 in billings and
$80,095.37 in receipts considered "unknown."

15. In conclusion, the largest fraud amount that could be directly proven from the Government
analysis is less than $17,282.

Rebuttal Expert Report Regarding Damages
Prepared by Michael F. Arrigo, October 9, 2017

|  | Total Billed | Total Paid |
|---|---|---|
| Hattrup | $  3,840.05 | $          3,540.00 |
| Foster (Sixtos) | $  2,685.00 | $             747.60 |
| Bennett | $  3,055.01 | $          1,089.01 |
| Solmor | $  1,115.00 | $             133.75 |
|  |  |  |
| Total | $ 10,695.06 | $          5,510.36 |

*Figure 4 - Independent Analysis of Government produced data – of the seven (7) patients in the indictment, four are used as the basis for sentencing and restitution projections*

Even then, the methodology behind this total has inadequacies because of the error rates and because there was no audit directly linking the duplicate billing to each Counts of fraud. Even in the Governments PSR there are errors of six to 26 percent (see figure below) and concludes that the Fraud was $9,920, an error of 8%.

| Government Fraud Counts vs. Arrigo Calculations | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Government | | | | Arrigo Analysis | | |
| | Presentencing Info. Report | No of Claims Analyzed for Each Insured | Difference | Governmen t Error Rate | Total Billed | Total Paid | Gov.: No of Claims by Analyzed by |
| Hattrup | $  3,615.00 | 69 | -$     225.05 | -6% | $  3,840.05 | $  3,540.00 | 69 |
| Foster (Sixtos) | $  2,135.00 | 12 | -$     550.00 | -26% | $  2,685.00 | $  747.60 | 12 |
| Bennett | $  3,055.00 | 49 | | 0% | $  3,055.01 | $  1,089.01 | 49 |
| Solmor | $  1,115.00 | 7 | | 0% | $  1,115.00 | $  133.75 | 7 |
| | | | | | | | |
| Total | $  9,920.00 | 137 | -$     775.06 | -8% | $ 10,695.06 | $ 5,510.36 | 137 |
| | | | | | | | |
| Total Claims in Data Produced by Government | | | | | | | 31,760 |

*Figure 5  - Comparison of Government Calculations in PSR v. Arrigo Analysis*

16. I do not believe the Government has proven that the Datrix DR512 was the device used in all cases to do diagnostic procedures.  (*See* Discussion of Gaps in the Government's Methodology to calculate damages and Exhibit E).

17. In my opinion, the Government has clearly established that the devices cannot do brain scans (EEG). There is much more to discuss this is only a quick briefing for you to determine next steps.  Even if this were the case, many if not most of the claims in question in data produced by the government are for cardiac or autonomic nerve disorders. [24]   See the 510k documents I am providing which do mention EKG or ECG but do not state that the device cannot be used for EEGs.  There are guidelines for FDA 510k devices – we need to discuss.  (*See* Discussion of Gaps in the Government's Methodology to calculate damages and Exhibit E).

18

18. Mr. Mirando's business appears to do autonomic testing, and the Caird software apparently can perform autonomic nerve testing (Caird software capabilities, produced by Government) and publicly available sources.[25]

19. In my opinion, the Government has not clearly established without reasonable doubt that the majority of the billings are inappropriate, other than for a small sample of seven (7) patients (*see* test results, **Exhibit C**).  Based on my initial test of one patient interviewed by the FBI, the patient's physician documentation and the test report do not show any irregularities when I used a National Correct Coding Initiative (NCCI) based claims scrubber.

20. In my opinion, the Government has not clearly established without a reasonable doubt that the insurance billings are inappropriate with respect to medical necessity because no evidence of insurance denials, pended claims, or audits are provided indicating any incorrect or inappropriate coding or billing.  The researcher notes, "I reviewed the Medicare billings data for these new entities – looks legitimate." [26]

J. The Government's Omission of Payment to Charge Ratio, Unreliable Sampling Methods, Overstated Intended Loss by Between $5.5 and $7.9 Million

Based on my testimony in several cases involving the Affordable Care Act, it is my understanding that for purposes of Healthcare Fraud cases, the 2010 Patient Protection and Affordable Care Act (commonly referred to as "Obamacare") changed, quite significantly, how that calculation is made. [27]

Under USSG Section 2B1.1, it is my understanding that the court must determine what the "loss" was related to any healthcare fraud offense.  The question becomes, what counts as "loss." Loss can be "actual" – defined as "the reasonably foreseeable pecuniary harm that resulted from the offense;" or it can be "intended" – defined as "pecuniary harm that was intended to result from the offense." [28]

I am also aware from other loss and damages calculations where I was retained by counsel for the Relator in San Francisco that the 'foreseeable' loss in health care fraud cases, is amount billed to an

Prepared by Michael F. Arrigo, October 9, 2017

1  insurer, if not rebutted, however, the parties may introduce additional evidence to support

2  arguments that the amount billed overestimates or understates the defendant's intent (*See* U.S. v

3  Popov and U.S. v. Prakash).[29]

4
5
6  ## M. No Stated Error Rate or Sampling Methods Can be Found in Government Analysis
7
8  The Government fails to include any estimate of the error rate, margin of error, confidence level or

9  response distribution in its statements of loss in U.S. v. Mirando.  Error rates are, in my opinion

10  absolutely essential to provide an estimate of losses.  There are standard mathematical methods for

11  calculating error rates and ensuring a reasonable sample size but these are not provided anywhere

12  in the tens of thousands of pages produced by the Government.  These methods are easy for a

13  layperson or other expert to determine with a fundamental understanding of statistics and

14  probability.  **In my opinion, a 19% confidence level is completely unacceptable for loss**

15  **calculations.  Any losses extrapolated from 137 data points to project to tens of thousands of**

16  **data points for sentencing or restitution cannot be relied upon.**

|  |  |  | Actual Government Methodology and Sample Size | Appropriate Sample Size for Statistical Validity |
|---|---|---|---|---|
| Population size (number of claims in Government document discovery) |  |  | 31,760 | 31,760 |
| Sample Size Used |  |  | **137** | **1,149** |
| Response distribution of 50% (each value is |  |  | 50% | 50% |
| Margin of error |  |  | 1% | 1% |
| **Confidence level** (a 51 percent confidence level +/- 1% margin of error yields 50% to 52%  confidence level.  A 19% confidence level + /- 1% margin of error yields an 18% to 20% confidence level.) |  |  | **19%** | **51%** |

17
18  *Figure 6* - Error Rate in Government Loss Calculations vs. Best Practices for Minimum 51% Certainty

19  For example, Raosoft provides a calculator that allows a low standard of confidence level such as

20  51%.  Many online calculators will not even allow such a low level of confidence, since it is a

21  statistically low standard and instead only provide the option to use confidence levels of 80% to

95% to 99%. However, if a layperson or other expert wishes to validate my calculations without

manually performing the z-score calculations they can be checked here:

http://www.raosoft.com/samplesize.html

### K. The Government Methodology Leads to Unreliable Conclusions Based on Statistically Invalid Sample Sizes and Extrapolations that Overstate Intended and Actual Loss

1. The government bases its entire loss calculation and sentence in the Pre-Sentencing Report (PSR) aka Pre-Sentencing Information Report (PIR) on an in-adequate examination of 137 health care claims out of a total of 31,761 claims.

2. The Government's result in a confidence level of 19%, far below the standard that I am held to as an expert of at least 51% certainty to arrive at opinions that have a 'reasonable degree of certainty.'

3. Based on my knowledge training education (including University of California Irvine in Statistics and Economics and Stanford Medical School in biomedical informatics and statistical analysis for medicine) calculations of proper confidence levels and error rates, the Government should have analyzed the underlying documentation for a minimum of 1,149 claims but did not to do so.

4. To review my detailed analysis and underlying assumptions and my basis for these opinions, see **Discussion** section, **Exhibit B** – Principles and Methods and Test Results in **Exhibit C**).

### L. The Government PSR contains Mathematical Errors of between 6% and 26%

Counts 1 to 14 of the PSR under count the amount of loss by $775.06.  I point this out for two reasons:

1. My goal is to always serve as an unbiased expert who provides opinions based on the facts, no matter which part retains me.  Though this under-counting is favorable to the Government I feel compelled to point it out.

2. The mathematical errors are based on an underlying flawed methodology which, while undercounting the loss based on counts 1-15 in the PSR has the effect of unreasonably over

stating intended loss by $millions, overstates the actual loss by $millions, and ignores the offset of over $1 million in unpaid claims by the named insures in the indictment.

### M. Summary of Losses – 18 Level Increase for Sentencing is Not Reasonable

1. Paragraph 46 of the PIR / PSR states, "As the intended loss of approximately $8.4 million is greater than the actual loss of approximately $3 million, the approximately $8.4 million intended loss amount is used for guideline computation purposes. As USSG § 2B1.1(b)(1)(J) correlates to loss amounts between $3.5 million and $9.5 million, an 18-level increase applies." I disagree with this finding because:

    a. Government data published by CMS in 2013 states that both the government and health care providers are aware that in a survey of over 3,300 hospitals and other providers, typically one knowingly acknowledges that bills in health care claims are 3.77 times on average what they expect to be paid. [30, 31]

    b. Since it is common knowledge amount payors and providers that 3.77 (nearly four times the net paid amount) is billed, the intended loss cannot be the gross billed amount but a net amount of actual loss of $2,482,751.39. This is because when applying the 31% paid to charge ratio of Holter Labs which is commensurate with the industry standards, 31% of the billed amount is less than the actual loss. The Actual loss is slightly higher (again I disagree with the methodology and the total amounts but am stating these to illustrate) at $2,587,360.23.

    c. I am also aware from other loss and damages calculations where I was retained by counsel for the Relator in San Francisco that the 'foreseeable' loss in health care fraud cases, is the amount billed to an insurer, if not rebutted, however, the parties may introduce additional evidence to support arguments that the amount billed overestimates or understates the defendant's intent (See U.S. v Popov and U.S. v. Prakash).[32]

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

### N. Summary of Losses Billed as Intended vs. Paid as Actual, Foreseeable

As noted in the prior section regarding summary of losses:

    a. Government data published by CMS in 2013 states that both the government and health care providers are aware that in a survey of over 3,300 hospitals and other providers, typically one knowingly acknowledges that bills in health care claims are 3.77 times on average what they expect to be paid. [33, 34]

    d. Since it is common knowledge amount payors and providers that 3.77 (nearly four times the net paid amount) is billed, the intended loss cannot be the gross billed amount but a net amount of actual loss of $2,482,751.39. This is because when applying the 31% paid to charge ratio of Holter Labs which is commensurate with the industry standards, 31% of the billed amount is less than the actual loss. The Actual loss is slightly higher (again I disagree with the methodology and the total amounts but am stating these to illustrate) at $2,587,360.23.

    b. I am also aware from other loss and damages calculations where I was retained by counsel for the Relator in San Francisco that the 'foreseeable' loss in health care fraud cases, is amount billed to an insurer, if not rebutted, however, the parties may introduce additional evidence to support arguments that the amount billed overestimates or understates the defendant's intent (*See* U.S. v Popov and U.S. v. Prakash).[35]

Based on an analysis of billed, intended (billed times 31% and actual paid) the maximum foreseeable loss is $2,587,360.23.

### H. Offset of Actual Foreseeable Loss by Unpaid Claims

My analysis (See Principles and Methods, **Exhibit B** and Test Results, **Exhibit C**) indicates:

    c. There are $1,339,180.04 in unpaid claims in the data provided by the Government that should offset any calculation of fraud or restitution.

    d. When this is included in the total calculations I get a negative number, meaning that the insurers potentially owe Mr. Mirando and Holter Labs funds and that there is no loss to the insurers.

e. Additional claims totaling 7% of the economic value of Holter Labs' historical claims were never produced and contain an additional offset of $95,21.04 in unpaid claims.

a. The Government's analysis is based on 31,761 claims but Holter Labs submitted over 34,000 claims based on data from Holter Labs in total.[36]  Therefore, the Government excluded 7% of all claims filed by Holter Labs. This is calculated as follows: 34,000 claims minus the 31,760 claims in the Government's analysis divided by 31,760 claims equals 7%.  The formula is as follows:

$$\frac{(34,000 - 31,761)}{31,760} = 2,240 \div 31,761 = 0.0705 \; or \sim 7\%$$

b. Using the 7% and applying it to total claims submitted by Holter in the Government discovery, I concluded that the mathematical error in summing total claims submitted by Holter was also miscalculated. Holter submitted 'gross claims' (including legitimate claims and any suspect or duplicate claims) of $11,499,638, which therefore represents 93% of all claims ever submitted by Holter Labs, or $12,365,202.15.   Based on Holter Lab's denial rate and duplicate claims rate (whether presumed to be fraud or simply a re-bill to attempt to secure payment), at least 11% (factor calculated in above opinions) 11% of the claims not produced by the Government are also unpaid which would serve as an additional offset of 11% times the difference between $12,365,201.15 and $11,499,638 = $865,564 times 11% or $95,212.04

c. Therefore, the hypothetical total offset could be higher ($1,339,180.04 plus $95,21.04 which equals $1,434,392.08) but I used $1,330,180.04 in my calculations since the Government did not produce all of the data.

d. The Government did not offset any amount in its own data and calculations.

2. The government produced statistically unreliable methods to support that claims were duplicated; therefore, I subtracted those duplicate claims totaling $368,880.

I.  Government drew conclusions about total value of medical procedures based on allegedly 'suspect' CPT codes, procedures - failed to link to data to prove fraud

    a.  without auditing the underlying claims data using a statistically valid sample to project the total number of claims that it alleges were unable to be performed

    b.  without confirming whether the devices used for each medical claim in question to confirm that they were fraudulent or unable to be performed,

    c.  by instead extrapolating from seven to fifteen patient files to draw this conclusion for thousands of claims and $millions in alleged fraud.

    d.  by relying on a single witness who stated that the device was 'unable to perform' the services in question when FDA 510(k) filings demonstrate that devices with the same frequency are used for exactly the same types of procedures in question in this case.

Therefore, $2,574,940 were also subtracted.

3.  The Government presented evidence for counts of fraud totaling $17,282 in the indictment and $9,920 in the PIR / PSR which is mathematically incorrect and based on patients who served as witnesses and their physicians, though in some cases medical records documenting the statements of these witnesses were not performed and only the recollection of the witnesses regarding services received several years in the past was relied upon.

    a.  Based on my knowledge training education and experience, patients do not often remember what treatments they received a few weeks ago, let alone months or years ago

    b.  similarly, physicians usually need to rely on their SOAP notes to recall what services were or were not rendered.

O.  Findings of Total Loss

The $2,587,360.23 minus $1,339.180.04 minus $538,515.73 minus $2,574,940 plus the accurate fraud counts mathematical total of $10,695.06 equals a negative number of ($1,854,580.95) which means that subject to further audits, the payors (health insurance firms) in this case may owe Holter Labs for unpaid claims.

Prepared by Michael F. Arrigo, October 9, 2017

| | Billed | Intended Loss | Paid (Actual Loss) | Total |
|---|---|---|---|---|
| Suspect + Dup | $8,008,875.45 | $2,482,751.39 | $ 2,587,360.23 | $ 2,587,360.23 |
| Less : Unpaid | | | $ 1,339,180.04 | $ 1,339,180.04 |
| | Subtotal - Suspect + Duplicates Less Offset | | | **$ 1,248,180.19** |
| | | | | |
| Less: unproven duplicates | | | | $ 538,515.73 |
| | Subtotal - Above Less Unproven Duplicates | | | **$ 709,664.46** |
| Less: unproven unable to perform | | | | $ 2,574,940.47 |
| | Subtotal - Above Less Unproven Unable to Perform | | | **$ (1,865,276.01)** |
| Add: accurate mathematical total for Counts 1-15 | | | | $ 10,695.06 |
| | Negative number means payors owe Holter Labs | | | **$ (1,854,580.95)** |

*Figure 7* - Summary of Calculations, with Mathematical Corrections by Arrigo

In my opinion net damages are zero (mathematically a negative number which may indicate payors owe money for unpaid claims). Though in my opinion the Government methodology could have been stronger, I have left the amounts of $10,695.06 (the correct mathematical total) my calculations.

## II.   Expert Qualifications, Publications, Testimony, Compensation

### A. Education

I earned my Bachelor of Science in Business Administration from the University of Southern California, Marshall School of Business, in 1981. I studied at Stanford Medical School in Biomedical Informatics and am currently studying at Harvard Law School in Bioethics.

### B. Experience

I previously worked for various Silicon Valley companies, including Oracle, Hewlett Packard, Symantec, Borland and Intel, with roles ranging from analyst to Product Manager, Vice President of Marketing and Sales, Corporate Development and Management Consultant. I was also previously the Senior Vice President of eCommerce for Fidelity and First American's CoreLogic business.

I am currently the Managing Partner of No World Borders. In this role, I consult with and advise healthcare organizations and investors regarding healthcare-related regulations, including medical

1    record and billing documentation, the International Classification of Diseases version 10 from the
2    World Health Organization (WHO) (ICD-10) which is the new coding standard as of October 1,
3    2015 in support of Section 1886(d) of the Social Security Act and Title 42: Public Health Part
4    412—Prospective Payment Systems for Inpatient Hospital Services, Current Procedural
5    Terminology (CPT) coding, compliance programs, business damages, Medicare and Medicaid
6    insurance fraud, Workers Compensation medical bills and fraud under State Labor codes, Usual,
7    Customary and Reasonable (UCR) medical charges (Criteria for determining reasonable charges 45
8    CFR §405.502), the Health Insurance Portability and Accountability Act (HIPAA Privacy Rule 45
9    CFR Part 160 and Subparts A and E of §164, and HIPAA Security Rule 45 CFR §160 and Subparts
10   A and C of §164),  the Meaningful Use provisions of the American Recovery and Reinvestment
11   Act of 2009 (ARRA) specifically the Health Information Technology for Economic and Clinical
12   Health including security risk analysis (HITECH Act 45 CFR §164.308(a)(1)), Meaningful Use
13   Provisions for Electronic Health Record certification criteria (including § 170.304-§ 170.314),
14   Standards for the Electronic Health Record Technology Incentive Program (physician and hospital
15   HITECH Act Stimulus funds) 42 CFR Part 495 Subpart B—Requirements Specific to the Medicare
16   Program and Subpart D—Requirements Specific to the Medicaid Program, the Confidentiality of
17   Medical Information Act ("CMIA") California Civil Code section 56, *et seq*.  In addition to these
18   regulations, I also consult with and advise healthcare organizations regarding health care claims
19   reimbursement, coverage determination provisions of the Patient Protection and Affordable Care
20   Act of 2010 including Prohibition of Preexisting Condition Exclusions (45 CFR § 147.108),
21   Medicare Expansion and Health Insurance Exchanges, the Office of the Inspector General (OIG)
22   self-disclosure, and HIPAA data breach response and remediation.  A copy of my Curriculum
23   Vitae and listing of publications is attached hereto as **Exhibit A**.

24   In my role as Managing Partner of No World Borders and based on my education and experience, I
25   have knowledge regarding the industry standards and regulations, guidelines and best practices in
26   private insurance, Medicare, Medicaid, Workers Compensation, and other payors under fee for
27   service, capitated, and risk based payment methods under Medicare Part C and the Affordable Care
28   Act.  By virtue of my training, education, knowledge and experience, I can fairly evaluate the
29   damages in this case.

30   ## C. Specialized Knowledge, Publications and Prior Testimony
31
32   My relevant experience includes management of a firm and a team of professionals that advise
33   health plans, hospitals, and health IT technology firms and health care investors.  Details are

27

provided in my Curriculum Vitae, **Exhibit A**.  My litigation consulting experience includes recent

retention by the U.S. Department of Justice in a False Claims Act case that resulted in a $155

million settlement for the U.S. where my responsibilities included in part to perform loss

calculations (*see DOJ Press Release* "Electronic Health Records Vendor to Pay $155 Million to

Settle False Claims Act Allegations" May 31, 2017*)*.   Within the past two years, I also served in a

*qui tam* case involving a Federally Qualified Health Center (FQHC) and its executives as

Defendants.  FQHCs are one of the models that the U.S. Department of Health and Human

Services uses to provide care for underserved populations, and like Disproportionate Share

Hospitals, both types of entities receive special incentives from the government to do so.


I have performed damages and loss calculations four times in 2017 in cases involving fraud,

medical coding and billing litigation (two in state court, two in federal court and one scheduled in

federal court in November 2017). I have been certified as an expert in 2017 by a Judge [37] in one of

these disputes and my testimony has never been excluded.  I have provided opinions on the record

in 35 cases to date.  I am currently retained by the U.S. Department of Justice to evaluate potential

losses regarding alleged fraud by a health care provider.  I have studied at Stanford Medical School

in Biomedical informatics under Dr. Kristin Sainani PhD regarding statistics for Medicine and

statistics and economics at the University of California, Irvine.  I have performed analysis and

provided opinions on the value of health care claims, loss and damages totaling over $4 billion to

date between my role as leader of a management consulting firm in the health care industry and my

litigation consulting experience.

## Publications

A list of all publications I have authored in the previous 10 years is included in my Curriculum

Vitae, **Exhibit A,** including prior publications regarding medical coding and the economic value of

health care claims processing using such codes.


## Prior Testimony

A list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or

by deposition is provided in **Exhibit G (Federal Rule 26 Required Disclosure of Prior**

**Testimony over the Past Four Years)**.

Prepared by Michael F. Arrigo, October 9, 2017

1   Testimony has Never Been Excluded

3   Exhibit G contains a list of over 35 cases where I have provided opinions on the record.  My

4   testimony has never been excluded. I have survived a motion to Exclude under the Daubert

5   standard in Federal Court (confidential / sealed case before the Federal Trade Commission), a

6   recent motion to exclude in Dallas Texas where my opinions were being offered with respect to

7   medical coding, medical billing and the economic value of historical claims as well as future value

8   of healthcare under the Affordable Care Act.  Judge Ambler recently certified me as an expert in

9   San Jose, CA in October 2017 where my testimony was provided under oath in a case involving

10   medical coding, medical billing and damages / loss calculations.[38]

12     D.  Compensation

14   Between January 27, 2017 and the date of this report, I have spent 124.75 hours on this matter.  My

15   billing rate is $600 per hour for expert analysis, $750 per hour for appearance at trial and

16   depositions, and $300 per hour for travel.   To date, I have been paid $69,450 and am still owed

17   $5,400.

18   ## III.   Summary of Facts and Data Considered

20     A.  Scope of Discovery Provided by the Government

22   Over 40 spreadsheets and 40,000 pages of data was produced by the Government and provided to

23   me by retaining counsel.  These documents are itemized in Exhibit D, Section A – Provided by

24   Counsel.

26     B.  Documents independently accessed and cited.

28   In addition, I independently accessed over 50 documents which are listed in the end notes as

29   Exhibit D, Section B – Documents independently accessed.

31     C.  Mirando was not trained as biller and coder by Nationally Credentialed
32       Organizations

34   Mr.  Mirando was trained by his former business partners, not by certified billing trainers.  The

35   American Academy of Professional Coders (AAPC), American Health Information Management

36   Association (AHIMA) and the North American Medical Auditing Society (NAMAS) which

37   provides licensed training from AAPC are examples of those organizations.

Prepared by Michael F. Arrigo, October 9, 2017

### D. Mirando was enticed to start a company and trained in billing practices by an unemployed whistle blower who was being sued for improper use and billing of medical devices.

Based on documents provided to me, Mr. Mirando was 26 years old and trusted an older partner Stanton Crowley. Once their relationship dissolved, Mr. Mirando prevailed in a law suit against Crowley. In April of 2015, Crowley filed for bankruptcy after Mirando's law firm filed a cross complaint against him. When he failed to answer the cross complaint, the superior court judge issued a default judgment against Crowley. Crowley filed for bankruptcy protection a day before his second debtor exam. He stated on record that he filed for bankruptcy in order to avoid having to pay Mirando.

### E. The Centers for Medicare and Medicaid Stated Holter Labs Met All Requirements

As noted in the opinions section and in the letter provided as an exhibit from Palmetto GBA, a Medicare Administrative Contractor, sent Mirando's company Holter Labs a letter in 2014 stating that it met all requirements to be a healthcare contractor that submits claims for services provided to Medicare insureds.

### F. Holter Lab's Denial Rate, Duplicate Clams Rates, and Payment to Charge Ratio vs. Industry Metrics

As noted in the Opinions section, I compared industry averages and ratios from published sources including the U.S. Government with those found in Holter Lab's business as one component of my methodology to determine whether the Government accurately and reasonable represented losses.

### G. FDA Data Regarding Datrix 512 Frequencies and FDA 510(k) for Similar Devices

I reviewed the frequency and capabilities of the Datrix 512 device in comparison to FDA published data for similar devices and concluded that the Datrix device operates at the same frequency as other devices approved by the FDA for a broad range of medical diagnostic procedures. This data is in direct conflict with the testimony of a single Government witness regarding Datrix frequencies and capabilities to perform cardio diagnostic vs. neuro diagnostic procedures. I note in my CV that I am currently retained by another IDTF to serve as an ongoing advisor to ensure regulatory

compliance and have served as management consultant to Abbott Laboratories in their FDA

Compliance in the past.


### H. Industry Standard Definitions of Duplicate Claim, Whether Those Claims are Payable.

As noted in this report, CMS published guidance acknowledges that duplicate claims may exist for

good reason and may be payable and are not universally considered fraud without further

examination.


### I. Prior Decisions in the 9th Circuit that Indicate Intended Loss, Foreseeable Loss May be Based on Factors Such as Payment to Charge Ratio

As noted in my Opinions I am familiar from other litigation consulting work with data from

retaining counsel where foreseeable loss includes an allowance for the amount billed being much

larger than what any provider anticipates being paid (*See CMS published data quote in Opinions*

*section that providers knowingly bill 3.77 times what they expect to be paid*).


*See* U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014

http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf


## IV.  Discussion


### A. Gaps in the Government's Sampling Methodology for Damages Calculations


Unreliable Sampling Methodology and Extrapolation

1. The Government used a limited set of seven (7) patients out of over 31,761 billing and claims

   that produces unreliable extrapolations and billing amounts of alleged fraud:


   a) There appears to be evidence that services were provided that and no documentation is

      provided as to whether they were requested by a clinician or not but only for selected

      components of the billings for seven (7) patients out of 31,761 claims.  To confirm that

      there is truly fraudulent intent requires that the service requested by the clinician and the

      intent of the clinician in ordering those tests is matched to the service provided by

      Holter Labs LLC using a statistically valid sample size.

Prepared by Michael F. Arrigo, October 9, 2017

b) There is evidence that multiple service encounters for the same type of service were provided in relatively short time frame but only for selected components of the billings for seven (7) patients out of 31,751 claims.  To confirm that there is truly fraudulent intent requires that the service requested by the clinician and the intent of the clinician in ordering those tests is matched to the service provided by Holter Labs LLC using a statistically valid sample size.

B.  Failure to Link of Claims to Supporting Documentation and Physician's Records

1. The calculation of the amount would require additional linkage of provider ordering documentation and billing linked to the relevant Holter Lab LLC billing for claims in question as to billing for services not ordered or for excessive service billing unsupported by new service requests.

2. Proving that services were provided when not ordered will require more complete data for claims and documentation from both the client and Holter Labs LLC.  To provide a statistically valid projection of fraud with a 99% confidence level and a margin of error of 5%:

    A. The complete data would need to be analyzed by in a random sample of at least 652 of the 31,761 claims, or a sample of 2.05% (z score of 1.96 or nearly two standard deviations from the mean) [39] which is sometimes called a 'normal' distribution of data.

$$Sample\ Size = \frac{\frac{z^2 \times p(1-p)}{e^2}}{1+(\frac{z^2 \times p(1-p)}{e^2 N})}$$

*Figure 8 - Population size = N, margin of error = e, z score = z.*

Prepared by Michael F. Arrigo, October 9, 2017



NORMAL DISTRIBUTION

- **Standardizing and z-Scores**
If x is an observation from a distribution that has mean μ and standard deviation σ, the **standardized value** of x is,

$$z = \frac{x - \mu}{\sigma}.$$

A standardized value is often called a z-score. If x is a normal variable with mean μ and standard deviation σ, then z is a standard normal variable with mean 0 and standard deviation 1.

The density function of a standard normal variable $z$,

$$f(z) = \frac{1}{\sqrt{2\pi}} e^{-\frac{z^2}{2}} \quad , -\infty < z < \infty$$

*Figure 9 - Standardizing z scores for normal distribution. (See Cite)[40]*

**Limited Degree of Certainty and High Margin of Error in Government Methods**

3. Similarly, to conclude with 95% certainty and a 5% margin of error that specific claims such as the 3,171 claims denoted with CPT code **93025** are fraudulent, at least 343 claims would have to be completely analyzed.

4. I also calculated the 'reasonable degree of certainty' or what in my opinion is generally considered to be a 51% certainty with low error rate and concluded that the Government should have analyzed at least 1,149 records. A complete analysis would require determining whether the procedure was performed as described "Microvolt T-wave alternans testing is performed to assess patients who are at risk for sudden cardiac arrest due to previous heart attack, heart failure, left ventricular dysfunction, unexplained syncope, or family history of sudden cardiac arrest. A set of 14 electrodes are distributed on the torso and attached to the ECG machine. Seven are standard electrodes while the other seven are special microvolt T-wave alternans sensors. ECG recordings are obtained while the patient walks on a treadmill while slowly increasing treadmill speed to increase the heart rate gradually. Alternatively, heart rate may be increased pharmacologically or using a pacer. The special microvolt T-wave alternans sensors are able to detect extremely small changes in the T-wave portion of the ECG that are not visible to the naked eye on the ECG recording. The test continues until T-wave changes are detected or until the patient achieves the desired heart rate without evidence of T-wave changes. The physician reviews the ECG and provides an interpretation of findings with a written report.

33

including viewing the patient chart, the physician's order, the actual service provided, evidence of what device was used which is not contained in the insurance claim, the insurance claim submitted, the amount paid, and whether the insurance company denied the claim, audited the records or provided a reason for not paying the claim to determine whether it is true that $1,106,777.76 was fraudulently billed and $314,153.63 was fraudulently received.

- o According to the information made available to me, Government data made available to me by counsel, payments were made by the following payors, each of which would have to be verified:
  - Aetna
  - Anthem
  - BCBS of Alabama
  - BCBS of Florida
  - BCBS of Minnesota
  - BCBS of New Jersey
  - BCBS of Rhode Island
  - BCBS of South Carolina
  - Cigna
  - Emblem Health
  - GEHA
  - Healthfirst
  - Humana
  - Independence Blue Cross
  - Independent Health
  - Premera
  - Tricare
  - United Health Group
  - XL Health

5. Similarly, to conclude with 95% certainty and a 5% margin of error that 4,967 claims denoted with CPT code **93226** are fraudulent, at least 357 claims would have to be completely analyzed. A complete analysis would include confirming whether these steps were completed:

1       o   Electrocardiographic (ECG) rhythm-derived data is gathered for up to 48 hours

2           of monitoring as the patient goes about regular daily activity while wearing an

3           external ECG recording device, also called a Holter monitor. Electrodes or leads

4           are placed on the patient's chest, and the patient is instructed on the use of the

5           monitor. The recording device makes continuous, original ECG wave recordings

6           for a 12 to 48-hour period. The recordings are captured on magnetic tape or

7           digitized medium to be reviewed later. At the end of the recording period, the

8           patient returns to the office with the device. Stored data derived from the

9           continuous recordings of the electrical activity of the heart include heart rhythm

10          and rate, ST analysis, variability in heart rate and T-wave alternans. Visual

11          superimposition scanning is done to give a 'page review' of the entire recording,

12          identifying different ECG waveforms with selective samples of rhythm strips. A

13          report is made after analysis of the scanning, and the physician or other qualified

14          health care professional reviews and interprets the data for heart arrhythmias.

15          connection, recording, and disconnection.

16

17       o   Each claim would need to be verified including viewing the patient chart, the

18           physician's order, the actual service provided, evidence of what device was used

19           (and since this is an alleged duplicate claim whether the claim was duplicated

20           for fraud, duplicated as an additional request for payment, duplicated because

21           the date is in close proximity to another date of service for legitimate reasons or

22           fraudulent reasons) which is not contained in the insurance claim, the insurance

23           claim submitted, the amount paid, and whether the insurance company denied

24           the claim, audited the records or provided a reason for not paying the claim to

25           determine whether it is true that $297,808.86 was fraudulently billed and

26           $90,669.54 was fraudulently received.   As noted in the detailed Methodology

27           and Findings / Test Results sections of this report, the Government produced

28           data indicating that there are 5,107 claims with duplicate dates of services

29           totaling $1,079,433.86 in billings and $369,883.36 in allegedly fraudulent gains.

30           However as detailed herein, 'duplicates' are considered multiple bills that may

31           be i) adjacent dates ii) different CPT codes.  As the PowerPoint analysis shows,

32           these 'duplicates' do not appear (based on the Governments small sample size)

33           to be problematic from the perspective of the National Correct Coding Initiative

(NCCI) standard. The combinations of codes and procedures appear to be acceptable based on NCCI which is a nationally accepted standard. **There are only ninety (90) claims out of 31,760 that are true duplicates for the same date of service totaling $19,889.90 in claims and a net of $1,003.52 in receipts to Holter Labs**.

- o According to the information made available to me, Government data made available to me by counsel, payments were made by the following payors, each of which would have to be verified:
  - Aetna
  - Anthem
  - BCBS of Alabama
  - BCBS of Florida
  - BCBS of Minnesota
  - BCBS of New Jersey
  - BCBS of Rhode Island
  - BCBS of South Carolina
  - Cigna
  - Emblem Health
  - GEHA
  - Healthfirst
  - Humana
  - Independence Blue Cross
  - Independent Health
  - Premera
  - Tricare
  - United Health Group
  - XL Health

6. In my opinion, if and only if it is determined using methods above including a statistically valid sample size that it was not possible for Holter Labs to provide the services billed consistent with the standard of practice for these studies, each of those service claims could be considered

Prepared by Michael F. Arrigo, October 9, 2017

fraudulent.  In that case, the calculation of the amount of fraudulent billing could be based on billed claims with those service codes.

7. I am aware that experts are often held to a much lower standard, "reasonable degree of certainty" which I understand to mean more likely than not or in statistical terms 51% confidence level.

### Even if Lower Standard of Reasonable Degree of Certainty is Used, Government Sampling is Unreliable

8. Even at the 'reasonable degree of certainty' level of confidence for damages calculations, and a population of 31,761 claims, a random sample of 1,201 records (meaning BOTH the patient record and physicians order AND the associated claim(s)) must be reviewed.

9. I calculated the random sample size of 1,201 by using a 52% confidence level with a 1% margin of error (52% minus 1% = 51%).  Again, this can be checked using the Z score calculations above.   A lay person can easily check this and my calculations using a number of online calculators.[41] This illustrated in the figure below.  Population is entered totaling 31,761 and a confidence level of 52% since a 1% error sometimes notated as (+/-) could result in 53% or 51% net confidence level.  Next a response distribution of 50% is used.[42]

### Data is Unavailable to Prove that "Unable to Perform" and Suspect Codes are Damages

10. Although experts in damages calculation work may state opinions, to the best of my knowledge, at the 'reasonable degree of certainty' level, it seems impossible to be 51% certain of a total damage amount without being 99% certain that the underlying data is 'suspect,' 'unable to perform,' or 'impossible to perform' or 'fraudulent' as the Government alleges. Much of the Government's presumption that certain procedures fall in the 'suspect,' 'impossible' or 'unable to perform' category are based on the statements that a specific Holter device could not perform a certain Neurodiagnostics (EEG) or cardio diagnostic (ECG) procedures. (*See* Exhibit E for a discussion and diagrams based on FDA form filings for medical devices and notices of intent to market (510(k)) which directly contradict these statements according to the official FDA filings.  In my opinion, the FDA data does indicate that it is 'possible' based on the frequency data in the filings.  Even if this possibility is dismissed and one assumes that the Datrix 512 device cannot perform a procedure, another device could have performed the procedure.  I saw no facts in this case that conclusively show

37

that ONLY the Datrix 512 was used and that no other device was ever used.  Therefore, in my opinion, to prove that a claim was filed for reimbursement with an insurance company where a specific device was used, a physical audit of every single physician's office for the claim in question would be required again pointing to the Government's lack of data and extremely low and unreliable sample size.  This is because the health care claim itself does not contain any data that provides without a reasonable doubt that the Datrix 512 device was used instead of another device.  Even at the lower standard of 'reasonable degree of certainty' one is again confronted with the statistical mandate to review over one thousand claims including the underlying data that supports or does not support its viability.  Even in the Government's indictment, they point out that the DEVICE used in a medical procedure in the Holter Labs business is not captured in the claims data.

Even if the Datrix 512 Device Could Not Perform the Procedure, We do Not Know what Device was used because claim data does not contain a reference to whether the device was used or another device was used

> 12.  The HCBPs required providers of medical services, including IDTFs like Holter Labs, to submit claim forms in order to receive reimbursement for medical services that the IDTFs had provided to each HCBP's subscriber.  Among other information, providers were required to state on the claim forms: (a) the beneficiary's name and Unique Beneficiary Number; (b) the type of service provided (identified by a standardized procedure code number (a "CPT code")); (c) the date the service was provided; (d) the charge for the service; and (e) the provider's name and/or the provider's identification number.

Source: Page 4 of the January 2016 Grand Jury Indictment, US v. Mirando

*Figure 10 - Grand Jury Indictment Annotation from Arrigo Exhibit E of this report has no linkage to the device used*

11. Therefore, my opinion the Government's limited set of seven (7) patients out of over 31,761 billing and claims that produces unreliable extrapolations and billing amounts of alleged fraud for damages calculations.

**Unbiased Method to Calculate Damages Must Consider all Possible Outcomes – Favorable and Unfavorable**

12. In my opinion, a reliable method to calculate damages must, upon concluding without a reasonable doubt that Holter Labs submitted fraudulent claims, perform a calculation of damages or loss to insurers that must include:

- o Total loss alleged by Government
- o MINUS The sum of all claims not paid by the insurers (representing the possible 'loss' to Holter Labs
- o MINUS the value of those claims for 'suspect' or 'impossible to perform' claims that are unproven to be fraudulent.
- o MINUS duplicate claims.

**Determining Medical necessity as a basis for paying or denying insurance claims**

Federal guidelines and statutes and payor policies are used as factors in determining whether a medical procedure is medically necessary but the final determination is usually made by examining a patient's chart as documented by a physician.

**Federal Government Guidelines**

The Medicaid Act does not define the term "medical necessity." Over the years, recipients have relied on regulatory and decisional principles to define the scope of coverage. [43] According to the U.S. Government's Medicare.gov official U.S. Government site for Medicare, "Medicare **Part B covers 2 types of services: a) Medically necessary services:** Services or supplies that are needed to diagnose or treat your medical condition and that meet accepted standards of medical practice, and b) **Preventive services:** Health care to prevent illness (like the flu) or detect it at an early stage, when treatment is most likely to work best."

Statutes and best practice guidelines include:

CMS Coverage Policy - Title XVIII of the Social Security Act, Section 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.

Title XVIII of the Social Security Act, Section 1862(a)(7). This section excludes routine physical

39

1   examinations.

2

3   Title XVIII of the Social Security Act, Section 1833(e) states that no payment shall be made to any
4   provider for any claim that lacks the necessary information to process the claim.

5

6   CMS Manual System, Pub 100-02, *Medicare Benefit Policy Manual*, Chapter 15, Sections 60 and
7   80

8

9   CMS Manual System, Pub. 100-03, *Medicare National Coverage Determinations Manual*, Chapter
10  1, Section 240.4

11

12  CMS Manual System, Pub 100-04, *Medicare Claims Processing Manual*, Chapter 1, Sections 10
13  and 30.2 and Chapter 35

14

15  CMS Manual System, Pub. 100-08, *Medicare Program Integrity Manual*, Chapter 3, Section
16  3.4.1.2, Chapter 10, Chapter 13, Section 13.5.142

17

18  Code of Federal Regulations, 410.32 and 410.33

19

20  Payor Policies for Specific Types of Diagnostic Facilities and Procedures
21
22  Medicare, Private Payors, Independent Diagnostic Testing Facilities (IDTFs)
23

24  • Medicare will cover diagnostic tests performed by an IDTF when the procedures are
25     medically necessary and the criteria in this LCD are met. The procedures in this document
26     are also subject to applicable National and Local Coverage Determinations (LCDs).[44]
27  • **IDTFs are required to report the exact CPT/HCPCS codes/procedures they intend to**
28     **perform when enrolling with the CMS-855B form**. If an IDTF which is already enrolled
29     wants to perform additional CPT or HCPCS code tests that were not originally specified on
30     its CMS-855B and that are for procedure types and supervision levels similar to its
31     previously allowed codes, the contractor shall have the IDTF amend its CMS-855B to add
32     the additional codes and equipment listing. A new site visit is not required. However, if the
33     enrolled IDTF will be performing CPT or HCPCS codes for different types of procedures,
34     or with different supervision levels, a new site visit is required. Claims submitted with

40

procedure codes not reported on the CMS-855B form and reviewed by the contractor will be denied.

Physician Documentation Trumps Payor Policy and Government Guidelines

Case law supports the idea that the ultimate test of whether a medical diagnostic procedure is 'medically necessary' is the patient's physician.  Without knowing the physician's opinion which is documented in **progress notes** and the referral or primary care physician's **order** one cannot truly know if a procedure is medically necessary.

Even when controversial topics are challenged in court, based on my knowledge training education and experience, the physician's decision is key.  Case law has also indicated that the patient's treatment and the medical necessity of that treatment is best determined by a physician.  In my work as an expert, retaining attorneys have sometimes cited case law in their instructions to me (*see Pinneke v. Pressier*). [45]

Senate Report No. 404, 89th Congress, 1st session, U.S. Code Cong. & Admin. News 1965, p. 1986, states in part:

> "3(a) Conditions and limitations on payment for services.
> > (1) Physicians' role
> > The committee's bill provides that the physician is to be the key figure in determining utilization of health services and provides that it is a physician who is to decide upon admission to a hospital, order tests, drugs and treatments, and determine the length of stay. For this reason, the bill would require that payment could be made only if a physician certifies to the medical necessity of the services furnished."

*Medicare, Private Payors, ECG or EKG*

Payors such as Medicare and Private Payors may make specific requirements for Coverage Determination and Medical Necessity Determinations. Here is an example:[46]

1.  Long-Term ECG Monitoring is defined as a diagnostic procedure, which can provide continuous recording capabilities of ECG activities of the patient's heart while the patient is engaged in daily activities. These can include continuous, patient-activated or patient-

demand monitoring. The purpose of these tests is to provide information about rhythm disturbances and waveform abnormalities and to note the frequency of their occurrence.

2. List the appropriate procedure code.

   a. If billing for 48 hours for codes 93224-93237, indicate this by placing <u>each date of service</u> on a separate line with a 1 in the units box (e.g., 010).

   b. When billing for a service of greater than 48 hours and less than 30 days, use the appropriate 30-day monitoring code with the -52 modifier, to indicate a reduced service. The documentation in the progress notes must reflect medical necessity for the service. The fee billed for the service must be appropriately reduced to reflect the time the patient required the service.

   c. List the ICD-9 code(s) (or after 10/1/15 ICD-10 code(s)) indicating the reason for the test.

   d. The physician ordering the test must be identified on the claim form in Boxes 17 and 17a with his/her UPIN number. For EMC, NSF fields FB1 - 10, 11, 12 (name) and FB1 - 13 (UPIN #) or ANSI - 837 NM1 - 03, 04, 05 (name) and NM1 - 09 (UPIN #).

   e. The physician interpreting the test must be identified on the claim form with his/her sequence number in Box 24K. For EMC, use NSF format field FA0 - 23, or ANSI - 837 or NM1 - 09 (loop 2310).

   f. The codes describing technical work may be billed by an independent physiological laboratory if they meet all requirements listed in the code descriptions and coverage requirements. They may bill the total component only if the physician interpreting the test is employed by the laboratory and is not billing for the interpretation separately. The physician's name and address must be on record with our MPCU department. A letter should be sent by the physician assigning all monies collected by the laboratory for the professional codes to the billing laboratory. If a letter is not

on file, professional services billed by the physiological laboratories will be denied.

g.  The physician may bill the technical and professional codes if all the criteria listed are met.

h.  Site-of-service reductions apply to these codes, i.e., if the technical component is performed in the out-patient setting, it is considered a Part A service.

i.  Do not use the "TC" or "26" modifier with these codes.

j.  Either the patient-activated monitor or the 24-hour monitor will be covered (not both)." [47]

*Medicare, Private Payors, EEG*

Medicare and Private Payors typically itemize specific CPT procedure codes that are permissible to bill for EEGs:

95812 - Electroencephalogram (EEG) extended monitoring; 41-60 minutes -average fee payment- $350 - $360

95813 - Electroencephalogram (EEG) extended monitoring; greater than 1 hour

95816 - Electroencephalogram (EEG); including recording awake and drowsy

95819 - Electroencephalogram (EEG); including recording awake and asleep

95822 - Electroencephalogram (EEG); recording in coma or sleep only

95827 - Electroencephalogram (EEG); all night recording

95950 - Monitoring for identification and lateralization of cerebral seizure focus, electroencephalographic (e.g., 8 channel EEG) recording and interpretation, each 24 hours

43

Prepared by Michael F. Arrigo, October 9, 2017

95951 - Monitoring for localization of cerebral seizure focus by cable or radio, 16 or more channel telemetry, combined electroencephalographic (EEG) and video recording and interpretation (e.g., for presurgical localization), each 24 hours

95953 - Monitoring for localization of cerebral seizure focus by computerized portable 16 or more channel EEG, electroencephalographic (EEG) recording and interpretation, each 24 hours, unattended

Diagnosis Codes that Support Medical Necessity

Payors typically list those diagnosis which support whether a treatment is medically necessary. However, again the Government's policy defers to the physician to decide: [48]

> "ICD-10-CM Codes that support Medical Necessity:
> It is the provider's responsibility to select codes carried out to the highest level of specificity and selected from the ICD-10-CM code book appropriate to the year in which the service is rendered for the claim(s) submitted."

National Coverage Determinations and Local Coverage Determinations

National Coverage Determinations (NCDs) and Local Coverage Determinations (LCDs) are used to determine when the procedures above described by CPT code will be paid.

Clinical Documentation as Basis for Diagnosis

NCDs and LCDs rely principally on specific patient conditions which must be documented by the physician to support a specific diagnosis. The presence of a diagnosis is the key indicator of whether a procedure is medically necessary. For example,

Prior Tests to Establish Medical Necessity for Additional Tests or Procedures

Medicare and other payors may require that prior conditions be met before allowing or covering payment for an additional procedure. For example, "Ambulatory EEG should always be preceded

Prepared by Michael F. Arrigo, October 9, 2017

by a routine EEG. A routine EEG is described by CPT codes 95812, 95813, 95816, 95819, 95822 or 95827 and refers to a routine EEG recording of less than a 24-hour continuous duration." [49]


## Payor Denials

If a payor (whether a government payor such as Medicare or Medicaid or private insurer such as Aetna, Cigna, Blue Cross or others) questions whether a procedure is medically necessary they have several tools at their disposal to examine a healthcare claim:

1. Pending claims and requesting more information, in which case the provider may be required to provide substantiation for medical necessity in the form of the patient's chart (including progress notes).  Usually the payor will provide an explanation in the form of **reason codes** when pending a claim to provide specific information on what data they feel is missing.  If the provider supplies the missing information when appealing the decision, the claim may be paid.

2. Denial of a claim, which can be appealed by a health care provider.  Usually the payor will provide an explanation in the form of **reason codes** when pending a claim to provide specific information on what data they feel is missing.  If the provider supplies the missing information when appealing the decision, the claim may be paid.

3. Audits – if the payor determines in its opinion that there is a pattern of pended or denied claims or unusual patterns of claims such as multiple claims on the same date of service (DOS) for the same patient it may request an audit of the healthcare provider's records.  If the provider supplies the missing information in an audit, the current claims in question and any future similar claims are more likely to be paid.


## Incomplete or Inconclusive Analysis by FBI

### Failure to Prove Lack of Medical Necessity – No Issues with Clinical Documentation, Coding

Based on the documents available to me, the government has not examined or has not produced evidence that it has examined any patient's medical records which would include the progress notes of the patient's primary care physician, the primary care physician's order for a test such as an ECG, EKG or EEG, the diagnosis and diagnosis codes for the patient, or the final report

generated from the test by the software. In the Grand Jury Indictment dated January 2016, the Government states that those claims that were paid must be medically necessary:



*The Medical Claims Process*

11. The HCBPs reimbursed providers only for services that were medically necessary to the treatment of a beneficiary's illness or injury, were prescribed by a beneficiary's physician, and were provided in accordance with each of the HCBP's regulations and guidelines that governed whether a particular service would be reimbursed by the HCBP.

*Figure 11 - Grand Jury Indictment January 2016 page 4*

## Failure to Prove Lack of Medical Necessity - No Evidence of Insurance Audits

Based on the information available to me, there is no evidence that any payor routinely denied claims.

## Failure to Prove That a Datrix DR512 Was Used – No Final Reports Indicating DR512

Generally, a Final Report would include the listing of which medical device was used in the procedure. Based on the information available to me, there were no final reports provided.

## Failure to Prove That a Datrix DR512 Was Used – No Form 855B

Independent Diagnostic Testing Facilities (IDTFs) such as Mr. Mirando's business are required to submit a form 855B to Medicare indicating which devices will be used in testing, the serial numbers of those devices[50], and which CPT codes will be billed. Based on the information available to me, there is no form 855B documenting whether only a Datrix DF512 was used or if other devices were used. I have found mention of other devices in document production and correspondence.

Rebuttal Expert Report Regarding Damages
Prepared by Michael F. Arrigo, October 9, 2017

## Failure to Prove That a Datrix DR512 Was Used – No Audit Trail

For the government to prove without a reasonable doubt that DR512 units were used, they would have to match each patient with that patient's progress notes, attending physician, the organization the physician uses to bill a payor by national provider ID (NPI), the diagnosis of the patient, the physician's order, the final report clearly showing the device used, the claim, and (if the coding or billing were in any way inappropriate) a pended or denied claim, or an audit by a payor which concluded that these items are not present. Based on the documents available to me, the Government has not provided such information. Without such information, the government cannot say that a provider billed inappropriately.

## Patient Interview with Belen Perazzo Barber

There are several patient interviews that I have reviewed. I used patient Barber as a test and conducted an audit trail of his statements back to anything that corroborates his statements about medical documentation and found none.

I searched Aetna records produced by the FBI and found a spreadsheet but nothing that states that Aetna produced it.

According to Barber she had one cardiac test but there is no documentation from a physician or provider of any kind corroborating this. Patients in my experience can forget their treatment regimen and appointments which is why providers do reminders. The Interview was conducted around the date of entry by the FBI of the report, April 9, 2014.

## Cross Check with Aetna Records for Patient Belen Perazzo Barber

I checked the Aetna claims report and I do find claims for this patient but they are over four years prior (see below).

| |
|---|
| 1/19/10 |
| 1/12/10 |
| 1/16/10 |
| 1/19/10 |

47

| |
|---|
| 1/13/10 |
| 1/23/10 |
| 1/12/10 |
| 1/12/10 |
| 1/16/10 |
| 1/19/10 |
| 1/16/10 |
| 1/13/10 |

## Medical Necessity of Treatment Frequency for Patient Belen Perazzo Barber

Based on nationally accepted standards such as the National Correct Coding Initiative (NCCI) I find no irregularities with respect to codes used, diagnosis used, or patterns that indicate problems with medical necessity. This could indicate coding errors or other errors but the source documentation would be important to view to make that determination.

It may be possible that a cardiologist would prescribe this regimen, though no physician's medical opinion has been secured to opine on whether more than one 24-hour monitoring within a few weeks of the initial date of service appears to be medically appropriate or not.

## FBI Interview with Jon Barron, Founder of Datrix

Much of the case hinges on whether EEG and ECG may be performed with the same device and what determines whether that is possible to do with one device. Of the 60,126 pages in this case that I can review, one phrase here is all the FBI appears to have and it does not appear to be a certainty that the device cannot do both EEG (brain) and ECG (cardiac / heart) related monitoring. If this is the case (see next section regarding FDA 510K), then in my opinion the government would need to tie this device to claims where the device was used for non-permitted procedures. I propose we develop a time line to show if and when non-permitted procedures were performed. My review indicates that there are no non-permitted procedures during the second (Oregon based) phase of business.

## Device Frequency and Bandwidth

This statement to me does not satisfy the 'reasonable degree of certainty test' and certainly not 'without a reasonable doubt':

48

Prepared by Michael F. Arrigo, October 9, 2017

1      *"BARRON believes that the DR512 model's sampling frequency rate is not sufficiently high*

2      *enough to be used for an EEG. An EEG generally requires a higher sampling frequency rate*

3      *than the model is capable of performing. Datrix also did not put in its FDA filing that*

4      *performing an EEG was an intended use of the device. BARRON noted that the software used*

5      *on the data collected from the DR512 would make no difference in whether an EEG could be*

6      *conducted, **since the device itself isn't able to sample data sufficiently for the test**[1]."*

7

8  ## FDA 510(K) Pre-Market Notifications

9

10  Please see separate 510(k) forms indicating that Datrix 512 and other FDA approved devices for

11  brain diagnostic EEGs have the same frequency range and bandwidth as ECG and EKG for cardiac

12  diagnostics.  In fact, the frequency rate of the DR512 is the same as these devices.

---

[1] In fact, FDA 510(K) forms indicate that there are devices with exactly the same bandwidth and frequency that <u>do</u> perform both brain (EEG) and cardiac (ECG) and are approved by FDA to do so. See PowerPoint.



JON BARRON INC. dba

9 - 2

## Predicate Device Comparison

The VX3 is substantially equivalent to other commercially distributed ECG Holter recorders. The following chart compares the VX3 with its predecessor device (Datrix DR512 digital Holter recorder (510(k): K982975), and another predicate device, (Braemar DXP1000 digital Holter recorder (510(k): K993618) with pacemaker pulse detection).

| Specification | Datrix VX3 | Datrix DR512 | Braemar DXP1000* |
|---|---|---|---|
| **Functional** | | | |
| ECG Channels | 2 or 3 | 2 or 3 | 2 or 3 |
| Resolution | 8 or 10 bit (programmable) | 8 bit | 12-bit sampling/ 10-bit recording |
| Sample Rate | 128 to 512 per channel/sec, programmable | 128 to 512 per channel/sec, programmable | 256 samples per second |
| Recording Duration | 24 or 48 hours, programmable | 24 hours | 24 or 48 hours |
| Memory Type | Non-volatile flash | Non-volatile flash | Non-volatile flash |
| Data Transfer | Removable flashcard | Removable flashcard | USB interface |
| Liquid Crystal Display | Yes | No | Yes |
| Keypad | Yes, optional | No | Yes |
| Pacemaker Pulse Detection | Yes, optional | No | Yes |
| **Physical** | | | |

*Figure 12 - Datrix Devices use sample rate of 128 to 512 per channel/sec*

1

2

3

Prepared by Michael F. Arrigo, October 9, 2017

| Parameter | EEGer4 | Brainmaster 2E K990538 | NeuroAmp K073557 | ProComp K903497 |
|---|---|---|---|---|
| | Mfr: Telediagnostics A200 versions A400 versions | | | |
| Operating System | Microsoft Windows (XP and later) | | | |
| Computer | Generic PC computer supported by Microsoft Windows | | | |
| Sampling Rate | 256 Hz | 120-256 Hz | 240/250 Hz | 64-512 Hz |
| Number of EEG channels | 4 | 2 | 2 | 4 |
| Bandwidth | 0 – 50 Hz | 0.8 – 40 Hz | 0.08-70 Hz | 2-1000 Hz |
| Power Supply | Not Applicable (software only) | Rechargeable batteries | Via USB port | AA batteries, single use or rechargeable |
| Filtering | Digital Filters | | | |
| Device Interface | Depends on amplifier/encoder used (serial, USB, Bluetooth, etc.) | Serial port | USB | USB or serial port |

EEGer4                    K122879                    510(k) Summary

1
2   *Figure 13 - EEG Software LLC FDA 510K with same sampling rate ranges from 64 to 512 Hz as Datrix Devices*

3

# V.    Conclusions

Based on the information available to me with a reasonable degree of certainty:

1. The PSR / PIR has mathematical errors of 6% to 12% in the summation of Counts 1-15 of fraud.

2. There are only seven (7) patients analyzed in the indictment and four (4) in the PIR / PSR which represent 137 claims out of over 31,000 claims in the data produced by the Government.

3. The Government's methodologies do not form the basis for a statistically valid method to extrapolate to over $7 million in fraudulent bills and $2 million in fraudulent receipts and results in a 19% certainty level regarding total fraud rather than the industry standard of 51% reasonable degree of certainty.

4. Duplicate charges are overstated. There are 90 actual duplicates which could be fraud or could be simply duplicate requests for payment.  There are over 31,000 claims and a small percentage of these claims are 'adjacent' to each other by date of service.

5. There were no audits conducted by any insurance company that confirmed the existence of fraud, and I have no data to conduct a statistically valid sample and project fraudulent claims in a damages analysis, beyond $10,695.06.

6. It appears inconclusive which device was used to perform alleged fraudulent 'unable to perform' procedures.

7. Without a complete analysis of physician interviews, patient documentation and diagnosis, claims data and reimbursement tied by individual medical service, it is impossible to determine how much if any fraud was committed beyond seven patients analyzed.

Prepared by Michael F. Arrigo, October 9, 2017

8.  Based on the information available to me, I do not know if Mr. Mirando or others submitted the insurance claims produced by the Government, but in total Holter Lab's cannot in my opinion be held to damages or loss calculations beyond the amount of $10,695.06.

9.  Since the suspect and duplicate claims are unproven in my opinion to be fraud, $2,587,360.23 for these amounts, minus $1,339.180.04 in unpaid claims as an offset, minus $538,515.73 in unproven duplicates, minus $2,574,940 for unable to perform procedures, plus the accurate fraud counts mathematical total of $10,695.06 equals a negative number of ($1,854,580.95) which means that subject to further audits, the payors (health insurance firms) in this case may owe Holter Labs for unpaid claims.

| | | Billed | Intended Loss | Paid (Actual Loss) | | Total |
|---|---|---|---|---|---|---|
| Suspect + Dup | | $8,008,875.45 | $2,482,751.39 | $ | 2,587,360.23 | $ 2,587,360.23 |
| Less : Unpaid | | | | $ | 1,339,180.04 | $ 1,339,180.04 |
| | | Subtotal - Suspect + Duplicates Less Offset | | | | **$ 1,248,180.19** |
| | | | | | | |
| Less: unproven duplicates | | | | | | $ 538,515.73 |
| | | Subtotal - Above Less Unproven Duplicates | | | | **$ 709,664.46** |
| Less: unproven unable to perform | | | | | | $ 2,574,940.47 |
| | | Subtotal - Above Less Unproven Unable to Perform | | | | **$ (1,865,276.01)** |
| Add: accurate mathematical total for Counts 1-15 | | | | | | $ 10,695.06 |
| | | Negative number means payors owe Holter Labs | | | | **$ (1,854,580.95)** |

*Figure 14* - Summary of Calculations, with Mathematical Corrections by Arrigo

In my opinion net damages are zero (mathematically a negative number which may indicate payors owe money for unpaid claims).  Though in my opinion the Government methodology could have been stronger, I have left the amounts of $10,695.06 (the correct mathematical total) my calculations.

10. I am also aware from other loss and damages calculations where I was retained by counsel for the Relator in San Francisco that the 'foreseeable' loss in health care fraud cases, is the amount billed to an insurer, if not rebutted, <u>however</u>, the parties may introduce additional

53

evidence to support arguments that the amount billed overestimates or understates the
defendant's intent (*See* U.S. v Popov and U.S. v. Prakash).[51]

11. Therefore, in my opinion the actual, foreseeable amount of fraud is at most 31% of the
billed amounts based on widely known industry practices and even data published by the
Government itself.

12. Intended fraud in this case is, at most 31% of the billed amount, and it is not reasonable to
add 18 points to the sentencing guideline formulas, and, based on the statistically invalid
and unreliable methodology employed by the Government the payors in this case may owe
Holter Labs money.

13. The PIR / PSR states in paragraph 37 that the unable to perform payments are
$3,025,329.47 and that this is due as restitution. This is **not** correct.

    ix. First as noted elsewhere in this report the sample size used by the
Government produces an unreliable 19% confidence level vs. the standard of
51%

    x. Second, even if it were accepted using appropriate sampling methods that all
paid claims for 'unable to perform' procedures were fraudulent the correct
total is $2,930,852.64 which is an error of 3.22% in the Government's
calculations.

    xi. Third, as noted elsewhere the Government fails to link all of the claims
associated with the procedures and CPT codes in question to the exact
device that was used to perform the procedure. I have not data to conclude
any amount for 'unable to perform' codes and presume that in the absence of
provable data and statistically valid methods that this is zero.

I specifically reserve the right to add to, amend or subtract from the report as new evidence
becomes available or the opinions of other experts are reviewed and considered.

Signed,

Michael Arrigo

Michael F. Arrigo

54

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

1  # Exhibit A – Curriculum Vitae
2
3  See separate document with CV.
4

Prepared by Michael F. Arrigo, October 9, 2017

1 # Exhibit B – Principles and Methods

2

3 ## Data and Methods for Calculating Charges v. Payments

4

5 Data from the Health Affairs analysis, CMS, and American Hospital Association was used to

6 collect health care provider characteristics. Data was obtained from the 2011 American

7 Hospital Association annual survey, which provides demographic and structural information

8 about American providers, and matched to CMS data using the Medicare Provider number or

9 the name of the provider. Health care provider financial information was obtained from 2011

10 Medicare Cost Reports.[52] Information on whether the provider is currently participating in an

11 accountable care organization (ACO) was obtained from Leavitt Partners' database of

12 ACOs. Location information is based on the United States Office of Management and Budget-

13 designated statistical areas using a zip code to statistical area crosswalk. Full data for all

14 specifications of the analysis were available for 2,925 (87.7 percent) of the CMS providers

15 which includes inpatient and outpatient data.

16 Provider characteristics that were evaluated include those associated with provider size

17 (determined by bed size); affiliation with a system; ownership (not-for-profit, government

18 owned or investor owned); academic status (determined by whether the provider is accredited to

19 offer a residency program); whether the provider offered an insurance product (health

20 maintenance organization, preferred provider organization or indemnity insurance plan);

21 whether the provider participated in a joint venture with physicians; location (metropolitan,

22 micropolitan or rural area); the percent of total payments the provider received through capitated

23 payments; the percent of provider discharges that are covered by Medicare and Medicaid; the

24 provider operating margin (calculated by dividing net operating income by net operating

25 revenue which is total patient revenue less contractual allowances and patient discounts); and

26 whether the provider participated in an ACO.

27 The unit of analysis is the ratio of charges billed to Medicare to the amount reimbursed by

28 Medicare. Providers that receive Medicare payments are required to accept them for the full

29 value of the care and cannot bill the patients for the difference between Medicare's

30 reimbursement and the billed charges, meaning that the providers are implicitly willing to

31 accept the amount paid by Medicare for the services rendered. Higher ratio values indicate

32 higher charges compared to the reimbursement level they are willing to accept for the services

33 rendered. The provider characteristics' association with the charge-to-reimbursement ratio was

1  calculated with ordinary least squares linear regression using discharge-adjusted average
2  provider ratios across all DRGs.

3  **Results**

4  There is significant variation of charge-to-reimbursement ratios.  Across all providers and all
5  DRGs, charges were 3.77 (standard deviation=1.83) times as high as Medicare reimbursements
6  (range .19 to 23.6, median=3.337).  Provider ratios (combining all DRGs at the provider level)
7  ranged from 0.42 to 16.23.

8  Exhibit 1 below contains the coefficients of the regression analysis of the association of
9  provider characteristics and the charge-to-reimbursement ratio.  Of the evaluated characteristics,
10 12 of 14 were significantly associated with either an increase or decrease in the charge-to-
11 reimbursement ratio ($p<.05$).  The factors associated with a substantial increase in the charge-to-
12 reimbursement ratio include being an investor-owned provider (compared to being a not-for-
13 profit provider), being part of a provider system, participating in a joint venture with physicians
14 and being larger in terms of bed size.  Accepting a higher percentage of care through capitated
15 payments and having a higher operating margin were significantly associated with higher
16 charge-to-reimbursement ratios, but the magnitudes of both associations were trivial.  Large,
17 investor owned providers that are part of provider systems and located in metropolitan areas
18 thus tend to have the largest charge-to-reimbursement ratio.

19 The factors associated with substantial decreases in the charge-to-reimbursement ratio include
20 the location (either being in a rural or micropolitan area as opposed to a metropolitan area),
21 being an academic medical center, offering an insurance product, and being government owned
22 (as opposed to not-for-profit).  A higher percent of Medicaid patients is associated with a
23 significant, but minor, decrease in the ratio.  Small, unaffiliated, government-owned providers
24 located in rural areas tend to have the lowest ratio.

25 Several factors were not significantly associated with the charge-to-reimbursement ratio.  These
26 include the percentage of provider discharges that are reimbursed by Medicare and whether the
27 provider participates in an ACO.

28 **Conclusion**

29 It is not surprising that there is variability in charge-to-reimbursement ratios among providers,
30 but the degree of that variability is substantial.  Some providers' (35 out of 3337) average

1   Medicare charge was for less than they were actually reimbursed, while others billed, on

2   average, as much as 16 times what they were paid by Medicare.  The average degree of the

3   charge-to-reimbursement ratio is also surprising, with providers charging nearly four times, on

4   average, what they accept as reimbursement.

5   From a consumer's perspective, the disadvantages of higher charges that are not strongly

6   correlated with actual reimbursement rates are real.  Specifically, charges uncorrelated with

7   actual reimbursements make it difficult, if not impossible, for patients to compare providers,

8   eliminating any potential financial benefit of consumer-directed choice of providers.  A

9   movement toward more transparent pricing may enable patients to become more involved in the

10  cost of their care.

Prepared by Michael F. Arrigo, October 9, 2017

| Exhibit 1: Hospital Characteristics and Association with Ratio of Hospital Charges to Reimbursement | | |
|---|---|---|
| Factor | Change in Ratio | p-value |
| Bed Size (100 bed increase) | 0.14 | <.001 |
| Member of Hospital System | 0.592 | <.001 |
| Investor Owned Hospital (compared to Not-For-Profit) | 1.064 | <.001 |
| Government Owned Hospital (compared to Not-For-Profit) | -0.21 | 0.012 |
| Academic Medical Center | -0.545 | <.001 |
| Offers Insurance Product | -0.269 | <.001 |
| Participates in Joint Venture with Physicians | 0.168 | 0.007 |
| Located in Micropolitan Area (compared to Metropolitan Area) | -0.776 | <.001 |
| Located in Rural Area (compared to Metropolitan Area) | -1.125 | <.001 |
| Percent of Patient Revenue Paid by Capitation (1% Increase) | 0.027 | 0.002 |
| Percent of Discharges paid by Medicare (1% increase) | 0.002 | 0.431 |
| Percent of Discharges paid by Medicaid (1% Increase) | -0.007 | 0.037 |
| Operating Margin (1% Increase) | 0.003 | 0.049 |
| Hospital participates in an Accountable Care Organization | -0.067 | 0.325 |
| Baseline | 3.002 | <.001 |

1
2
3

Data from CMS, AHA, and author's analysis.

1
2

## Clinician's Medical Documentation and Medical Coding Review, Where Applicable

4

### Medical Coding

6

Medical coding and billing is a complex and regulated function that is part of the process of transforming a patient's medical record into financial reimbursement for services provided by health care providers. Medical coding does not stand alone however in securing reimbursement for billable health care procedures, services or equipment provided. Clinical documentation provided by licensed professionals supports the use of medical codes (*see* next section).

### Fundamental Purpose of Clinical Documentation

The American Health Lawyers explained the importance the linkage between Medical Coding, Medical Necessity and Clinical Documentation. *(See* AHLA - Timothy P. Blanchard and Joan Ragsdale – Clinical Documentation) stating,

> "Clinical documentation serves several important purposes in healthcare, including:
> 1. Facilitating efficient and effective delivery of high quality health care services.
> 2. Satisfying Conditions of Participation (COP) in Medicare (and other payers) [53]
> 3. Satisfying Conditions of Payment, [54] including, but not limited to the reasonableness and medical necessity of items and services (or that this standard is not applicable to the particular services in question).
> 4. Complying with state licensing and professional practice laws and regulations.
> 5. Demonstrating satisfaction of performance metrics and targets.
> 6. Defending allegations of failure to comply with or satisfy any of the above and/or false claims and health care fraud."

Most importantly, clinical documentation in the medical record for each individual patient is required by applicable state and federal statutes and regulations, including facility-licensing rules and medical/professional practice acts. While the language and details of state statutes and regulations vary somewhat, all states essentially require providers to "maintain adequate and accurate records relating to the provision of services to their patients." The adequacy of clinical documentation may depend on the intended use of the information by the reader (the physician, a

covering or co-treating physician, consulting specialists, hospitalists, nurses, therapists, and other provider or nursing facility personnel, medical reviewers, medical staff peer review, payer reviewers, program integrity and law enforcement personnel, administrative law judges and courts, and increasingly patients and family members). Providers must recognize that any or all of these persons may have occasion to review and evaluate (or seek to understand) the medical record entries made by the provider."

Documentation of Medical Necessity Required for Medical Coding and Payment

Under the Medicare statute[55], no Medicare payment shall be made for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury. [56]  Although these statutes were originally established for Medicare they have been adopted nationwide as the standard payors use to determine if a medical procedure is medically necessary. Clinical documentation is necessary to establish that services provided were reasonable and necessary. It is important to recognize, moreover, that adequate clinical documentation is a condition of payment distinct from the requirement of medical necessity itself. [57] It has been held that Medicare claim form certifications (whether submitted on paper or electronically) are representations "that the person signing the claim has acquired sufficient information **and made the requisite documentation** to prove that the services were provided as claimed." [58]

Failure to provide required documentation to support Medicare and Medicaid claims is a basis for exclusion from the programs, [59] and clinical documentation is required to satisfy requirements for QIO reviews. [60]

In a well-documented medical record, there will frequently be several types and sources of documentation supporting the necessity of the services provided, but the primary objective in preparing clinical documentation should be to assure that a qualified reviewer can easily determine what was done for the patient and the clinical rationale for the services provided.

The Medical Necessity Documentation Requirements vary with type of items and services involved. In some cases, specific forms of orders are required. In others, additional specific types of documentation must be prepared (*e.g.,* certifications of medical necessity). In general, however, **orders and other specific documentation must be backed up by entries in the medical record**

61

Prepared by Michael F. Arrigo, October 9, 2017

**demonstrating the ordering physician's involvement in the case and medical decision making or rationale for the services ordered**.

One component in determining medical costs is accomplished by reviewing medical codes provided in patient documentation. Medical diagnosis codes (usually ICD-9 or ICD-10) are entered by coders at health care providers as a result of a licensed physician's diagnosis at a health care provider. Procedure codes (usually CPT or HCPCS) are used to describe billable medical procedures that are translated into economic value for health care claims. I am relying on the diagnosis and the codes that exist in the documentation and I review the documentation and coding for the way they are used to derive medical costs.

Patient Condition and Diagnosis

Since a licensed clinician must determine when a medical procedure is appropriate (*See* Code of Federal Regulations 42 CFR §410.32 [61]), the patient's medical records must clearly document the medical necessity for the test (*See* Title XVIII of the Social Security Act, §1833(e), which prohibits Medicare or other payor's payment for any claim lacking the necessary documentation to process the claim.)

If the physician does not indicate a diagnosis, then a medical procedure may be determined by an insurance company (whether private payor or Medicare and Medicaid) to be non-medically necessary and therefore a claim for reimbursement of this procedure may be denied.

Billing, Claims Denials and Medical Review

If a claim for reimbursement of any medical procedures submitted to a payor results in denial, it is appropriate to ask for a review. During a review, BOTH the patient's condition and diagnosis codes as well as the data collected during the medical assessment, medical procedure or diagnostic test may be required. The responsibility to provide this information falls to the medical professional (health care provider) not to the billing and coding function.

Payors must decide whether to take one of three actions when presented with a claim for payment for services:

62

- **Pay** - When the claim is received the service is paid at some defined level assuming appropriate conditions are met.

- **Pend** – Hold payment of the claim for some level of review or request for additional information

- **Deny** – Disallow payment of the claim for any number of reasons that may be related to benefits, coverage limits, medical necessity, evidence of medical effectiveness, medical appropriateness or any number of other reasons that may or may not have to do with medical reasons. [62]

### Medical Policy and Coverage Determinations from the Payor

If maximum out of pocket exceeds the cost of a treatment plan under the ACA, then the value of the cost of the treatment is used.  If the maximum out of pocket is less than the treatment cost, then maximum lifetime out of pocket value is used for those procedures deemed medically necessary in the opinion of insurance companies based on my knowledge of industry best practices and guidelines and applicable statutes.

I may consider Medical Policies and guidelines of payors applicable in the geography where medical procedures are rendered may provide claims payment determination for procedures identified by CPT, HCPCS and ICD-9[2], ICD-10 CM or ICD-10 PCS coding. Reimbursement guidelines are developed by clinical staff that work with payors and include yearly coding updates, periodic reviews of specialty areas based on input from specialty societies and physician committees and updated logic based on current coding conventions.

Out of network "non-par" payments are made by payors to providers who are not in the payor's contracted provider network.  These providers' payments may be subject to delays. Furthermore, out of network payments may be subject to higher special investigation unit (SIU) examinations.

**Therefore, as a solution to delayed payments, some Providers are willing to accept reimbursement via a discount settlement network by signing an agreement in perpetuity** that they will accept a lower reimbursement for all future procedures of the same type (usually

---

[2] ICD-9 coding standard in effect until October 1, 2015 and replaced by ICD-10

1  described by CPT code or ICD-9 or ICD-10 code) when the claim is submitted for a specific payor

2  in lieu of delays for pended claims.  Only claims that are adjudicated by the payor and meet the

3  initial policy plan design are forwarded for discount settlement so the payor is ensured that the

4  procedure meets initial UM, COB, Case Management and medical necessity review.

5

6  So called "out of network" discount settlement payments provide data points to help determine

7  what the free market value of a procedure are because the provider has a choice to wait or accept

8  reimbursement quickly at a discount.

9

10  **ICD-9 or ICD-10 Diagnosis and Procedure Codes** - Medical patient records in this case may

11  contain ICD-9 diagnosis codes which are used for both inpatient and outpatient diagnosis, and

12  ICD-9 procedure codes which are used exclusively for inpatient procedures. (ICD-9 stands for the

13  International Classification of Diseases, 9th edition from the World Health Organization[3], localized

14  for the U.S. market). The U.S. developed its own procedure coding system (ICD-9-CM, Volume 3)

15  for inpatient hospital services in the late 1970's to use with ICD-9-CM, Volumes 1 and 2 for

16  diagnoses. Since 1979, procedures performed in hospitals have been coded for hospital statistics

17  and on hospital claims, using ICD-9-CM, Vol. 3 and the ICD-9 standard is managed under the

18  authority of the NCVHS.  NCVHS is authorized under Section 306(k) of the Public Health Service

19  Act, as amended, and codified at Title 42, Chapter 6A, Subchapter II, Part A, § 242k. The

20  Committee is governed by provisions of Public Law 92-463, as amended, (5 U.S.C. App. 2), which

21  sets forth standards for the formation and use of advisory committees.  I cross-referenced the

22  numeric references to codes found in documents provided by counsel and compared them with

23  corresponding descriptive references to confirm descriptions of a medical procedure performed in

24  the inpatient setting and the cost of those procedures locally and nationally, the coverage

25  determinations and reimbursement rates under the patient's health plan, and Medicare

26  reimbursement rates.  The ICD-9 diagnosis code(s) and correlated ICD-9 procedure codes are

---

[3] The World Health Organization (WHO) is the authoritative body that directs and coordinates international health within the United Nations' system.  The World Health Assembly is the supreme decision-making body for WHO. WHO generally meets in Geneva in May each year, and is attended by delegations from all 194 Member States including the United States.  Source: http://www.who.int/governance/en/

64

1  examined for reasonableness and peer-reviewed by an AHIMA[4] certified coder under my direction

2  and control. Any procedures rendered after October 1, 2015 may contain ICD-10 diagnosis codes

3  and ICD-10 PCS procedure codes for inpatient procedures only.

4

5  **Current Procedural Terminology ("CPT") codes** for outpatient procedures and professional

6  fees charged by physicians - Some outpatient medical patient records if applicable, contain

7  CPT procedure codes, (Current Procedural Terminology or CPT®[5] codes and descriptions).

8  The ICD-9 (see below) diagnosis code(s) correlated with the CPT-4 procedure codes are

9  examined for reasonableness and peer-reviewed by an AAPC[63] certified coder under my

10  direction and control.

11

12  Outpatient Prospective Payment System (OPPS), Medicare GAF

13

14  Some types of procedures are adjusted geographically for local markets using U.S. Office of

15  Management and Budget (OMB) statistical data adjusted annually for wage indices using

16  Medicare Geographic Adjustment Factors (MGAF).  In 2007, payment for the technical

17  component (TC) portion of a radiology service was limited to the lesser of the Medicare

18  Physician Fee Schedule (MPFS) amount or the Outpatient Prospective Payment System (OPPS)

19  amount. Effective January 1, 2012, CMS applied a 25 percent payment reduction for the

20  professional component (PC) of second and subsequent imaging services furnished by the same

21  provider including physicians in a group practice to the same patient in the same session on the

22  same day.  The basis for MPFS in determining the value of work is 42 CFR Parts 405, 410,

23  411, 414, 423, and 425.

24

25  National Percentile Levels to Establish Customary Medical Charges

26

27  In order to adjust the national average to specific geographic areas, geographic adjustment factors

28  have been calculated by taking the difference from the national average for each service area across

---

[4] AHIMA – The American Health Information Management Association is an accepted standards education and certification organization for medical coder certification, especially for inpatient coding.

[5] CPT is a registered trademark of the American Medical Association (AMA)

Prepared by Michael F. Arrigo, October 9, 2017

all service areas for each geographic area.  Averages of charges were then taken across the service areas and percentiles (50th, 75th and 90th) to create one overall difference from the national average. This amount is an aggregated estimate and individual procedure codes may not reflect this difference from the national average. These GAFs were developed by Optum using FAIR Health, Inc. data.

I used charges at the 50th percentile, (50% of charges are below this rate; 50% of charges are at or above this rate) and 75th percentile (75% of charges are below this rate; 25% of charges are at or above this rate).  The reason for the 50th percentile level is that it is a relatively low amount matching Medicaid pricing for contracted providers.   In my opinion this Plaintiff, if a U.S. citizen current house hold income would potentially be a Medicaid insured.  If the Plaintiff was insured by other sources, then the percentile charges would be higher at a maximum amount in my opinion of 75th percentile.   Texas Medicaid rates include a broad spectrum of the population with household incomes from zero to 133% of the Federal Poverty Level (FPL) calculated as Modified Adjusted Gross income (MAGI). [64]

Medi-Cal rates at the 50th percentile lag substantially behind commercial payor rates. [65]

**Ambulatory Patient Classification (APC)**

APCs are an outpatient prospective payment system applicable only to ambulatory surgery centers (ASCs).  To be deemed an ASC the center must operate,

> "...independently or as hospitals, and have no impact on physician payments under the Medicare Physician **Fee Schedule**."  Additionally, according to the U.S. HHS Centers for Medicare and Medicaid, "… an ASC is a distinct entity that operates exclusively for the purpose of furnishing surgical services to patients who do not require hospitalization and in which the expected duration of services does not exceed 24 hours following admission. This definition applies to the ASC no matter who the payor is for the ASC's services. Additionally, services to Medicare patients are not expected to require active medical monitoring at midnight when furnished in an ASC (see discussion in the ASC Payment section on pages 2 through 4). You must be certified as meeting the requirements for an ASC and enter into an agreement with the Centers for Medicare & Medicaid Services (CMS) to be eligible for Medicare payment. An ASC can be either:

- Independent (not part of a provider of services or any other facility); or
- Operated by a hospital (under the common ownership, licensure, or control of a hospital). An ASC operated by a hospital must meet additional criteria (*See* ICN 006819 December 2015 on the CMS website) [66] including Ambulatory Surgical Center Conditions for Coverage and Associated Interpretive Guidelines for Medicare Certification.

... If the patient is admitted from a hospital clinic or ED, then there is no **APC** payment, and Medicare will pay the hospital under inpatient DRG methodology.

In most cases, the unit of payment under the OPPS is the APC. CMS assigns individual services (Healthcare Common Procedure Coding System [HCPCS] codes) to APCs based on similar clinical characteristics and similar costs. The payment rate and copayment calculated for an APC apply to each service within the APC. Sometimes new services are assigned to New Technology APCs, which are based on similarity of resource use only, until cost data are available to permit assignment to a clinical APC. The payment rate for a New Technology APC is set at the midpoint of the applicable New Technology APC's cost range. Some services are paid separately, including but not limited to:

- o Many surgical, diagnostic, and nonsurgical therapeutic procedures;
- o Blood and blood products;
- o Most clinic and emergency department visits;
- o Some drugs, biologicals, and radiopharmaceuticals;
- o Brachytherapy sources;
- o Corneal tissue acquisition costs; and
- o Certain preventive services.

Partial hospitalization is paid on a per diem basis, with payment rates dependent on the number of individual services provided to the patient in one day[67].

**Professional Components, Technical Components, Relative Value Units**

Where applicable for imaging services, charges are split into technical and professional components (the TC and PC), each separately billable[68].

A relative value is a numeric ranking assigned to a procedure relating it to other procedures in terms of the time, work and costs associated with the procedure. The Medicare relative value units are based on the Resource Based Relative Value Scale (RBRVS) update and published

1    yearly by CMS. The total value is the sum of three components: a work value, a practice

2    expense (PE) value, and a malpractice (MP) expense value. The PE value has been further

3    subdivided into a facility value and a non-facility value. The basis for RVUs in determining the

4    value of work is 42 CFR Parts 405, 410, 411, 414, 423, and 425.

5    The RVU ratio between TC and PC can vary by type of diagnostic image, and the ratios are

6    published by the Centers for Medicare and Medicaid.

7    The PC is indicated in claims using a "Modifier 26." Certain procedures are a combination of a

8    physician or other qualified health care professional component and a technical component.

9    When the physician or other qualified health care professional component is reported

10   separately, the service may be identified by adding modifier 26 to the usual procedure number

11   or CPT code[69].

12

13   Authoritative Economic, Scientific and Standards Organizations for CPT, ICD

14

15   Current Procedural Terminology or CPT Codes for Outpatient Procedures

16

17   Current Procedural Terminology or CPT® codes and descriptions, are copyrights of the American

18   Medical Association Current Procedural Terminology (CPT®), Fourth Edition, is a standardized

19   listing of descriptive terms and identifying codes for reporting medical services and procedures.

20   The purpose of CPT is to provide a uniform language that accurately describes medical, surgical,

21   and diagnostic services, and thereby serves as an effective means for reliable nationwide

22   communication among physicians and other healthcare providers, patients, and third parties[70].

23

24   CPT was first developed by the AMA in 1966 and is used for the billing of physician services and

25   non-inpatient medical procedures in the U.S. The current version, CPT-4 is maintained by the

26   AMA and is an accepted standard by the National Committee on Vital Statistics or NCVHS[71].

27   NCVHS is authorized under Section 306(k) of the Public Health Service Act, as amended, and

28   codified at Title 42, Chapter 6A, Subchapter II, Part A, § 242k. The Committee is governed by

29   provisions of Public Law 92-463, as amended, (5 U.S.C. App. 2), which sets forth standards for the

30   formation and use of advisory committees. I cross-referenced the numeric references to codes

31   found in documents provided by counsel and compared them with corresponding AMA references

32   to confirm descriptions of a medical procedure performed in the outpatient setting and the cost of

Prepared by Michael F. Arrigo, October 9, 2017

those procedures locally and nationally, the coverage determinations and reimbursement rates under the patient's health plan, and Medicare reimbursement rates.

The CPT Editorial Panel is tasked with ensuring that CPT codes remain up to date and reflect the latest medical care provided to patients. In order to do this, the Panel maintains an open process and convenes meetings three times per year to solicit the direct input of practicing physicians, medical device manufacturers, developers of the latest diagnostic tests, and advisors from over 100 societies representing physicians and other qualified healthcare professionals.

International Classification of Diseases (ICD) for all diagnoses and inpatient procedures

Methodology for Analysis of Duplicate Claims

The Claim files were first analyzed for what the Government alleges are "suspect" procedures designated by CPT codes as delineated in the Government's indictment.

Although in my opinion there are mitigating circumstances as to whether these are all suspect procedures, I checked the Government's methodology and calculations first.

Therefore, any claim that contained CPT codes below were flagged as "Suspect" CPT codes:

1. **93025** - Microvolt T-wave alternans for assessment of ventricular arrhythmias

2. **93229** - External mobile cardiovascular telemetry with electrocardiographic recording, concurrent computerized real time data analysis and greater than 24 hours of accessible ECG data storage (retrievable with query) with ECG triggered and patient selected events transmitted to a remote attended surveillance center for up to 30 days; technical support for connection and patient instructions for use, attended surveillance, analysis and transmission of daily and emergent data reports as prescribed by a physician or other qualified health care professional [72]

3. **93271** - External patient and, when performed, auto activated electrocardiographic rhythm derived event recording with symptom-related memory loop with remote download capability up to 30 days, 24-hour attended monitoring; transmission and analysis

69

Prepared by Michael F. Arrigo, October 9, 2017

1

2     **4. 95806 -** Sleep study, unattended, simultaneous recording of, heart rate, oxygen saturation,

3          respiratory airflow, and respiratory effort (e.g., thoracoabdominal movement

4

5     5.  **95827 -** Electroencephalogram (EEG); all night recording

6

7     The totals were obtained for the amount billed and paid for these Claims flagged as "suspect".

8

9     The Claims were then analyzed for Duplicate Claims.  All "Suspect" Claims were excluded to

10    avoid counting these claims twice.  Any claim that had the same Patient ID, date of service and

11    CPT codes were identified as a duplicate Claim.  The totals were obtained for the Amount Billed

12    and Amount Paid for the Duplicates.

13

14    The Unpaid Claims were identified by first excluding all "Suspect" Claims and Duplicate Claims.

15    The remaining claims were investigated for claims that were submitted but not paid (the paid

16    amount = 0).  These claims were summed to find the total of Unpaid Claims.

17
18

Confidential Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

Methodology for Unpaid Claims Analysis

1. Overview of Claims date reviewed

   Claims data was provided by the Government to counsel for Mirando who provided them for the analysis.

   Claims data was received for the following payors:

   - Aetna,
   - Anthem,
   - BCBS,
   - Blue Choice,
   - Cigna,
   - Coventry,
   - Emblem,
   - GEHA,
   - HealthFirst,
   - Highmark,
   - Humana,
   - IHC Health Solutions,
   - Independent Blue Cross,
   - Independent Health,
   - Kaiser,
   - Medicare,
   - Premera Blue Cross,
   - TriCare,
   - United Health Care,
   - Wellcare Health
   - XL Health
   - Medicare.

Prepared by Michael F. Arrigo, October 9, 2017

2. The following table lists the total amount billed and total amount paid for each health insurer, including valid claims.

| Insurance Company | Total Claims Billed | Paid |
|---|---|---|
| Aetna Life Insurance Company | $1,792,645.32 | $462,666.82 |
| Anthem Inc/ Anthem Blue Cross/WellPoint | $1,725,696.00 | $403,490.05 |
| BCBS 2005 -2008 | $9,253.00 | $4,222.84 |
| Blue Choice | $26,778.00 | $12,195.85 |
| Blue Cross Blue Shield of Alabama | $227,549.00 | $125,054.87 |
| BCBS of Arkansas (Claim file Password Protected) | | |
| Blue Cross Blue Shield of Florida | $39,862.85 | $8,908.92 |
| Blue Cross Blue Shield of Hawaii | $3,642.00 | $1,723.00 |
| Blue Cross Blue Shield of Minnesota | $30,162.00 | $14,825.49 |
| Blue Cross Blue Shield of New Jersey | $33,162.00 | $10,847.90 |
| Blue Cross & Blue Shield of Rhode Island | $24,909.00 | $11,989.48 |
| Blue Cross Blue Shield of South Carolina | $98,818.00 | $38,667.13 |
| Cigna | $872,327.36 | $285,388.72 |
| Coventry Health Care | $74,263.00 | $26,692.50 |
| Emblem Health | $52,730.84 | $9,235.84 |
| GEHA | $37,682.00 | $15,138.21 |
| Healthfirst | $18,695.00 | $83.84 |
| Highmark Blue Cross | $391,777.00 | $185,592.49 |
| Humana | $1,598,745.03 | $389,215.50 |
| IHC Health Solutions | $2,710.00 | $427.00 |
| Independence Blue Cross | $193,696.00 | $82,103.25 |
| Independent Health | $175,400.00 | $123,659.32 |
| Kaiser Permanente | $7,792.00 | $5,432.59 |
| Medicare thru 4/17/2016) | $983,390.00 | $352,300.34 |
| Premera Blue Cross | $28,030.00 | $8,343.73 |
| Tricare (Claim file Password Protected) | | |
| United Health Group (Optum) | $4,039,106.06 | $1,322,595.28 |
| WellCare Health Plans, Inc. | $14,285.00 | $6,231.34 |
| XL Health | $15,953.50 | $8,191.94 |
| **Total** | **$12,519,059.96** | **$3,915,224.24** |

Findings:

a. The Government data that was produced does not represent all claims submitted by Holter Labs, only those claims for that period that the Government determined relevant for its investigation and Indictment.

b. The Government's determination of total claims by payor from January 4, 2005 through March 2016 are:[73]

Prepared by Michael F. Arrigo, October 9, 2017

| Insurance Company | Sum of Billed Amount | Sum of Paid Amount |
|---|---|---|
| AETNA | $1,681,855.44 | $437,492.41 |
| Anthem Blue Cross/WellPoint | $1,260,463.00 | $326,071.53 |
| BCBS of Alabama | $227,504.00 | $124,913.29 |
| BCBS of Arkansas | $7,090.00 | $3,034.60 |
| BCBS of Florida | $34,155.90 | $8,822.97 |
| BCBS of Hawaii | $3,926.00 | $2,021.07 |
| BCBS of Minnesota | $24,347.00 | $12,984.33 |
| BCBS of New Jersey | $33,162.00 | $10,847.90 |
| BCBS of Rhode Island | $22,644.00 | $11,989.48 |
| BCBS of South Carolina | $98,818.00 | $38,667.13 |
| Cigna | $920,076.62 | $300,576.52 |
| Coventry Health | $46,906.00 | $19,876.51 |
| Emblem Health | $44,710.84 | $9,113.12 |
| GEHA | $37,682.00 | $15,138.21 |
| Healthfirst | $18,075.00 | $6,322.26 |
| Highmark Blue Cross | $391,777.00 | $185,267.49 |
| Humana | $1,031,990.95 | $284,422.29 |
| IHC Health Solutions | $8,980.00 | $1,666.11 |
| Independence Blue Cross | $186,588.00 | $83,388.42 |
| Independent Health | $237,068.00 | $161,428.50 |
| Kaiser Permanente | $19,501.00 | $11,302.93 |
| Premera Blue Cross | $28,030.00 | $8,343.73 |
| Tricare | $289,901.00 | $112,230.68 |
| United Health Group | $3,631,111.68 | $1,314,383.06 |
| Wellcare | $14,285.00 | $6,231.34 |
| XL Health | $15,858.50 | $8,139.29 |
| (blank) | | |
| **Grand Total** | **$10,316,506.93** | **$3,504,675.17** |

1

2

3. The five CPT codes considered to be potential fraud by the US will be referred to as "suspect" CPT codes:

**93025** Microvolt T-wave alternans for assessment of ventricular arrhythmias

**93229** External mobile cardiovascular telemetry with ECG recording, technical support for connection and patient instruction for use, attended surveillance, analysis and physician prescribed transmission of daily and emergent data reports.

**93271** External patient and, when performed, auto activation ECG rhythm derived event recording with symptom related memory loop with remote download capability up to 30 da. 24-hour attended monitoring, includes transmission and analysis

**95806** Sleep study, unattended, simultaneous recording of heart rate, oxygen saturation, respiratory airflow, and respiratory effort

**95827** Electoencephalogram, all night recording

Prepared by Michael F. Arrigo, October 9, 2017

4. Summary of Claims by CPT Code

For each health insurer, the claims data was further analyzed by looking at the CPT codes for the claims listed.

For example, the Anthem the total claims for each CPT are listed below:

|  | CPT | Amount Billed | Amount Paid |
|---|---|---|---|
| Anthem | 93025 | $5,774.00 | $685.07 |
|  | 93271 | $206,715.00 | $58,417.86 |
|  | 95806 | $5,675.00 | $2,043.03 |
|  | 95827 | $94,375.00 | $28,806.72 |
| Total |  | $312,539.00 | $89,952.68 |

Some Claim Files obtained contained only the CPT codes considered suspect and exclude appropriately billed claims.

5. The Claims files were analyzed for total of "suspect" CPT codes.  For each claim file the total amount billed and paid from the "suspect" CPT codes was calculated. The totals for all claims data of "suspect" CPT codes:

Total Amount Billed "suspect' CPT Codes     **$8,254,859.72**

Total Amount Paid "suspect' CPT Codes     **$2,930,852.64**

Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

6. Claims were analyzed for Duplicate Claims. A claim is considered a duplicate claim if the date of service and CPT code for the patient are the same. **This excludes the "suspect" CPT Codes**. The total duplicate claims for all files:

Total Amount Duplicates Billed      **$835,865.73**

Total Amount Duplicates Paid      **$12,419.76**

| Unpaid Claims Excluding "Suspect" CPT codes and Duplicates | | |
|---|---|---|
| **Insurance Company** | | |
| Aetna Life Insurance Company | $ | 275,199.63 |
| Anthem Inc/ Anthem Blue Cross/Wellpoint | $ | 203,348.00 |
| BCBS 2005 -2008 | $ | - |
| Blue Choice | $ | 1,106.00 |
| Blue Cross Blue Shield of Alabama | $ | 6,091.00 |
| BCBS of Arkansas (Claim file Password Protected) | | |
| Blue Cross Blue Shield of Florida | $ | 8,158.00 |
| Blue Cross Blue Shield of Hawaii | $ | 481.00 |
| Blue Cross Blue Shield of Minnesota | $ | 4,419.00 |
| Blue Cross Blue Shield of New Jersey | $ | 11,747.00 |
| Blue Cross & Blue Shiled of Rhode Island | $ | 790.00 |
| Blue Cross Blue Shield of South Carolina | $ | 5,118.00 |
| Cigna | $ | 107,005.00 |
| Coventry Health Care | $ | 16,660.00 |
| Emblem Health | $ | 9,530.00 |
| GEHA | $ | 2,460.00 |
| Healthfirst | $ | 4,020.00 |
| Highmark Blue Cross | $ | - |
| Humana | $ | 128,329.50 |
| IHC Health Solutions | $ | 1,380.00 |
| Independence Blue Cross | $ | 15,628.00 |
| Independent Health | $ | 300.00 |
| Kaiser Permanente | $ | 2,147.00 |
| Medicare thru 4/17/2016) | $ | 49,500.00 |
| Premera Blue Cross | $ | 3,250.00 |
| Tricare (Claim file Password Protected) | | |
| United Health Group (Optum) | $ | 481,341.91 |
| WellCare Health Plans, Inc. | $ | 1,095.00 |
| XL Health | $ | 76.00 |
| **Total** | **$** | **1,339,180.04** |

*Figure 15 - Unpaid claims analysis*

7. Unpaid Claims were identified in the Claims data. After excluding the CPT codes considered "suspect" and excluding Duplicate Claims, Claims that were submitted but not paid were identified. For all Claims files the total amount of unpaid Claims is **$1,339,180.04**. This total is the sum obtained from all insurers. Each claim file was

76

Expert Report Regarding Hattrup
Prepared by Michael F. Arrigo, October 9, 2017

examined and claims with non-suspect" CPT codes were identified.  Any duplicate claims were eliminated.  A total of unpaid claims for each insurer was found by identifying the remaining claims that were billed but not paid.

The Unpaid Claims by insurer:

As previously noted some claims files only contain the CPT codes under investigation, these files do not contain the correctly billed data from that insurer.  There may be unpaid claims that have been excluded by not including all CPT codes in the claims data.  The Unpaid claims total is underestimated because of the omission of correctly billed claims.

8. Detailed claim analysis was performed on four individuals.

a. The patient J. Hattrup was interviewed on 4/11/14 regarding his heart monitoring in 2011.  He remembers wearing a heart monitor.  He also remembers visiting a neurologist for testing at some point in time which was not specified.

The United Health Care claims for the patient Hattrup were identified.  The dates of Service listed on the claims are 4/11/11, 4/12/11, 4/15/11, 4/18/11 and 4/21/11.



*Figure 16 - Summary of Hattrup Claims Analysis*

77

Prepared by Michael F. Arrigo, October 9, 2017

b. The patient S.R. Foster (Sixtos) was interviewed on 4/14/14 regarding her heart monitoring.  She remembers wearing a cardiac monitor for approximately ==two weeks== during her pregnancy in 2008/2009.  She could not recall wearing a cardiac monitor in 2011.  The Cigna claims for Foster include 4 dates of service: 8/10/11, 8/11/11, 8/18/11 and 8/24/11.

| Claim History from Cigna for Foster (Sixtos) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Member Last | Member Firs | Member Nur | First Service | Procedure Code | DESCRIPTION | Charge Amo | Eligible Charg | Paid Amount | Valid per US |
| FOSTER | STACEY | 5699150860: | 8/10/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | 100.00 | 60.00 | 0.00 | Yes |
| FOSTER | STACEY | 5699150860: | 8/10/11 | 93799 | CARDIOVASCULAR PROCEDURE | 325.00 | 325.00 | 0.00 | Yes |
| FOSTER | STACEY | 5699150860: | 8/10/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | 325.00 | 195.00 | 0.00 | |
| FOSTER | STACEY | 5699150860: | 8/11/11 | 93271 | ECG/MONITORING AND ANALYSIS | 695.00 | 417.00 | 250.20 | |
| FOSTER | STACEY | 5699150860: | 8/18/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | 195.00 | 117.00 | 0.00 | |
| FOSTER | STACEY | 5699150860: | 8/18/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | 400.00 | 240.00 | 112.20 | |
| FOSTER | STACEY | 5699150860: | 8/18/11 | 95921 | AUTONOMIC NERV FUNCTION TEST | 225.00 | 135.00 | 81.00 | |
| FOSTER | STACEY | 5699150860: | 8/24/11 | 93025 | MICROVOLT T-WAVE ASSESS | 325.00 | 195.00 | 117.00 | |
| FOSTER | STACEY | 5699150860: | 8/24/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | 195.00 | 117.00 | 70.20 | |
| FOSTER | STACEY | 5699150860: | 8/24/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | 325.00 | 195.00 | 117.00 | |
| | | | | | | 3,110.00 | | 747.60 | |

Rebuttal Expert Report Regarding Issues
Prepared by Michael F. Arrigo, October 9, 2017

c. The patient M. Bennett was interviewed on 4/14/14 regarding her cardiac monitoring. She remembered wearing a cardiac monitor but could not recall the date. It was placed on at her physician's office on a Friday and she took it off on Sunday and returned it to her physician's office on Monday. She recalls wearing the device while she slept.

The United Health Care claims for M. Bennett include four dates of service: 12/2/12, 12/4/12, 12/6/12 and 12/10/12.

| PAT_L_NAME | PAT_F_NAME | DOS_BEGIN | CLAIM | LINE | DX1 | DX1_DESCR | DX2 | CPT | CPT_DESCR | UNITS | AMTCHG | AMTPAID | Valid Per US |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BENNETT | MARTHA | 12/3/12 | 395307288601 | 1 | 7851 | PALPITATION | | 93226 | ECG MONITO | 1 | $ 195.00 | $ 96.53 | Yes |
| BENNETT | MARTHA | 12/3/12 | 395307288601 | 3 | 7851 | PALPITATION | | 93799 | CARDIOVASC | 1 | $ 195.00 | $ 96.53 | Yes |
| BENNETT | MARTHA | 12/3/12 | 395307288601 | 2 | 7851 | PALPITATION | | 95827 | EEG, ALL NIG | 1 | $ 325.00 | $ 160.88 | |
| BENNETT | MARTHA | 12/3/12 | 395307288601 | 1 | 7851 | PALPITATION | | J8499 | PRSC RX ORA | 1 | $ 0.01 | $ - | |
| BENNETT | MARTHA | 12/4/12 | 399402695101 | 2 | 7851 | PALPITATION | | 93025 | MICROVOLT | 1 | $ 395.00 | $ 213.30 | |
| BENNETT | MARTHA | 12/4/12 | 399402695101 | 1 | 7851 | PALPITATION | | 93271 | ECG/MONITO | 1 | $ 595.00 | $ 321.30 | |
| BENNETT | MARTHA | 12/6/12 | 398955221801 | 3 | 7851 | PALPITATION | | 93025 | MICROVOLT | 1 | $ 325.00 | $ - | |
| BENNETT | MARTHA | 12/6/12 | 398955221801 | 1 | 7851 | PALPITATION | | 93226 | ECG MONITO | 1 | $ 195.00 | $ - | |
| BENNETT | MARTHA | 12/6/12 | 398955221801 | 2 | 7851 | PALPITATION | | 95827 | EEG, ALL NIG | 1 | $ 325.00 | $ - | |
| BENNETT | MARTHA | 12/10/12 | 402261643201 | 1 | 7851 | PALPITATION | | 93226 | ECG MONITO | 1 | $ 100.00 | $ - | |
| BENNETT | MARTHA | 12/10/12 | 402261643201 | 3 | 7851 | PALPITATION | | 95806 | SLEEP STUDY | 1 | $ 395.00 | $ 195.53 | |
| BENNETT | MARTHA | 12/10/12 | 402261643201 | 2 | 7851 | PALPITATION | | 95827 | EEG, ALL NIG | 1 | $ 400.00 | $ 198.00 | |
| | | | | | | | | | | | $ 3,445.01 | $ 1,282.07 | |

Claim History from United Health Group for M. Bennett

d. The patient L Solmor was interviewed on 4/14/14 regarding her cardiac monitoring. She recalled wearing the monitor and estimated the date to be around June 2013. She stated she wore it for 24 hours and followed up with a cardiologist 6 months later. The Aetna claims for L Solmor include two dates of service: 5/29/13 and 5/30/13.

| Claim History from Aetna | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LAST_NM | FIRST_NM | SERVICE_DT | PRCDR_CD | MOD | PRCDR_CD_TEXT | BILLED AMT | PAID AMT | Valid Per US |
| SOLMOR | LISA | 5/29/13 | 93226 | | ECG MONIT/REPRT UP TO 48 HRS | $100.00 | $55.00 | Yes |
| SOLMOR | LISA | 5/29/13 | 93799 | TC | CARDIOVASCULAR PROCEDURE | $195.00 | $107.25 | Yes |
| SOLMOR | LISA | 5/29/13 | 95827 | | NIGHT ELECTROENCEPHALOGRAN | $325.00 | $133.75 | |
| SOLMOR | LISA | 5/30/13 | 93025 | | MICROVOLT T-WAVE ASSESS | $395.00 | $0.00 | |
| SOLMOR | LISA | 5/30/13 | 93271 | | ECG/MONITORING AND ANALYSIS | $395.00 | $0.00 | |
| | | | | | | $1,410.00 | $296.00 | |

CONTINUED NEXT PAGE

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

## Exhibit C – Test Results

### Mathematical Errors in Government Presentencing Information Report

The government presented a list of Counts 1- 14 for fraud. I analyzed the counts, added up the totals and compared them to my own calculations which included a review of each and every claim.  The presentencing report appears to rely on other calculations I do not have that may have been performed by the FBI or others and then given to the author of the PIR / PSR.  Paragraph 20 of the PSR states, "

Information pertaining to the offense was obtained from the Indictment, the trial memoranda, and materials provided by the United States Attorney's office." The government's error rate was 6% to 26% as follows:

CONTINUED NEXT PAGE

81

Prepared by Michael F. Arrigo, October 9, 2017

| | | | |
|---|---|---|---|
| Count 1 charges that on April 18, 2011, Mirando caused a $325 false claim to be submitted to UnitedHealthcare (United) for services purportedly provided to beneficiary J.H. on April 11, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 325.00 | |
| Count 2 charges that on May 16, 2011, Mirando caused a $695 false claim to be submitted to United for services purportedly provided to beneficiary J.H. on April 12, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 695.00 | |
| Count 3 charges that on June 13, 2011, Mirando caused a $695 false claim to be submitted to United for services purportedly provided to beneficiary J.H. on April 15, 2011, in violation of 18 U.S.C. 1347, 2(b). | $ | 695.00 | |
| Count 4 charges that on July 18, 2011, Mirando caused a $950 false claim to be submitted to United for services purportedly provided to beneficiary J.H. on April 18, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 950.00 | |
| Count 5 charges that on July 18, 2011, Mirando caused a $950 false claim to be submitted to United for services purportedly provided to beneficiary J.H. on April 21, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 950.00 | |
| **Subtotal Beneficiary J.H.** | | | **$ 3,615.00** |
| Count 7 charges that on November 22, 2011, Mirando caused a $695 false claim to be submitted to Cigna for services purportedly provided to beneficiary S.F. on August 11, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 695.00 | |
| Count 8 charges that on November 22, 2011, Mirando caused a $595 false claim to be submitted to Cigna for services purportedly provided to beneficiary S.F. on August 18, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 595.00 | |
| Count 9 charges that on December 15, 2011, Mirando caused an $845 false claim to be submitted to Cigna for services purportedly provided to beneficiary S.F. on August 24, 2011, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 845.00 | |
| **Subtotal Beneficiary S.F.** | | | **$ 2,135.00** |
| Count 10 charges that on December 10, 2012, Mirando caused a $325 false claim to be submitted to United for services purportedly provided to beneficiary M.B. on December 3, 2012, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 325.00 | |
| Count 11 charges that on January 11, 2013, Mirando caused a $990 false claim to be submitted to United for services purportedly provided to beneficiary M.B. on December 4, 2012, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 990.00 | |
| Count 12 charges that on January 11, 2013, Mirando caused an $845 false claim to be submitted to United for services purportedly provided to beneficiary M.B. on December 6, 2012, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 845.00 | |
| Count 13 charges that on February 6, 2013, Mirando caused an $895 false claim to be submitted to United for services purportedly provided to beneficiary M.B. on December 10, 2012, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 895.00 | |
| **Subtotal Beneficiary M.B.** | | | **$ 3,055.00** |
| Count 14 charges that on June 6, 2013, Mirando caused a $325 false claim to be submitted to Aetna for services purportedly provided to beneficiary L.S. on May 29, 2013, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 325.00 | |
| Count 15 charges that on July 9, 2013, Mirando caused a $790 false claim to be submitted to Aetna for services purportedly provided to beneficiary L.S. on May 30, 2013, in violation of 18 U.S.C. §§ 1347, 2(b). | $ | 790.00 | |
| **Subtotal Beneficiary L.S.** | | | **$ 1,115.00** |

*Figure 17* - Analysis of PSR / PIR Counts 1-15 of Fraud

Next I compared the totals with those from my independent analysis:

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

| Government Fraud Counts vs. Arrigo Calculations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Government | | | | | Arrigo Analysis | | |
| | Presentencing Info. Report | No of Claims Analyzed for Each Insured | Difference | Government Error Rate | | Total Billed | Total Paid | Gov.: No of Claims by Analyzed by |
| Hattrup | $ 3,615.00 | 69 | -$ 225.05 | -6% | | $ 3,840.05 | $ 3,540.00 | 69 |
| Foster (Sixtos) | $ 2,135.00 | 12 | -$ 550.00 | -26% | | $ 2,685.00 | $ 747.60 | 12 |
| Bennett | $ 3,055.00 | 49 | | 0% | | $ 3,055.01 | $ 1,089.01 | 49 |
| Solmor | $ 1,115.00 | 7 | | 0% | | $ 1,115.00 | $ 133.75 | 7 |
| | | | | | | | | |
| Total | $ 9,920.00 | 137 | -$ 775.06 | -8% | | $10,695.06 | $ 5,510.36 | 137 |
| | | | | | | | | |
| Total Claims in Data Produced by Government | | | | | | | | 31,760 |

*Figure 18 -* Comparison of Government Fraud Counts vs. Arrigo Analysis.

This analysis with respect to "Arrigo Analysis" columns was developed by evaluating each of the 137 claims as follows:

Claims were evaluated based on the Government's criteria of 'suspect,' unable to perform and duplicate and checked for assumptions.

Insured Hattrup's data is as follows which ties to my analysis and differs from the Government's analysis:

CONTINUED NEXT PAGE

83

Rebuttal Expert Report Regarding Issues
Prepared by Michael F. Arrigo, October 9, 2017

**Claim History from United Health Group for J.Hattrup**

| PAT_L_NAME | PAT_F_NAME | DOS_BEGIN | CLAIM | LINE | DX1 | DX1_DESCR | CPT | CPT_DESCR | UNITS | AMTCHG | AMTPAID | Valid Per US |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 325.00 | $ 325.00 | Yes |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 3 | 78650 | CHEST PAIN U | 93799 | CARDIOVASCULAR PROCEDURE | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 3 | 78650 | CHEST PAIN U | 93799 | CARDIOVASCULAR PROCEDURE | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 3 | 78650 | CHEST PAIN U | 93799 | CARDIOVASCULAR PROCEDURE | 1 | $ 325.00 | $ 325.00 | Yes |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | 93271 | ECG/MONITORING AND ANALYSIS | 1 | $ 695.00 | $ - | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | 93271 | ECG/MONITORING AND ANALYSIS | -1 | $ 695.00 | $ - | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | 93271 | ECG/MONITORING AND ANALYSIS | 1 | $ 695.00 | $ 695.00 | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | -1 | $ 295.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 295.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 295.00 | $ 295.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 400.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | -1 | $ 400.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 400.00 | $ 400.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 3 | 78650 | CHEST PAIN U | 95921 | AUTONOMIC NERV FUNCTION TEST | 1 | $ 225.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 3 | 78650 | CHEST PAIN U | 95921 | AUTONOMIC NERV FUNCTION TEST | -1 | $ 225.00 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 3 | 78650 | CHEST PAIN U | 95921 | AUTONOMIC NERV FUNCTION TEST | 1 | $ 225.00 | $ 225.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | -1 | $ 300.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ 300.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | -1 | $ 300.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ 300.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | -1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| | | | | | | | | | | $ 4,490.05 | $ 4,490.00 | |

**Claim History from United Health Group for J.Hattrup**

| PAT_L_NAME | PAT_F_NAME | DOS_BEGIN | CLAIM | LINE | DX1 | DX1_DESCR | CPT | CPT_DESCR | UNITS | AMTCHG | AMTPAID | Valid Per US |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 325.00 | $ 325.00 | Yes |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 3 | 78650 | CHEST PAIN U | 93799 | CARDIOVASCULAR PROCEDURE | 1 | $ 325.00 | $ 325.00 | Yes |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/11/11 | 283578669201 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | 93271 | ECG/MONITORING AND ANALYSIS | 1 | $ 695.00 | $ 695.00 | |
| HATTRUP | JOHN | 4/12/11 | 285937578601 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 295.00 | $ 295.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 400.00 | $ 400.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 3 | 78650 | CHEST PAIN U | 95921 | AUTONOMIC NERV FUNCTION TEST | 1 | $ 225.00 | $ 225.00 | |
| HATTRUP | JOHN | 4/15/11 | 288563029501 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ 300.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/18/11 | 291903650901 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 3 | 78650 | CHEST PAIN U | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 300.00 | $ 300.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 2 | 78650 | CHEST PAIN U | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 325.00 | |
| HATTRUP | JOHN | 4/21/11 | 291903650801 | 1 | 78650 | CHEST PAIN U | J8499 | PRSC RX ORAL NONCHEMOTHAPEUT | 1 | $ 0.01 | $ - | |
| | | | | | | | | | | $ 4,490.05 | $ 4,190.00 | |
| | | | | | | | | Alleged Fraud ( Total - Valid ) | | $ 3,840.05 | $ 3,540.00 | |

*Figure 19* - Supporting detail of Hattrup claims analysis (L.H.) vs. PSR Count analysis

Prepared by Michael F. Arrigo, October 9, 2017

I performed the same analysis for patient / insured Foster (Sixtos)

| Member Last | Member First | Member Num | First Service | Procedure Code | DESCRIPTION | Charge Amo | Eligible Char | Paid Amoun | Valid per US |
|---|---|---|---|---|---|---|---|---|---|
| FOSTER | STACEY | 569915086( | 8/10/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | $ 100.00 | $ 60.00 | $ - | Yes |
| FOSTER | STACEY | 569915086( | 8/10/11 | 93799 | CARDIOVASCULAR PROCEDURE | $ 325.00 | $ 325.00 | $ - | Yes |
| FOSTER | STACEY | 569915086( | 8/10/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | $ 325.00 | $ 195.00 | $ - | |
| FOSTER | STACEY | 569915086( | 8/11/11 | 93271 | ECG/MONITORING AND ANALYSIS | $ 695.00 | $ 417.00 | $ 250.20 | |
| FOSTER | STACEY | 569915086( | 8/18/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | $ 195.00 | $ 117.00 | $ - | |
| FOSTER | STACEY | 569915086( | 8/18/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | $ 400.00 | $ 240.00 | $ 112.20 | |
| FOSTER | STACEY | 569915086( | 8/18/11 | 95921 | AUTONOMIC NERV FUNCTION TEST | $ 225.00 | $ 135.00 | $ 81.00 | |
| FOSTER | STACEY | 569915086( | 8/24/11 | 93025 | MICROVOLT T-WAVE ASSESS | $ 325.00 | $ 195.00 | $ 117.00 | |
| FOSTER | STACEY | 569915086( | 8/24/11 | 93226 | "ECG MONITOR/REPORT, 24 HRS" | $ 195.00 | $ 117.00 | $ 70.20 | |
| FOSTER | STACEY | 569915086( | 8/24/11 | 95827 | NIGHT ELECTROENCEPHALOGRAM | $ 325.00 | $ 195.00 | $ 117.00 | |
| | | | | | | | | | |
| | | | | | Totals | $ 3,110.00 | | $ 747.60 | |
| | | | | | | | | | |
| | | | | | Alleged Fraud ( Total - Valid ) | $ 2,685.00 | | $ 747.60 | |

*Figure 20* - Supporting detail of analysis of claims for Foster (Sixtos)

Next, I performed the same analysis for patient / insured Bennett

| DX1 | DX1_DESCR | DX2 | CPT | CPT_DESCR | UNITS | AMTCHG | AMTPAID | Valid Per US |
|---|---|---|---|---|---|---|---|---|
| 7851 | PALPITATION | | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 195.00 | $ 96.53 | Yes |
| 7851 | PALPITATION | | 93799 | CARDIOVASCULAR PROCEDURE | 1 | $ 195.00 | $ 96.53 | Yes |
| 7851 | PALPITATION | | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ 160.88 | |
| 7851 | PALPITATION | | J8499 | PRSC RX ORAL NONCHEMOTHAPEUTIC I | 1 | $ 0.01 | $ - | |
| 7851 | PALPITATION | | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 395.00 | $ 213.30 | |
| 7851 | PALPITATION | | 93271 | ECG/MONITORING AND ANALYSIS | 1 | $ 595.00 | $ 321.30 | |
| 7851 | PALPITATION | | 93025 | MICROVOLT T-WAVE ASSESS | 1 | $ 325.00 | $ - | |
| 7851 | PALPITATION | | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 195.00 | $ - | |
| 7851 | PALPITATION | | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 325.00 | $ - | |
| 7851 | PALPITATION | | 93226 | ECG MONITOR/REPORT, 24 HRS | 1 | $ 100.00 | $ - | |
| 7851 | PALPITATION | | 95806 | SLEEP STUDY UNATT&RESP EFFT | 1 | $ 395.00 | $ 195.53 | |
| 7851 | PALPITATION | | 95827 | EEG, ALL NIGHT RECORDING | 1 | $ 400.00 | $ 198.00 | |
| | | | | | | | | |
| | | | | Total | | $ 3,445.01 | $ 1,282.07 | |
| | | | | | | | | |
| | | | | Alleged Fraud ( Total - Valid ) | | $ 3,055.01 | $ 1,089.01 | |

*Figure 21 - Supporting detail of Bennett claims analysis vs. PSR Count analysis*

Finally I performed the same analysis for patient / insured Solmor:

| Claim History from Aetna | | | | | | | |
|---|---|---|---|---|---|---|---|
| LAST_NM | FIRST_NM | SERVICE_DT | PRCDR_CD | MOD | PRCDR_CD_TEXT | BILLED AMT | PAID AMT | Valid Per US |
| SOLMOR | LISA | 5/29/13 | 93226 | | ECG MONIT/REPRT UP TO 48 HRS | $ 100.00 | $ 55.00 | Yes |
| SOLMOR | LISA | 5/29/13 | 93799 | TC | CARDIOVASCULAR PROCEDURE | $ 195.00 | $ 107.25 | Yes |
| SOLMOR | LISA | 5/29/13 | 95827 | | NIGHT ELECTROENCEPHALOGRAM | $ 325.00 | $ 133.75 | |
| SOLMOR | LISA | 5/30/13 | 93025 | | MICROVOLT T-WAVE ASSESS | $ 395.00 | $ - | |
| SOLMOR | LISA | 5/30/13 | 93271 | | ECG/MONITORING AND ANALYSIS | $ 395.00 | $ - | |
| | | | | | | | | |
| | | | | | Total | $ 1,410.00 | $ 296.00 | |
| | | | | | | | | |
| | | | | | Alleged Fraud ( Total - Valid ) | $ 1,115.00 | $ 133.75 | |

*Figure 22 -* Supporting detail of patient Solmor vs. PSR Count analysis

Billed vs. Intended vs. Actual / Foreseeable Loss for "unable to perform" procedures

As noted earlier I found flaws and statistically invalid methods in the governments methodologies regarding 'unable to perform' for reasons:

1. The presumption that all procedures were performed with a device that was unable to perform the procedure based on the frequency as attested by a government witness was wrong when compared to FDA filings.

2. The presumption that all procedures billed in the classification of 'unable to perform' were actually provided using the Datrix device in question, without any documentation proving conclusively that this device as used

3. A high error rate statistically invalid method yielding only 19% confidence based on a limited sample size.

4. In addition, there were mathematical errors in the totals even if one accepts the Governments logic in items 1-3 above. I determined arithmetic errors by dong the following:

All codes from all payors were analyzed and summed to arrive at the following findings:

5. Of the accurately totaled $7.470 million in billings, the intended loss is $2.3 million using the Governments' methodology, times the payment to charge ratio for Holter Labs business of 31%. Actual loss is $2.575 million using correct totals for the actual amount paid.

6. Because of a below industry standard 19% level of certainty it cannot be concluded what the intended loss or actual loss are.

Prepared by Michael F. Arrigo, October 9, 2017

| Insurance Company | Suspect CPT Codes | | | |
|---|---|---|---|---|
| | Billed | Intended Loss | Paid (Actual Loss) | Statistically Valid Conculsion |
| Aetna Life Insurance Company | $ 1,187,835.00 | $ 368,228.85 | $ 307,309.96 | $ - |
| Anthem Inc/ Anthem Blue Cross/Wellpoint | $ 1,490,910.00 | $ 462,182.10 | $ 368,700.63 | $ - |
| Blue Cross Blue Shield of Alabama | $ 176,839.00 | $ 54,820.09 | $ 101,583.69 | $ - |
| BCBS of Arkansas (Claim file Password Protected) | | | | $ - |
| Blue Cross Blue Shield of Florida | $ 17,201.00 | $ 5,332.31 | $ 4,670.53 | $ - |
| Blue Cross Blue Shield of Hawaii | $ 1,920.00 | $ 595.20 | $ 1,212.51 | $ - |
| Blue Cross Blue Shield of Minnesota | $ 13,545.00 | $ 4,198.95 | $ 8,402.24 | $ - |
| Blue Cross Blue Shield of New Jersey | $ 19,555.00 | $ 6,062.05 | $ 8,554.98 | $ - |
| Blue Cross & Blue Shiled of Rhode Island | $ 14,485.00 | $ 4,490.35 | $ 8,428.15 | $ - |
| Blue Cross Blue Shield of South Carolina | $ 68,558.00 | $ 21,252.98 | $ 30,952.36 | $ - |
| Cigna | $ 556,131.00 | $ 172,400.61 | $ 186,763.32 | $ - |
| Coventry Health Care | $ 13,297.00 | $ 4,122.07 | $ 5,935.40 | $ - |
| Emblem Health | $ 36,645.98 | $ 11,360.25 | $ 7,814.00 | $ - |
| GEHA | $ 25,866.00 | $ 8,018.46 | $ 11,053.67 | $ - |
| Healthfirst | $ 13,890.00 | $ 4,305.90 | $ 31.50 | $ - |
| Highmark Blue Cross | $ 384,667.00 | $ 119,246.77 | $ 182,721.89 | $ - |
| Humana | $ 542,001.50 | $ 168,020.47 | $ 213,050.69 | $ - |
| IHC Health Solutions | $ 325.00 | $ 100.75 | $ - | $ - |
| Independence Blue Cross | $ 126,336.00 | $ 39,164.16 | $ 64,539.31 | $ - |
| Independent Health | $ 125,465.00 | $ 38,894.15 | $ 99,430.07 | $ - |
| Kaiser Permanente | $ 3,875.00 | $ 1,201.25 | $ 2,758.55 | $ - |
| Premera Blue Cross | $ 20,770.00 | $ 6,438.70 | $ 7,003.28 | $ - |
| Tricare (Claim file Password Protected) | | $ - | | $ - |
| United Health Group (Optum) | $ 2,611,469.74 | $ 809,555.62 | $ 942,251.86 | $ - |
| WellCare Health Plans, Inc. | $ 9,150.00 | $ 2,836.50 | $ 5,756.57 | $ - |
| XL Health | $ 9,622.50 | $ 2,982.98 | $ 6,015.31 | $ - |
| | | | | $ - |
| **Total** | **$ 7,470,359.72** | **$ 2,315,811.51** | **$ 2,574,940.47** | $ - |

*Figure 23* - Billed vs. Intended vs.  Paid

## Billed vs. Intended vs. Actual / Foreseeable Loss for "Duplicates"

As noted earlier I found flaws in the assumptions regarding what constitutes a fraudulent duplicate vs. a re-billed claim or a duplicate of a portion of a claim that may be payable.  Evaluating the Government's methodology to determine the mathematically correct value for 'duplicates" I evaluated every claim for all payors.  The results were as follows:

87

Rebuttal Expert Report Regarding Documents
Prepared by Michael F. Arrigo, October 9, 2017

Observations:

- Mr. Mirando does not determine the clinical necessity of the services he provides, it is the responsibility of the physician to decide what specific study or studies are needed for the patient's specific condition. In other words, Holter Labs is in the business of providing services that are ordered by physicians.

- Mr. Mirando should not bill for any studies other than those requested by the clinician. It is up to the clinician to document the evidence for the medical necessity of the study. It is not up to Mr. Mirando to determine the medical necessity of the study performed assuming it was requested by the clinician.

- To prove fraud, records would need to be provided showing that services were performed that were either:
  - Not ordered by a physician
  - Ordered by a physician but not medically necessary. In this case, the fraud would be committed by the physician who ordered the services that Holter Labs provides. Of approximately 150,000 dates of service over several years I was provided with less than ten (10) complete records of physician orders for specific patients. Even in those cases is not clear what device was used to perform the procedure.

- Mr. Mirando is not a clinician and not trained to clinically interpret measures of cardiac electrical activity, EEGs, vagal responses, sleep disorders or other interpretations of the reports generated for clinicians who use his services.

- Mr. Mirando provides his clients (generally primary care physicians) with cardiac monitor devices that are used by the client as part of cardiac related evaluations that are deemed medically necessary by the physician.

- Mr. Mirando does not provide diagnostic interpretation but only the equipment and reported data derived from the equipment.

- Mr. Mirando does not provide any physical testing or evaluation of the patient directly.

- Non-coverage of services various greatly from one payer to the next. Non-coverage or denial does not imply fraud. Submission of a duplicate claim also does not imply fraud in and of itself unless there is evidence that multiple claims with different IDs where submitted for the same type of services and different dates of services that would be inconsistent with the type of service rendered.

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

1    Analysis of Alleged Fraud Proof Points from the Government

2    1. Although there are over $7 million in fraudulent billings and over $2 million in alleged

3       payments that were obtained fraudulently in the government's data, the Government only

4       provides complete detail on patient records and doctors' orders for seven (7) patients.

5       Based on the information available to me provided by counsel, the data is available for

6       these patients and the respective alleged fraudulent amounts:

| Patient | Insurance | Total Suspected Fraud | |
|---------|-----------|-------------|-------------|
| | | **Amt Billed** | **Amt Paid** |
| Landis | Aetna | $ 3,881.00 | $ 2,217.60 |
| Murphy | Aetna | $ 2,060.00 | $ 36.00 |
| Barber | Aetna | $ 2,096.00 | $ 712.32 |
| Solmor | Aetna | $ 115.00 | $ 133.75 |
| Bennett | UHG | $ 3,055.00 | $ 1,089.01 |
| Harttrup | UHG | $ 3,615.00 | $ 3,315.00 |
| Foster | Cigna | $ 2,460.00 | $ 1,476.00 |
| | | | |
| | | $ 17,282.00 | **$ 8,979.68** |

7

8    2. Of the approximate 31,761 separate billings produced by the Government, these seven (7)

9       patients are the only ones where an audit trail is provided, and it omits all clinical records.

10      Holter Labs billed services since 2005 for 18,791 patients.[74]

11

12   3. This is equivalent to a sample size of (7 patients divided by 31,761 claims or 7/31761)

13      which equals two tenths of one percent of the data (0.02204%).  This sample size would not

14      in my opinion be able to extrapolate to fraud for the majority of these claims, and would not

15      meet the test of 'reasonable degree of certainty' to which one would be held as an expert in

16      a civil trial ("…in a civil trial, a party may prevail with as little as 51 percent probability (a

17      preponderance))[75] and certainly not meet the standard "beyond a reasonable doubt" in a

18      criminal trial. [76]

19   4. It is not clear if the clinician requested additional services beyond the basic cardiac

20      monitoring or that any such studies in the evaluation and treatment of the patient. While

21      there appears to be a single order for 24-hour monitoring, multiple days of service with

22      different claims ids where billed for a variety of services.   I do not have the documentation

23      to show whether the multiple 24-hour monitoring events were ordered or not ordered.

89

1   These orders occur within the space of 1 to 2 weeks' time.  I defer to a physician's
2   judgement as to whether it would be medically necessary to order multiple 24-hour
3   monitoring in one to two weeks' time.

4   **Assessment:** A case could be made that the additional services beyond the standard ECG
5   monitoring codes 93226 and 93232 where neither requested nor needed by the ordering
6   clinician.  Based on existing information it appears that multiple monitoring services where
7   done on multiple days in a short period of time.  This would not seem reasonable and there
8   is no evidence that I can see that these services where ordered.

9   5.  The government states that it appears that the device(s) used did not have the ability to
10      provide remote access to data and nor the ability to provide patient externally activated
11      recordings over 30 days.   My understanding is that the device stores data in a static
12      memory system and can be downloaded by the physician and sent to Holter Labs, therefore
13      both the remove capability and the capability to record data for over 30 days are possible.

14  **Assessment:**  Government's alleged fraud for the following services would be consider
15  cannot be considered inappropriate without more information which has not been provided,
16  specifically

17      **a.**  the physician's order,
18      **b.**  the documentation of which device was used,
19      **c.**  the diagnostic report.

        93229    REMOTE 30-DAY ECG TECH SUPP
                 XTRNL PT ACTIVATED ECG REC DWNLD 30
        93271    DAYS

20  6.  The Government states that equipment used does not appear to be able to provide EEG
21      capability required for a standard EEG assessment and patient interviewed reported there
22      were no cranial leads.

23  **Assessment:** If this is true, billing for the following service would be considered
24  inappropriate and could be considered fraudulently billed for all claims. However, I have no
25  data proving what device was used.  Patients often do not remember what services were
26  performed a few weeks after receiving medical care.  It is possible that given there were
27  four years elapsed time between these service dates and the patient interviews that they may
28  have forgotten, particularly if they had chronic (ongoing) symptoms and treatments.  Again,

Prepared by Michael F. Arrigo, October 9, 2017

we have a sample size of only seven patients for 31,000 plus in medical claims, which is not a statistically valid sample.

95827     NIGHT EEG

7. The equipment allegedly used allegedly does not appear to support the various respiratory and other component of a sleep study.

**Assessment:** If this is true, billing for the following service would be consider inappropriate and could be considered fraudulently billed for all claims.  However, I have no data proving what device was used.


95806     SLEEP STUDY UNATT&RESP EFFT


8.  The equipment available does not appear to support micro T-wave assessment.

**Assessment:** If this is true, billing for the following service would be consider inappropriate and could be considered fraudulently billed for all claims.  However, I have no data proving what device was used.


93025     MICROVOLT T-WAVE ASSESS


1.  Cardiac autonomic testing requires a correlation between a physical maneuver observed by the physician and a correlated ECG to determine the result.  It allegedly does not appear the current offering can provide this correlation. **Assessment:** If this is true, billing for the following service would be consider inappropriate and could be considered fraudulently billed for all claims. However, I have no data proving what device was used.


95921     AUTONOMIC NERVE FUNCT TEST


## Summary of Gaps in the Government's Sampling Methodology

13. The Government used a limited set of seven (7) patients out of over 31,761 claims transactions that produced unreliable extrapolated amounts of alleged fraud.

14. For this limited set of seven (7) patients:

    c) There appears to be evidence that services were provided and that no supporting clinical documentation is available as to whether those services were requested by a clinician or not.

    d) There is evidence that multiple service encounters for the same type of service were provided in relatively short time frame. This may be a reason to audit Holter Lab's claims, but no audits were performed by any health plan.

    e) Typically, such audits are conducted by the payor who received the claim. Based on the documents available to me, there are nineteen (19) health plans that received claims, and then either denied claims or paid claims for services billed by Holter Labs. Each health plan would have the discretion to audit those claims.

    f) To confirm that there is truly fraudulent intent requires that the service requested by the clinician and the intent of the clinician in ordering those tests is matched to the service provided by Holter Labs LLC using a statistically valid sample size.

    g) To achieve an audit of a statistically valid sample and evaluate whether these claims are valid or fraudulent, one would need to either look at a statistically valid sample across all nineteen payors, or have a very large sample size of claims that had been previously evaluated by at least one payor. Neither of these are available.

15. Once the sample size has been secured, a calculation of the actual fraudulent amount, if any, would require linkage of provider ordering documentation and billing linked to the relevant Holter Lab LLC billing for claims in question as to billing for services not ordered, the report to the physician, and for those claims the government has categorized as "unable to perform" due to alleged use of a device that is incapable of performing a specific procedure, proof of which device was used. The only way to prove which device was used is to contact the physician who used the device, because this data is not present on the health care claim, the order by the physician, or the report that is provided from the device by Holter Labs back to the physician.

16. Proving that services were provided when not ordered will require more complete data for claims and documentation from both the client and Holter Labs LLC. To provide a statistically valid projection of fraud with a 99% confidence level and a margin of error of 5%:

    B. The complete data would need to be analyzed by at least 652 of the 31,761 claims, or a sample of 2.05% (z score of 1.96 or nearly two standard deviations from the mean).

Prepared by Michael F. Arrigo, October 9, 2017

$$Sample\ Size = \frac{\frac{z^2 \times p(1-p)}{e^2}}{1 + (\frac{z^2 \times p(1-p)}{e^2 N})}$$

*Figure 24 - Population size = N, margin of error = e, z score = z.*

17. Similarly, to conclude with 95% certainty and a 5% margin of error that specific claims such as the 3,171 claims denoted with CPT code **93025** are fraudulent, at least 343 claims would have to be completely analyzed.  A complete analysis would require determining whether the procedure was performed as described "Microvolt T-wave alternans testing is performed to assess patients who are at risk for sudden cardiac arrest due to previous heart attack, heart failure, left ventricular dysfunction, unexplained syncope, or family history of sudden cardiac arrest. A set of 14 electrodes are distributed on the torso and attached to the ECG machine. Seven are standard electrodes while the other seven are special microvolt T-wave alternans sensors. ECG recordings are obtained while the patient walks on a treadmill while slowly increasing treadmill speed to increase the heart rate gradually. Alternatively, heart rate may be increased pharmacologically or using a pacer. The special microvolt T-wave alternans sensors are able to detect extremely small changes in the T-wave portion of the ECG that are not visible to the naked eye on the ECG recording. The test continues until T-wave changes are detected or until the patient achieves the desired heart rate without evidence of T-wave changes. The physician reviews the ECG and provides an interpretation of findings with a written report. including viewing the patient chart, the physician's order, the actual service provided, evidence of what device was used which is not contained in the insurance claim, the insurance claim submitted, the amount paid, and whether the insurance company denied the claim, audited the records or provided a reason for not paying the claim to determine whether it is true that $1,106,777.76 was fraudulently billed and $314,153.63 was fraudulently received.

  o According to the information made available to me, Government data made available to me by counsel, payments were made by the following payors, each of which would have to be verified:

    ▪ Aetna
    ▪ Anthem

93

Confidential Expert Report Regarding Claims
Prepared by Michael F. Arrigo, October 9, 2017

- BCBS of Alabama
- BCBS of Florida
- BCBS of Minnesota
- BCBS of New Jersey
- BCBS of Rhode Island
- BCBS of South Carolina
- Cigna
- Emblem Health
- GEHA
- Healthfirst
- Humana
- Independence Blue Cross
- Independent Health
- Premera
- Tricare
- United Health Group
- XL Health

18. Similarly, to conclude with 95% certainty and a 5% margin of error that 4,967 claims denoted with CPT code **93226** are fraudulent, at least 357 claims would have to be completely analyzed. A complete analysis would include confirming whether these steps were completed:

- Electrocardiographic (ECG) rhythm-derived data is gathered for up to 48 hours of monitoring as the patient goes about regular daily activity while wearing an external ECG recording device, also called a Holter monitor. Electrodes or leads are placed on the patient's chest, and the patient is instructed on the use of the monitor. The recording device makes continuous, original ECG wave recordings for a 12 to 48-hour period. The recordings are captured on magnetic tape or digitized medium to be reviewed later. At the end of the recording period, the patient returns to the office with the device. Stored data derived from the continuous recordings of the electrical activity of the heart include heart rhythm and rate, ST analysis, variability in heart rate and T-wave alternans. Visual superimposition scanning is done to give a 'page review' of the entire recording, identifying different ECG waveforms with selective samples of rhythm strips. A report is made after analysis of the scanning, and the physician or other qualified health care professional reviews and interprets the data for heart arrhythmias. connection, recording, and disconnection.

94

o Each claim would need to be verified including viewing the patient chart, the physician's order, the actual service provided, evidence of what device was used (and since this is an alleged duplicate claim whether the claim was duplicated for fraud, duplicated as an additional request for payment, duplicated because the date is in close proximity to another date of service for legitimate reasons or fraudulent reasons) which is not contained in the insurance claim, the insurance claim submitted, the amount paid, and whether the insurance company denied the claim, audited the records or provided a reason for not paying the claim to determine whether it is true that $297,808.86 was fraudulently billed and $90,669.54 was fraudulently received.

o According to the information made available to me, Government data made available to me by counsel, payments were made by the following payors, each of which would have to be verified:

- Aetna
- Anthem
- BCBS of Alabama
- BCBS of Florida
- BCBS of Minnesota
- BCBS of New Jersey
- BCBS of Rhode Island
- BCBS of South Carolina
- Cigna
- Emblem Health
- GEHA
- Healthfirst
- Humana
- Independence Blue Cross
- Independent Health
- Premera
- Tricare
- United Health Group
- XL Health

19. In my opinion, if and only if it is determined using methods above including a statistically valid sample size that it was not possible for Holter Labs to provide the services billed consistent with the standard of practice for these studies, each of those service claims could be considered

1    fraudulent.  In that case, the calculation of the amount of fraudulent billing could be based on

2    billed claims with those service codes.

## Exhibit D – Materials Reviewed

### A. Provided by Counsel

Section 3

3    3    Client outline prepared by counsel

3a 1    Crowley debtor exam, March 19 2015, Judgement Debtor Examination

        Table of Contents

        Client case outline

3a 2    Verified Complaint Cast v. Holter filed October 24, 2012

3a 3    Verified Cross-Complaint Cast v. Holter filed November 18, 2013

3a 4    Default Judgement Request filed April 10, 2014

3a 5    Holter Requsets for Production to Plaintiff James Cast, Set One

3a 6    Cast Response to Requests for Production Set One

3a 7    Declaration in Support of Attorney's Motion to be Relieved as Counsel Civil for Cast and Crowley.  Attorney Benjamin Flint III  - July 28, 2014

3a 8    Declaration in Support of Attorney's Motion to be Relieved as Counsel – Civil for Cast 2 Attorney Kevin Day – May 12, 2014

3a 9    Declaration in Support of Attorney's Motion to be Relieved as Counsel – Civil for Crowley Attorney Kevin Day - May 12, 2014

3a 10    Minute Order Re Relief of Counsel September 4, 2014

3a 11 Defendants Holter Labs and Michael Mirando's reply in support of their motion to require plaintiff to furnish a security pursuant to Corp. Code 17501

3a 12 Miscellaneous Emails Between Holter Counsel and BK Lawyer

3a 13    Emails Between Jim Cast and Michael Mirando

3a 14    Emails from Jim Cast to Mirando/ Holter Labs

3a 15    Miscellaneous emails between Crowley and Mirando

3a 16 Defense Holter Labs, LLC's requests for admission to Plaintiff James Cast, Set One April 4, 2014

3a 17 Cast's Supplemental Response to Request for Admission Set no. One

3a 18    Deposition of Olena Burns August 11, 2014

3a 19 JP Morgan Chase Account Records for Holter Labs, LLC

3a 20   Cast Medical Services, LLC corporate filings

3a 21 Civil Docket for case USA ex Rel Jamse Case, et al v. National Cardio Labs, LLC, et. al.
        filed 1-16-04


3a 22 First Superseding Information re USA v. Parsons filed January 24, 2007

3a 23   Miscellaneous emails between Mirando and Counsel

3a 24 Holter Labs Inc Medicare approval for IDTF September 19, 2014

3a 25   Specialized Medical, LLC corporate filing February 27, 2012

3a        Defense Discovery Disclosure Table of Contents December 13, 2016

Section 4 Production 1

2.  Cast v. Mirando

        Cast v. Mirando Holter Labs, LLC's answer to the verified first amended Complaint filed
November 18, 2013

        Cast v. Mirando, Answer of Stanton Crowley to Verified Cross- Complaint - 1 filed
        November 25, 2014

        Cast v. Mirando Case Summary

        Cast v. Mirando Verified Cross-Complaint Filed November 18, 2013

        Cast v. Mirando Default Judgement filed August 12, 2014

        Cast v. Mirando Verified First amended shareholder derivative complaint filed March 15,
        2013

        Cast v. Mirando Michael - Mirando's answer to the verified first amended complaint filed
        November 18, 2013

        Cast v. Mirando – Notice of Change of Address filed January 30, 2015

        Cast v. Mirando – Register of Actions

        Cast v. Mirando – Request for Dismissal filed December 2, 2014

        Cast v. Mirando Verified Complaint filed October 24, 2012

        Cast v. Mirando FBI electronic communication – obtained some court documents 3/18/15

        Cast v. Mirando – Holter Labs, LLC notice of motion and motion to require plaintiffs to
        furnish a security pursuant to corporate code section 17501

3. Websites

1    http://holterlabs.com/faq.php FAQ's

2    http://holterlabs.com/ How to Start

3    http://holterlabs.com/services.php Services

4    http://holterlabs.com/ What we do

5    http://holterlabs.com/ Your benefit

6    4. Database Queries

7        Clear searches; NCIC checks September 23, 2013 FBI Electronic Communication

8

9

10       Holter Labs LLC California Secretary of State Business Entity Detail

11       Holter Labs California CLEAR Business Report

12       Holter Labs Oregon CLEAR Business Report

13       Michael Mirando CLEAR National Comprehensive Report

14       Mirando NCIC

15       Mirando DMV Image Record

16       Mirando, Finzer, West Coast

17           CLEAR.4 Companies November 4, 2014

18           CLEAR Michael Mirando

19           CLETS Oregon + DMV

20           D&B Global Reference Solution – Report Page: Pelagic

21           D&B Global Reference Solution – Report Page: Finzer Properties, LLC

22           Business Registry Business Name Search Finzer LLC, Oregon

23           ACCURINT Michael J Mirando Properties

24           ACCURINT Mirando

25           ACCURINT Mirando + OR

26           Business Registry Business Name Search Pelagic Properties LLC, Oregon

27           FBI Electronic Communications – Results of database searches for Michael

28           Mirando and four identified companies November 7, 2014

29           Business Registry Business Name Search West Coast Home Solutions LLC

30           Business Registry Business Name Search West Coast Real Estate Holdings LLC

31           Spreadsheet ACCURINT Finzer, Pelagic, West Coast Home Solutions, West

32           Coast Real Estate Holdings

33       Request to run Mirando in TECHS

98

1    Holter Labs Amended Annual Report efiled December 1, 2014 Oregon Secretary of State

2    Holter Labs Articles of Organization efiled November 14, 2012

3    Holter Labs Articles of Conversion filed March 16, 2013

4    WHOis.net lookup holterlab.com

5

6    5. Holterlabs.com Screenshots

7    Holterlabs.com.FAQ.2.screen shot.03.30.2016.pdf

8    Holterlabs.com.FAQ.screen shot.03.30.2016.pdf

9    Holterlabs.com.Home page.screen shot.03.30.2016.pdf
10
11

12    Holterlabs.com.Home.how to start.screen shot.03.30.2016.pdf

13    Holterlabs.com.Home.your benefit.screen shot.03.30.2016.pdf

14    Holterlabs.com.pdf

15    Holterlabs.com.Request Supplies.Contact Us.screen…ot.03.30.2016.pdf

16    Holterlabs.com.Services.screen shot.03.30.2016.pdf

17    FBI Electronic Communication: Screenshots taken on Holterlabs.com

18    6. Godaddy.com

19    Contact Info for Shopper ID 5980856 -holterlabinc Domain Information, Audit Histroy

20    GoDaddy Response to Court Order

21    GoDaddy Correspondence with FBI

22    GoDaddy Declaration of Custodian Certifying Business Record

23    GoDaddy Service of Court Order

24    Import Form – WHOis search for domain registrar for Holterlabs.com March 29, 2016

25    WHOis.net lookup holterlabs.com

26    7.  Health Markets

27    Health Markets correspondence with FBI September 30, 2013

28    8.  Holter Labs Inventory

29    IntriConDatrix Records

30    Barbara Streagle, technician, Intricon Datrix, interviewed 4/1/16

31    Interview with Jon Barron

32    Address for Caird Technology (Software Company)

33    Flyer for Datrix VX3

34    Interview of Jon Barron General Manager of Datrix on 3/19/14

| | |
|---|---|
| 1 | Lynn Medical Invoices |
| 2 | Sample Device Label |
| 3 | Response to Federal Grand Jury Subpoena |
| 4 | Intricon Datrix Declaration of Custodian |
| 5 | Intricon Datrix Subpoena to Testify April 4, 2016 |
| 6 | Intricon Datrix Invoice 5/18/2011 |
| 7 | Intricon Datrix Response to Subpoena April 5, 2016 |
| 8 | Official Record of Intricon Datrix response to subpoena April 8, 2016 |
| 9 | Response to HIPAA subpoena |
| 10 | FBI Import Form: IntriCon Datrix HIPAA subpoena November 15, 2013 |
| 11 | |
| 12 | IntriCon Datrix Response to HIPAA subpoena |
| 13 | IntriCon Datrix Subpoena to appear |
| 14 | Repair Invoices IntriCon Datrix |
| 15 | Lead-Lok Records |
| 16 | Lead-Lok Response March 30, 2016 |
| 17 | Invoice Number 0100882-IN |
| 18 | Invoice Number 0101234-IN |
| 19 | Invoice Number 0101677-IN |
| 20 | Invoice Number 0102195-IN |
| 21 | Invoice Number 0102668-IN |
| 22 | Invoice Number 0103150-IN |
| 23 | Invoice Number 103290-IN |
| 24 | Invoice Number 103818-IN |
| 25 | Invoice Number 0104323-IN |
| 26 | Invoice Number 0104757-IN |
| 27 | Invoice Number 0105080-IN |
| 28 | Lead-Lok Response to FGJ subpoena April 5, 2016 |
| 29 | Email response to FBI from Lead-Lok |
| 30 | Lead-Lok FGJ subpoena with proof of service March 30, 2016 |
| 31 | Screen shot of Invoices from Lead-Lok |
| 32 | Lead-Lok Response September 28, 2015 Email |
| 33 | from Lead-Lok to FBI 9-28-15 |
| 34 | Interview with Chris Healy, VP of Lead-Lok |

1    Customer Contact Information
2    Customer Credit Card Maintenance AMEX
3    Holter Labs Transactions with Lead-Lok 12-4-12 to 3-25-14
4    Invoices 1-25-2005 to 11-29-12
5    FGJ subpoena with return of service August 18, 2015
6    Invoice 0095045-IN
7    Invoice      0095046-IN
8    Invoice      0095656-IN
9    Invoice      0095986-IN
10   Invoice 0096243-IN
11
12   Invoice 0096362-IN
13   Invoice 0096924-IN
14   Invoice 0097253-IN
15   Invoice 0097664-IN
16   Invoice 0098086-IN
17   Vermed Response
18   Declaration of Custodian of Records May 13, 2016
19   Holter Labs Invoices from Vermed
20   Vermed Respond to FJG subpoena
21   Lynn Medical Records
22   Lynn Medical FJG Subpoena March 29, 2016
23   Lynn Medical Correspondence March 31, 2016
24   Lynn Medical Invoice February 8, 2010
25   Lynn Medical Invoice February 18, 2009
26   Lynn Medical Invoice March 24, 2010
27   Lynn Medical Invoice April 5, 2006
28   Lynn Medical Invoice February 8, 2010
29   Lynn Medical Invoice  May 21, 2009
30   Lynn Medical Invoice  June 2, 2010
31   Lynn Medical Invoice  June 14, 2005
32   Lynn Medical Invoice  June 28, 2005
33   Lynn Medical Invoice  July 9, 2007

Lynn Medical Invoice  July 22, 2005

Lynn Medical Invoice  July 26, 2005

Lynn Medical Invoice  July 28, 2005

Lynn Medical Invoice  September 24, 2008

Lynn Medical Invoice  September 28, 2009

Lynn Medical Invoice November 12, 2010

Lynn Medical Return of Service for subpoena

Lynn Medical Response to FJG subpoena

Lynn Medical's Response to HIPAA subpoena November 27, 2013

Lynn Medical Equipment Transactions Spreadsheet for Holter Labs

Pulse Biomedical Records

PBI Document production 04-04-2016

Pulse Biomedical correspondence to FGJ subpoena

Pulse Biomedical Declaration of Custodian of Records 4-4-2016

Pulse Biomedical FGJ subpoena with POS 3-30-2016

Email Correspondence Mirando and Pulse Biomedical

Pulse Biomedical Response to FGJ subpoena 4-8-2016


9.  Interviews

Interview of Jim Cast

Interview of Jon Barron, Attachments

Address for Software Company- Caird Technologies

Flyer DR512 VX3 Model

Lynn Medical Invoices

Sample Device Label

Interview of Andrew Escobar

Interview of Belen Perazzo Barber

Interview of John Harttrup

Interview of Jon Barron

Interview of Lisa Murphy

Interview of Lisa Solmor

Interview of Marla Landis

Interview of Martha Bennett

1.  Interview of Stacy Sixtos Foster
2.  Interview of Stanley Klein
3.  Interview of Ivan Polanco- Practice Manager of Optum Care Medical Group
4.  Interview of Kimberly Smith, Medical Assistant of Dr. Ruby Simpkins
5.  Stanton Crowley
6.      Emails
7.      Interview Notes
8.      Interviews RE SC
9.          Attachment Amended Complaint 9-17-2013
10.          Attachment Blue Cross payment notifications 9-17-2013
11.          Attachment Complaint
12.
13.          Attachment Holter Labs Documents
14.          Attachment Immunity Agreement
15.          Interview of Stanton Crowley 9-17-13
16.          Interview of Stanton Crowley 9-23-13
17.          Attachment Contact Listing 4-11-14
18.          Attachment Inventory List 4-11-14
19.          Attachment Mednet.Heartrak 4-11-14
20.          Attachment Patient List 4-11-14
21.          Interview of Stanton Crowley 4-11-14
22.          Crowley email 5-12-14
23.          Interview of Stanton Crowley 5-14-14
24.          Interview of Stanton Crowley 11-7-14
25. 11. Murrieta Medical Supply
26.      Fictitious Business Name Statement Murrieta Medical Supply 3-27-14
27.      Orange County Clerk Recorder Fictitious Business Name Statement Murrieta Medical
28.      Supply
29. 12.  Request for Investigative Assistance Enrollment
30.      Aetna response for enrollment documentation
31.      Anthem
32.          Email correspondence from Carl Reinhardt
33.          Import from Carl Reinhardt

1                     NHCAA request letter Blue Cross of CA

2        Cigna
                  8
3                  9
4              10   Request for Enrollment Application

5              11   Response to Request

6        Optum
             12
7              13   UHG response to request for enrollment documents

               14   Request for Enrollment Documents

13. Surveillance

          Physical Surveillance Finzer 5-6-

          16 Physical Surveillance Mirando

          5-11-16 Physical Surveillance

          Mirando 5-18-16 Physical

          Surveillance Mirando 5-23-16

Section 5 Production 2

    8. Declaration of Custodians – Various

                     Ally Bank 9-22-14 Declaration FGJ

                     Bank of America 9-28-15 Declaration

                     FGJ Bank of the West 4-2-14

                     Declaration FGJ Capital One 3-17-15

                     Declaration FGJ Capital One 10-20-15

                     Declaration FGJ

                     Fidelity National of Oregon 9-24-14 Declaration

                     FGJ JP Morgan Chase 10-14-14 Declaration FGJ

                     Lea Lacsoon 6-4-15 Declaration

                     Wells Fargo Bank 10-6-15 Declaration

    15.  Miscellaneous Documents

                     Bank of America account RE Murrieta Medical Deposits

    16.  Bank Schedules

          Ally Bank Mirando Account 5-19-10 to 3-15-16

          Bank of America Murrieta Medical Supply 2007-

          2012 Bank of the West Holter Labs LLC 2010-

104

2012

Chase

Holter Labs 2005 – 2013

Mirando 2008 - 2014

ING Mirando 2005-

2016 US Bank Holter

Labs

US Bank - Mirando dba Holter Labs 2012-

2013 US Bank - Holter Labs 2013- 2016

19. Financial Records

Ally Bank

Ally Bank Production 4-12-16

FGJ subpoena requests document production 4-12-16 Ally Bank response to subpoena 4-8

-16

Ally Bank monthly statements September 2015 to March 2016

SD card containing aircraft video surveillance in

Portland Surveillance request for Michael Mirando 5-

6-16

Ally Bank Customer Service Screen

Ally Bank Declaration of Custodian

Ally Bank FGJ subpoena with proof of serve 3-24-16

Ally Bank Screen shot of Mirando account 4-5-16

Bank of America

Bank of America production 9-22-15

Bank of America signature cards

Bank of America response to FJG subpoena 9-22-15

Bank of America FGJ subpoena with proof of service 8-19-15

Bank of America correspondence- password for CD

Bank of America Custodian of Records Affidavit 9-21-15

Bank of America Checking Account Statement Mirando 2007-2012

Bank of the West

Prepared by Michael F. Arrigo, October 9, 2017

Bank of the West description of response to FJG subpoena 4-2-14

Bank of the West Declaration of Custodian 3-12-14

Bank of the West account records for Holter Labs LLC

Bank of the West checks

Bank of the West deposits from 2010 to 2012

Bank of the West FJG subpoena with proof of service 3-13-14

Bank of the West banks statements from 4-2010 to 12-2012

Bank of the West FGJ subpoena 3-6-14

Capital One ING

Capital One FGL subpoena requests 10-10-15

Capital One Production 3/6/2015

Deposited Checks Account 6279769

Deposited Checks Account 133192018

Capital One response to FGJ subpoena 3-17-2015

Capital One ING Custodian of Records

Bank Statements ING and Capital One 3-05 to 1-15

Capital One FJG subpoena 2-9-15

Capital One Production 4-27-16

Capital One correspondence response to subpoena 4-26-16

Capital One debits

Prepared by Michael F. Arrigo, October 9, 2017

        Capital One deposited items

        Capital One statements 10-15 to 3-16

        Capital One wire 3-4-16

        Capital One Declaration of Custodian

        Capital One FJG subpoena with proof of service 3-24-16

        Capital One response to FGJ 4-29-16

        Capital One FGJ subpoena, proof of service 4-29-16 Import form

     Second FGJ subpoena August 2015

        Capital One 360 FGJ subpoena with proof of service 8-18-15

        Email correspondence 1-6-16

        Kennedy wires

        Mirando and Capital One ING correspondence

        Capital One ING Declaration of Custodian

        ING Statement for Mirando account 5-08

        ING Statement for Mirando account 2-15 to 9-15

Chicago Title Company of Oregon

     Declaration of Custodian

     FJG subpoena with proof of service 8-18-15

     Response to FJG subpoena

     Escrow documents

Etrade

     Documents provided by E Trade Clearing LLC

     FGJ subpoena with proof of service 8-25-14

     ETrade Activity

     Declaration of Custodian

     Mirando, Michael – GJ

        Account 65845349

           Account Profile

           Statement 1-30-09

           Statement 3-31-09

           Statement 6-30-09

           Statement 9-30-09

           Statement 12-31-09

Prepared by Michael F. Arrigo, October 9, 2017

Statement 3-31-10

Online Account Application

Account 66189461

2007 Consolidated Form 1099

2007 Year End Summary

2008 1009 Consolidated amended 1099

2008 1009 Consolidated Form 1099

2008 Year End Summary correspondence

2008 Year End Summary

2009 Form 1099 and details

2010 Form 1099 and details

2011 Form 1099 and details

2012 Form 1099 and details

2013 Form 1099 and details

Account profile

ACH 2007- 2011

Checks

Bank Statements 9-07 to 9-14

OLA Reprint

Account  66799604

Statements 9-07 to 3-13

Account Profile

OLA Reprint

Fidelity National Title Company

Copies of 6 Checks

Escrow File

Title File

Declaration of Custodian

FGJ subpoena with proof of service 8-25-14

Response to FGJ

Source of funds

JP Morgan Chase

Declaration of Custodian

FGJ subpoena and FD 302s

Chase – Holter Labs LLC

Deposits 2005-2010

Statements 2005-2013

Deposits 2011-2013

Signature Card

Holter Labs checks signed by Crowly

Holter Chase review of account

Mirando Checking Account

Statements 2008- 2014

Signature Card

Wires 2009

Pelagic Accounts and Bradford Tyler Holdings

Bradford Tyler Holdings

Statements 2009-2010

Signature Card

Pelagic Properties of Mississippi

Chase Statements 2009-2011

Signature Card

Pelagic Properties of North Carolina

Chase Statements 2006-2014

Signature Card

Pelagic Properties of South Carolina

Chase Statements 2005-2011

Signature Card

Metavante

Northern Trust Investment

Northwestern Life

Ocwen Indymac

PNC Bank

US Bank

Vanguard Group

Vehicles

Audi Wilsonville

    Documents produced under FGJ subpoena

    Declaration of Custodian

    Records of Purchase

Ron Tonkin Toyota

        Documents produced under FGJ subpoena

        Declaration of Custodian

        Records of Purchase

US Bank Leasing

    Response to FGJ subpoena 2008 Chevy Corvette

    Records 2008 Chevy Corvette

    Declaration of Custodian

Vision Financial Markets

Wells Fargo

    Home Mortgage Produced 10-15-15

21.  Miscellaneous Spreadsheets

    Mirando Assets and Summary of Bank Accounts

    USA_ 025472 Holter Labs GJ Serials

    USA_ 025473 Holter Labs Main file Serial Numbers

24.  Miscellaneous Documents

    Arrest of Michael Mirando 10/07/16

    Attempt to Interview James Brown 10/28/16

    James Brown DMV Record

    Deliverables

        MAC Request form EDI Request for Pametto GBA

        MAC Request for EFT Request for Holter Labs

        Provider Call Logs SC Part B Palmetto GBA- Medicare B SC

        Provider Enrollment Holter Labs IDTF Site Investigation

        Email Crowley- Holter Labs partners 9-3-16

        RFI Holter Labs Inc 10-13-16

25. Documents

    Email Update Kathleen Kennedy to Christopher Kendall: Holter Labs – FD 302s

Indictment Summary of

Evidence Items for AUSA 3-

16-16

Link Chart Chase Bank Account held by Holter Labs


Section 6 Production 3

AdvanceMed correspondence 11-21-16

Holter Labs 12-20-16

AdvanceMed Medicare

Correspondence 11-

21-16 Deliverables

E

D

I

E

F

T

Provider Call Logs

Provider Enrollment correspondence

Provider Enrollment Holter Labs Inc 1-

1-14

Physical Surveillance 9-20-16, 9-28-16, 10-

6-16 Password Medicare Re: Holter Labs 11-21-16

Physical Surveillance 9-20-16

Physical Surveillance 9-28-16

Physical Surveillance 10-

6-16 RFI Holter Labs 10-

13-16


18 Claims Data and Patient Documentation

RIA requests

Anthem request letter 3-29-

16 Holter Labs Request

111

Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

2005-2008 Holter Labs

Request 2009-2012 Holter

Labs RIA 8-3-15

Holter Labs RIA 9-19-13

Optum request letter 3-

29-16

Premera Blue Cross request letter 3-

29-16 RIA 247 and RIA 249  3-29-16

Holter Lab Reports Samples

Holter Labs Report Hattrup, John  4-11-11 Records

Holter Labs Report partial Landis, Maria 4-27-09

Records Holter Labs Report Solomon 5-28-13 Records

Holter Labs Report Bennett, Martha 12-3-12

Records Holter Labs Report Foster, Stacey 8-10-

11 Records Holter Labs Report Perazzi, Belen 1-

12-10 Records Review of Holter Labs Report

Medicare claims January 2014 to April

2016 Aetna Claims

Anthem Claims

BCBS Alabama

Claims BCBS

Arkansas Claims

BCBS Florida/ Florida Blue

Claims BCBS Hawaii Claims

BCBS Minnesota Claims

BCBS New Jersey

Claims BCBS South

Carolina Claims BCBS

Rhode Island Claims

Cigna Claims

Claims Data from

FBI Coventry

Claims

112

Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

Data Analysis

Emblem Health Claims

Fraud Analysis by

Government GEHA

Claims

Healthfirst

Claims

Highmark

Claims

Humana

Claims

IHC Health Solutions

Claims Independent Blue

Cross Claims Independent

Health Claims Kaiser

Permanente Claims

Medicare Claims


Patient Files: Insured Beneficiary Interviews

    4. Belen Perazzo 1-12-10, 1-13-10, 1-16-10, 1-19-10, 1-23-10

    5. Martha Bennett

        HCFA 1500

        UHG Checks – Paid Bennett

        claims UHG claims for Bennett

    9. John Hattrup

        HCFA 1500

        UHG Checks paid Hattrup

        billings UHG claims for

        Hattrup

    10. Interviews with

        Beneficiaries Interview

        of John Hattrup

        Interview of Lisa

113

Solmor Interview of

Matha Bennett

Interview of Stacey Sixtos (nee Foster)

12. Lisa Solmor

HCFA 1500 5-29-13

Holter Labs Final Appeal for Claim 5-

30-13 Aetna Response to first Appeal 5-

30-13

Non-payment of Claim Notice from Aetna 5-30-13

Aetna Final level of appeal response- Notice of Exhaustion of Appeal 5-

30-13 Second Appeal Holter Labs 5-30-13

Third Appeal Holter Labs      5-30-13

13. Marla Landis

HCFA 1500 4-27-09

HCFA 1500 4-28-09

HCFA 1500 5-8-09

HCFA 1500 5-15-09

HCFA 1500 5-22-09


17.  Beneficiaries

Health Insurance Claim

Information Aetna


Correspondence Information

Patient Meza

Patient Solmor

HCFA 1500 Claim Information

Aetna response to RFI

RFI requesting HCFA for claims


Cigna

Request to HCFA 1500

Response to request

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

H                                    FA forms

C                                    Stacey Foster 1500 HCFA

                    Optum UHG

                            Hattrup1500 HCFA Bennett

                            1500 HCFA Checks to Holter

                            Labs LLC RFI to UHG

                            Response to RFI

                 Patient Insurance Claims data

                         Aetna Beneficiaries Claims

                         Cigna Beneficiaries Claims

                         United Health Group Beneficiaries Claims

                 Physicians

                         Donah Bulasan MD

                                Declaration of Custodian

                                Response to HIPAA subpoena

                                HIPAA subpoena with proof of service

                                Medical Records Meza Murphy Service of

                                HIPAA subpoena

                         Gregory Joy MD

                                Declaration of Custodian

                                HIPAA subpoena Medical

                                Records Hattrup


                                Service of HIPAA subpoena 3-17-15


                         Jeffery Globus MD

                                Declaration of Custodian

                                HIPAA subpoena

                                Response to HIPAA subpoena

                                Medical Records Foster

                                Service of HIPAA subpoena 3-16-15

                                                                    115

Prepared by Michael F. Arrigo, October 9, 2017

Richard Richmond MD

Declaration of Custodian

HIPAA subpoena

Medical Records Landis

Medical Records Barber

Medical Records Solmon

Service of HIPAA subpoena

Premera Blue Cross Claims

Provider Enrollment- Palmetto GBA Part B

Tricare Claims

United Health Group Claims

WellCare Health Claims

XL Health Claims

Datrix EEG v ECG

Interview with Jon Barron, General Manager of Intricon Datrix 3-24-14

Indictment

Indictment filed April 5, 2016

Summary of Evidence- Mirando Case, Arrigo annotations

Summary of Evi

Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

### B. Citations and Documents Independently Reviewed

Citations and documents independently accessed appear as end notes in this document.

Rebuttal Expert Report Regarding Losses
Prepared by Michael F. Arrigo, October 9, 2017

# Exhibit E – Prior Testimony

See separate document

Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

## Exhibit F – PowerPoint Illustrations

See separate document

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

1

---

[1] U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014

http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf

[2] Pay to charge ratio is payment for a healthcare claim divided by the charge for the health care claim.  At times the numerator and denominator are reversed (charge divided by payment) and the ratio is then called charge to reimbursement ratio (*see* http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/).

[3] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[4] Collected by: U.S. Department of Health and Human Services
**Archived since:** Sep, 2013 HHS news and announcements from 1991+. https://archive-it.org/collections/3926?fc=meta_Date:2013 accessed October 5, 2017.

[5] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[6] Collected by: U.S. Department of Health and Human Services
**Archived since:** Sep, 2013 HHS news and announcements from 1991+. https://archive-it.org/collections/3926?fc=meta_Date:2013 accessed October 5, 2017.

[7] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[8] Collected by: U.S. Department of Health and Human Services
**Archived since:** Sep, 2013 HHS news and announcements from 1991+. https://archive-it.org/collections/3926?fc=meta_Date:2013 accessed October 5, 2017.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

[9] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[10] San Francisco Spine Surgeons, LLC v. Claim Works LLC., JAMS Reference No. 1110018697, hearing held October 2017 in San Jose, California (Ambler, Arb).

[11] It was stipulated in these proceedings by both parties and Judge Ambler that my qualifications deemed me to be an expert on medical coding, billing, insurance reimbursement, and damages / loss calculations.

[12] Kaiser Health News' Phil Galewitz September 2011.  Denial rates for insurance policies purchased in the individual market—published for the first time as a result of the provisions in the Affordable Care Act— finds that insurers deny coverage at different rates depending on geographical location and for almost any reason. For instance, a review of the 20 most populous states find that "denial rates routinely exceed 20 percent and often are much higher" and seem to contradict industry claims to the contrary.

[13] Dichara, Jaqueline.  Quantify Denial Rates for Smooth Revenue Cycle Management. RevCycle Intelligence. https://revcycleintelligence.com/news/quantify-denial-rates-for-smooth-revenue-cycle-management

[14] August 26, 2016. Lachney, Cameron. Medical Billing Denials Are Avoidable: How to Help Prevent the Top 5 http://www.mckesson.com/bps/blog/medical-billing-denials-are-avoidable/

[15] Gibson, Harold. M-Scribe Medical Billing, August 28, 2014.

[16] Easterling, Sharon. RAC Forensics 101 Part 3: Denials Management, AHIMA. http://bok.ahima.org/doc?oid=103685#.Wdm7FxNSzCI

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

[17] Easterling, Sharon. RAC Forensics 101 Part 3: Denials Management, AHIMA. http://bok.ahima.org/doc?oid=103685#.Wdm7FxNSzCI

[18] Health iPass - Reducing the Expenses of Claim Denial Management Through Automation," May 31, 2016.  http://insights.healthipass.com/blog/reducing-the-expenses-of-claim-denial-management-through-automation

[19] Gibson, Harold. M-Scribe Medical Billing. August 28, 2014. https://www.m-scribe.com/blog/bid/353875/Top-5-Medical-Claim-Denials-in-Medical-Billing

[20] Gibson, Harold. M-Scribe Medical Billing. August 28, 2014. https://www.m-scribe.com/blog/bid/353875/Top-5-Medical-Claim-Denials-in-Medical-Billing

[21] Woodstock, Elizabeth. Denial Management: Field Tested techniques that get claims paid. Optum.

[22] Gibson, Harold. M-Scribe Medical Billing. August 28, 2014. https://www.m-scribe.com/blog/bid/353875/Top-5-Medical-Claim-Denials-in-Medical-Billing

[23] Gibson, Harold. M-Scribe Medical Billing. August 28, 2014. https://www.m-scribe.com/blog/bid/353875/Top-5-Medical-Claim-Denials-in-Medical-Billing

[24] According to the Mayo Clinic, Neurology department, "Autonomic nerve disorders (dysautonomia) refer to disorders of autonomic nervous system (ANS) function. Dysautonomia is a general term used to describe a breakdown or abnormal function of the ANS. The autonomic nervous system controls much of your involuntary functions. Symptoms are wide-ranging and can include problems with the regulation of heart rate, blood pressure, body temperature, perspiration, and bowel and bladder functions. Other symptoms include fatigue, lightheadedness, feeling faint or passing out (syncope), weakness, and cognitive impairment."

[25] Section 13 - Software Validation & Verification

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

http://cairdtech.com/Jim/FDA%20Information/HRV%20FDA%20510K/FDA%20ANS%20510K%205%20-%20pdf/FDA%20markup%20Software%20Validation%20&%20Verification.pdf

[26] Summary of evidence, companion to indictment, page 19, Bates USA_025517 – provided by counsel

[27] Federal Healthcare Fraud Sentencing After Obamacare: Analyzing Title 18 USC 1347
https://www.newyorkcriminallawyer-blog.com/2014/06/federal-healthcare-fraud-sentencing-obamacare.html

[28] Federal Healthcare Fraud Sentencing After Obamacare: Analyzing Title 18 USC 1347
https://www.newyorkcriminallawyer-blog.com/2014/06/federal-healthcare-fraud-sentencing-obamacare.html

[29] U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014
http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf

[30] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[31] Collected by: U.S. Department of Health and Human Services
**Archived since:** Sep, 2013 HHS news and announcements from 1991+. https://archive-it.org/collections/3926?fc=meta_Date:2013 accessed October 5, 2017.

[32] U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014
http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf

[33] July 14, 2013. Mulestein, Health Affairs Blog. http://healthaffairs.org/blog/2013/07/15/what-types-of-hospitals-have-high-charge-to-reimbursement-ratios/

[34] Collected by: U.S. Department of Health and Human Services
**Archived since:** Sep, 2013 HHS news and announcements from 1991+. https://archive-it.org/collections/3926?fc=meta_Date:2013 accessed October 5, 2017.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

[35] U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014

http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf

[36] Based on email from Michael Mirando to attorney Ed Robinson forwarded to me dated September 22, 2017 stating 18,791 patients and approximately 34,000 claims.

[37] San Francisco Spine Surgeons, LLC v. Claim Works LLC., JAMS Reference No. 1110018697, hearing held October 2017 in San Jose, California (Ambler, Arb).

[38] Id.

[39] A lay person can easily confirm these calculations using any number of online calculators (provided that the confidence level is above 80% to 99%; for lower standards providing less quality or certainty, other calculators can be used which are referenced in this report in subsequent citations). One easy to use calculator is the Survey Monkey Sample size calculator which can be found at https://www.surveymonkey.com/mp/sample-size-calculator/

[40] My basis for this data and calculation methods are my knowledge training education and experience. Specifically, these topics were covered in my education in statistical analysis at the University of California, Irvine as part of my economics curriculum and in my course at Stanford Medical School, with a focus on Biomedical Informatics in a course focused on Statistical Analysis for Medicine taught by Kristin L. Sainani, PhD an Associate Professor with Health Research and Policy at Stanford University.  Sainani's courses are Statistics in Medicine, Writing in the Sciences, Probability and Statistics, Discrete Data Analysis, and Longitudinal Data Analysis. Sainani's work is independently quoted by industry peers in a presentation entitled "Basics of Statistics - Research Statistics" prepared by Jobayer Hossain, PhD and Larry Holmes, Jr. PhD, D.Ph., CPH in October 2008.  Hossain and Holmes are employed at Nemours Biomedical Research.  Hossain is Manager, Biostatistics Core Research Scientist, Department of Biomedical Research, Nemours Adjunct Associate Professor, Department of Applied Economics and Statistics, University of Delaware.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

[41] For example, Raosoft provides a calculator that allows a low standard of confidence level such as 51%. Many online calculators will not even allow such a low level of confidence, since it is a statistically low standard and instead only provide the option to use confidence levels of 80% to 95% to 99%. However if a layperson or other expert wishes to validate my calculations without manually performing the z-score calculations they can be checked here:

http://www.raosoft.com/samplesize.html

[42] For each claim and associated medical record, the result of the review / audit will either fraudulent or not fraudulent. Therefore the 'answer' to this question is skewed one way or the other (yes, or no).

[43] NHelp National Health Law Program http://www.healthlaw.org/about/staff/mara-youdelman/all-publications/qa-defining-medical-necessity#.WL4vwhiZP5c June 24, 2004

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

[44] CMS Coverage Policy - Title XVIII of the Social Security Act, Section 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury.

Title XVIII of the Social Security Act, Section 1862(a)(7). This section excludes routine physical examinations.

Title XVIII of the Social Security Act, Section 1833(e) states that no payment shall be made to any provider for any claim that lacks the necessary information to process the claim.

CMS Manual System, Pub 100-02, *Medicare Benefit Policy Manual*, Chapter 15, Sections 60 and 80

CMS Manual System, Pub. 100-03, *Medicare National Coverage Determinations Manual*, Chapter 1, Section 240.4

CMS Manual System, Pub 100-04, *Medicare Claims Processing Manual*, Chapter 1, Sections 10 and 30.2 and Chapter 35

CMS Manual System, Pub. 100-08, *Medicare Program Integrity Manual*, Chapter 3, Section 3.4.1.2, Chapter 10, Chapter 13, Section 13.5.142

Code of Federal Regulations, 410.32 and 410.33

---

[45] In a case involving a transgender patient "On May 11, 1979, the District Court declared that the **policy of denying Medicaid benefits** for sex reassignment surgery **where it is a medical necessity for treatment of transsexualism is contrary to the provisions of Title XIX of the Social Security Act**, 42 U.S.C. § 1396 (1976), and therefore violates the supremacy clause of the United States Constitution. It declared the relevant parts of the Iowa State Plan void, and permanently enjoined the administration and enforcement of the Iowa Medicaid program in a manner to deny benefits for medically necessary care and treatment incident to sex reassignment surgery or subsequent corrective surgery."[45]  The 8th Circuit Court of Appeals affirmed the decision of the lower court.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

> In *Pinneke v. Preisser,* 623 F.2d 546, 550 (8th Cir. 1980) (recognizing that "the decision
> of whether or not certain treatment or a particular type of treatment is 'medically
> necessary' rests with the individual recipient's physician and not with clerical personnel
> or government officials");

[46] Title XVIII of the Social Security Act section 1862 (a)(1)(A). This section allows coverage
and payment of those services that are considered to be medically reasonable and necessary.

Title XVIII of the Social Security Act section 1862 (a)(7). This section excludes routine physical
examinations and services.

[47] Title XVIII of the Social Security Act section 1862 (a)(1)(A). This section allows coverage
and payment of those services that are considered to be medically reasonable and necessary.

Title XVIII of the Social Security Act section 1862 (a)(7). This section excludes routine physical
examinations and services.

[48] Medicare LCD - Local Coverage Determination Independent Diagnostic Testing Facility
(IDTF) (L35448)

[49] http://www.medicarepaymentandreimbursement.com/2011/10/special-
electroencephalography-eeg-cpt.html

[50] https://www.cms.gov/Medicare/Provider-Enrollment-and-
Certification/MedicareProviderSupEnroll/downloads/independentdiagnostictestingfacility.pdf

[51] U.S. Court of Appeals, 9th Circuit, Opinion February 11, 2014
http://cdn.ca9.uscourts.gov/datastore/opinions/2014/02/11/12-10045.pdf

[52] Medicare Cost Reports. CMS.gov, https://www.cms.gov/Research-Statistics-Data-and-
Systems/Downloadable-Public-Use-Files/Cost-Reports/

[53] These requirements govern whether an entity or individual is qualified to provide services to
Medicare patients rather than whether particular items or services provided by a provider are
covered by and properly billable for payment from the Medicare program. These provisions are
referred to by three essentially interchangeable terms. *See* 42 C.F.R. Subpart G, Parts 482-498.

12

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

- "Conditions of participation" for hospital, skilled nursing facility and home health agencies; 42 C.F.R. Parts 482, 483 (Subpart B) and 484.
- "Conditions for coverage" for suppliers, including individual physicians and practitioners; *See, e.g.*, 42 C.F.R. Part 498
- "Conditions for certification" for rural health clinics, 42 C.F.R. Part 491 (Subpart A), and clinical laboratories. *See* 42 C.F.R. Part 493 (CLIA certification requirements).
- A lapse in compliance with a COP should not, and to date has not been held to, affect the propriety of billing, so
- long as the provider retains its provider agreement (colloquially, "remains a currently-certified Medicare provider")
- and billing privileges. Medicare Program Integrity Manual, CMS Pub. 100-08 (hereafter "PIM"), Chap. 3, § 3.1A
- (emphasis added). Some COPs, however, are also considered conditions of payment based on particular regulatory
- language or the provisions of provider agreements or provider certifications.

[54] Conditions of Payment are statutory and regulatory provisions that specify that Medicare payment shall not be made unless the condition is satisfied, such as specific exclusions from coverage, 42 U.S.C. § 1395y, documentation requirements, 42 U.S.C. § 1395*l*(e), and the Stark self-referral prohibition. 42 U.S.C. § 1395nn. Certain other statutory and regulatory requirements, including some provisions, which, by their own terms, appear to be COPs may become Conditions of Payment based on required provider certifications or terms of provider agreements. *See, e.g.*, 42 U.S.C. § 1320a-7b(b), the anti-kickback statute. *See also U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011); *cf. U.S. ex rel. Mikes v. Straus*, 247 F.3d 687 (1st Cir. 2011).

[55] Medicare statutes are referenced here because the Centers for Medicare and Medicaid tend to set standards for themselves as the Federal payor, which are then adopted by other payors and for

12

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

medical billing statements for cash pay.  Since states have phased in of Medicare standards for Workers Compensation billing they are applicable to this report and my opinion.

[56] 42 U.S.C. § 1395y(a)(1); 42 C.F.R. § 411.15(k)(1).

[57] 42 U.S.C. § 1395*l*(e) ("No payment shall be made . . . unless there has been furnished such information as may be necessary in order to determine the amounts due . . . for the period with respect to which the amounts are being paid or for any prior period").

[58] See Case of *The Inspector General V. Respondent [George Kern MD], HHS Departmental Appeals Board, Docket No. C-25 (CR12) (August 26, 1987) (emphasis added).*

[59] 42 U.S.C. § 1320a-7(b)(11).

[60] 42 U.S.C. § 1320c-3(a)(1).

[61] 42 CFR §410.32 states that all diagnostic tests must be ordered by a physician who is treating the beneficiary, and test results must be used in the management of the beneficiary's specific medical problem

[62] Joseph Nichols MD Health Data Consulting in presentations to the Workgroup for Electronic Data Interchange (WEDI), an industry standards group that advises Federal Standards groups such as the HHS Office of the National Coordinator on electronic data standards in healthcare. Dr. Nichols reviewed the claims of all 50 state Medicaid as well as Guam and Puerto Rico during the transition to ICD-10 from 2013 to 2015.

[63] AAPC (American Academy of Professional Coders) is an accepted standards education and certification organization for medical coder certification, especially for outpatient coding.

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

[64] State Medicaid and CHIP Income Eligibility Standards1 Expressed in Monthly Income, Household Size of One (For MAGI Groups, based on state decisions as of October 1, 2014) https://www.medicaid.gov/medicaid-chip-program-information/program-information/downloads/medicaid-and-chip-eligibility-levels-table_hhsize1.pdf accessed May 31, 2016

[65] Comparing CPT Code Payments for Medi-Cal and other Payers.  Price Waterhouse Coopers, accessed May 31, 2016
http://www.chcf.org/~/media/MEDIA%20LIBRARY%20Files/PDF/PDF%20C/PDF%20ComparingCPTCodePayments.pdf

[66] Centers for Medicare and Medicaid, ICN 006819 December 2015 https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/AmbSurgCtrFeepymtfctsht508-09TextOnly.pdf

[67] Source: CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf

[68] Source: CMS, coverage of imaging services. https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Radiology_FactSheet_ICN907164.pdf

[69] Medicare Claims Processing Manual Chapter 23 -Fee Schedule Administration and Coding Requirements

https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c23.pdf

[70] American Medical Association http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/about-cpt.page?

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

---

[71] Source: http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/

[72] Source: American Medical Association CPT Code Book

[73] Excludes Medicare

[74] Based on email from Michael Mirando to attorney Ed Robinson forwarded to me dated September 22, 2017 stating 18,791 patients and approximately 34,000 claims.

[75] This citation is being provided to speak to statistical probability and error rates in expert opinions, not as my legal interpretations or legal conclusions.  Beyond a Reasonable Doubt, US Legal "Beyond a Reasonable Doubt [is the] standard of proof is used exclusively in criminal cases, and a person cannot be convicted of a crime unless a judge or jury is convinced of the defendant's guilt beyond a reasonable doubt. Precisely, if there is any reasonable uncertainty of guilt, based on the evidence presented, a defendant cannot be convicted.  Ostensibly, this burden requires that a trier of fact (judge, jury, arbiter) is fully satisfied and entirely convinced to a moral certainty that the evidence presented proves the guilt of the defendant. There is essentially no room for wavering or uncertainty; the trier of fact believes the evidence to be precise, indubitable, and leaves one with an inescapable conclusion of certainty. Whereas, in a civil trial, a party may prevail with as little as 51 percent probability (a preponderance), those legal authorities who venture to assign a numerical value to "beyond a reasonable doubt" place it in the certainty range of 98 or 99 percent. In a criminal trial, the state must prove that the defendant is guilty, and the burden of proof is always with the state for the **case in chief.** The defendant, carrying a presumption of innocence, has no burden of proof, and need prove nothing. A defendant may sit mute at a criminal trial, because the state has the burden of proof to show that the defendant satisfied each element of the statutory definition of a crime by his or her action/participation or failure to act. Any evidence offered by the defense is generally directed

United States of America, Plaintiff, v. Michael Mirando, Defendant
Rebuttal Expert Report Regarding Loss
Prepared by Michael F. Arrigo, October 9, 2017

toward discrediting or undermining the state's evidence, and does not contribute to any evidentiary burden.  https://courts.uslegal.com/burden-of-proof/beyond-a-reasonable-doubt/

[76] This citation is being provided to speak to statistical probability and error rates in expert opinions, not as my legal interpretations or legal conclusions. Jack B. Weinstein and Ian Dewsbury Law Probability and Risk Oxford Academic. For example, in theory, the 'presumption of innocence' should mean that, before hearing any evidence, the jury should start with the assumption that it is close to 0% likely that the defendant (out of all the people in the universe) committed the crime charged. In practice, most trier's initial anchoring assumption is probably considerably higher than this. Jurors will assume, to some extent, depending on their individual beliefs about how the criminal justice system works (and despite directions not to do so), that if there were no substantial evidence of guilt: (a) the prosecutors and investigators would not have gone forward with the case, (b) the grand jury would not have indicted and (c) the trial judge would not have started up the machinery of selecting a jury and holding a trial. Some jurors also probably have been swayed towards or away from a preliminary hypothesis of guilt or innocence by the jury selection process and opening statements of counsel. It is not unlikely that many jurors begin hearing evidence believing that it is roughly 50% probable that the defendant committed the offense charged, with the state having the responsibility to drive up this probability. https://academic.oup.com/lpr/article/5/2/167/927735/Comment-on-the-meaning-of-proof-beyond-a

Exhibit E – PowerPoint Illustrations (separate document)

Exhibit F – Prior Testimony as Provided in Federal Rule 26 (separate document)

13