SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MICHAEL G. FREEDMAN (Cal. Bar No. 281279)
KATHERINE A. RYKKEN (Cal. Bar No. 267196)
Assistant United States Attorneys
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0631/3659
     Facsimile: (213) 894-0141
     E-mail:    michael.freedman@usdoj.gov
                katherine.rykken@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>           v.<br><br>MICHAEL MIRANDO,<br><br>         Defendant. | No. CR 16-215-PA<br><br>GOVERNMENT'S POSITION REGARDING SENTENCING OF DEFENDANT MICHAEL MIRANDO; DECLARATION OF MICHAEL G. FREEDMAN<br><br>Hearing Date: October 30, 2017<br>Hearing Time: 8:30 a.m.<br>Location:    Courtroom of the<br>               Honorable Percy<br>               Anderson |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Michael G. Freedman and Katherine A. Rykken, hereby files its sentencing position regarding defendant Michael Mirando.

     This position is based upon the attached memorandum of points

and authorities, the files and records in this case, the attached Declaration of Michael G. Freedman, the Presentence Investigation Report, and such further evidence and argument as the Court may permit.


 Dated: October 16, 2017          Respectfully submitted,

                                  SANDRA R. BROWN
                                  Acting United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                        /s/Michael G. Freedman
                                  MICHAEL G. FREEDMAN
                                  KATHERINE A. RYKKEN
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   OFFENSE CONDUCT................................................2

      A.    Background...............................................2

      B.    Defendant's Fraudulent Billing...........................3

      C.    Loss Amount..............................................4

      D.    Defendant's Bank Accounts................................5

      E.    Defendant's Obstruction of Justice at Trial..............6

III.  GUIDELINES CALCULATIONS........................................6

      A.    The PSR..................................................6

      B.    Loss Amount..............................................7

            1.    The Amount Billed Constitutes Prima Facie
                  Evidence of the Intended Loss Amount...............7

            2.    The Loss Amount Is Determined by a Preponderance
                  of the Evidence Standard and Includes All Conduct
                  Within the Scope of Defendant's Fraudulent Scheme....8

            3.    To Rebut the Presumption, Defendant Bears the
                  Burden of Showing His Own Intent..................10

      C.    Victim Enhancement......................................11

      D.    Sophisticated Means.....................................12

      E.    Obstruction of Justice..................................13

IV.   RESTITUTION...................................................13

V.    SENTENCING FACTORS............................................14

      A.    Legal Standard..........................................14

      B.    Nature and Circumstances of the Offense.................16

      C.    History and Characteristics of the Defendant............16

      D.    Deterrence, Promoting Respect for the Law, Protecting
            the Public from the Defendant, and Punishing the
            Defendant for His Crimes................................17

i

E.   The Need to Avoid Unwarranted Sentencing Disparities.....17

VI.   CONCLUSION.......................................................18

1

2

TABLE OF AUTHORITIES

3

CASES:                                                                  PAGE(s)

4

United States v. Armstead,
    552 F.3d 769 (9th Cir. 2008) ............................... 8, 9

5

6

United States v. Berger,
    587 F.3d 1038 (9th Cir. 2009) ................................ 9

7

United States v. Garro,
    517 F.3d 1163 (9th Cir. 2008) ................................ 9

8

9

United States v. Gordon,
    393 F.3d 1044 (9th Cir. 2004) ............................... 13

10

United States v. Jennings,
    711 F.3d 1144 (9th Cir. 2013) ............................... 12

11

12

United States v. Johnson,
    540 F. App'x 573 (9th Cir. 2013) ............................. 9

13

United States v. Knows His Gun,
    438 F.3d 913 (9th Cir. 2006) ................................ 15

14

15

United States v. Lawrence,
    189 F.3d 838 (9th Cir. 1999) ................................ 14

16

United States v. Lewis,
    93 F.3d 1075 (2d Cir. 1996) ................................. 12

17

18

United States v. Mares,
    402 F.3d 511 (5th Cir. 2005) ................................ 17

19

20

United States v. Miller,
    316 F.3d 495 (4th Cir. 2003) .............................. 8, 11

21

United States v. Nichols,
    464 F.3d 1117 (9th Cir. 2006) ............................... 15

22

23

United States v. O'Doherty,
    643 F.3d 209 (7th Cir. 2011) ................................ 12

24

United States v. Popov,
    742 F.3d 911 (9th Cir. 2014) ............................ 7, 9, 10

25

26

United States v. Riley,
    335 F.3d 919 (9th Cir. 2003) ................................. 9

27

28

TABLE OF AUTHORITIES (Continued)

CASES:                                                        PAGE(s)

United States v. Vasquez,
    673 F.3d 680 (7th Cir. 2012) ................................. 11

STATUTES:

18 U.S.C. § 3553(a) ..................................... 14, 15, 16

18 U.S.C. § 3663A(c)(1)(A)(ii) (2012) ........................... 13

SENTENCING GUIDELINES:

U.S.S.G. § 2B1.1 ............................................ 6, 7

U.S.S.G. § 2B1.1(a)(1) ......................................... 6

U.S.S.G. § 2B1.1(b)(1)(J) ...................................... 6

U.S.S.G. § 2B1.1(b)(2)(A) ................................... 6, 11

U.S.S.G. § 2B1.1(b)(10) ..................................... 6, 12

U.S.S.G. § 3C1.1 ........................................... 6, 13

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Defendant Michael Mirando ("defendant") was convicted following a jury trial of 15 counts of health care fraud in violation of 18 U.S.C. § 1347.  The evidence at trial established that defendant engaged in a multi-year, multi-million dollar health care fraud scheme.  Through his company Holter Labs, defendant submitted approximately $8.4 million in fraudulent claims for tests that his company's heart rate monitors never performed and were unable to perform.

The Presentence Investigation Report ("PSR") calculates defendant's total offense level as 30, resulting in a Guidelines range of 97 to 121 months' imprisonment.  The PSR calculated this offense level based on the following enhancements: a loss amount of between $3.5 million and $9.5 million; 10 or more victims; sophisticated means; and obstruction of justice.[1]  The PSR also calculates the restitution defendant should be ordered to pay as $3,025,329.47.

---

[1] The PSR was filed on September 25, 2017, but defendant did not file timely objections.  <u>See</u> Fed. R. Crim. P. 32(f)(1) ("Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report").  Defendant filed his sentencing position (Dkt. 93) on October 16, 2017, the same day as the government.  In his position, defendant objects to these enhancements, focusing primarily on the loss amount based on a lengthy expert report also filed on October 16, 2017.  The government likewise focuses its position on the loss amount, and may file an additional response to defendant's position once it has completed its review of defendant's position and supporting exhibits.

1

The government agrees with the PSR's calculations and recommends that the Court sentence defendant to a 121-month term of imprisonment[2] and order him to pay $3,025,329.47 in restitution.

## II.   OFFENSE CONDUCT

### A.   Background

From approximately January 2005 to April 2016, defendant engaged in a scheme to defraud health insurance companies (legally defined as health care benefit programs or "HCBPs"). (PSR ¶ 21.) Defendant was a member and owner of Holter Labs, LLC ("Holter Labs"), which he formed in 2005 with Stanton Crowley ("Crowley"). (PSR ¶ 21.)

Holter Labs provided cardiac monitoring services to doctors. (PSR ¶ 22.) Holter Labs provided a digital recorder, called a holter recorder, to doctors for use on their patients to monitor heart rate. (PSR ¶ 22.) The holter recorder is a portable device that monitors cardiovascular activity for 24 or 48 hours. (PSR ¶ 22.) The device records electrical signals from the heart via a series of electrodes attached to the chest. (PSR ¶ 22.) The most common use of a holter recorder is to monitor heart activity for electrocardiography ("ECG"). (PSR ¶ 22.) The manufacturer of the holter devices used by Holter Labs, and several prescribing doctors testified to these details at trial.

When doctors prescribed a holter recorder to their patients, the doctors filled out an order form provided by Holter Labs, indicating whether they were prescribing a 24-hour or 48-hour use of the device.

---

[2] Because defendant was convicted at trial of 15 felony counts that carry a statutorily authorized maximum sentence of 10 years, the recommended 121 months is less than the authorized maximum sentence of 150 years if the Court were to sentence defendant to the authorized maximum for each count, to be served consecutively.

2

(PSR ¶ 23.)  After the patient returned the device to the doctor's office, the doctor's office sent the data from the device to Holter Labs.  (PSR ¶ 23.)  Crowley, as Holter Lab's technician, used a software program to create a medical report using the data retrieved from the device.  (PSR ¶ 24.)  He then completed a quality control review of the report and uploaded it to Holter Labs' website for the physician to access.  (PSR ¶ 24.)  Crowley then sent to defendant, often via e-mail, the information for that patient, including the patient's name and insurance information.  (PSR ¶ 24.)  Typically, Crowley included in the e-mail a copy of the order form and the first page of the medical report.  (PSR ¶ 24.)  Defendant's responsibilities were to handle all of the other business activities for Holter Labs, including purchasing the holter recorders, advertising, managing the company's finances, and submitting the medical claims to the patients' insurance companies. (PSR ¶ 25.)

    **B.   Defendant's Fraudulent Billing**

    Defendant billed the patient's insurance companies using the Current Procedural Terminology ("CPT") codes, which are medical codes maintained by the American Medical Association. (PSR ¶ 27.)  CPT codes describe medical, surgical, and diagnostic services and are designed to communicate uniform information about medical services and procedures among providers, beneficiaries, and HCBPs.  (PSR ¶ 27.)  CPT codes define the services rendered.  (PSR ¶ 27.)  CPT codes are used by HCBPs in medical billings.  (PSR ¶ 27.)

    Defendant appropriately billed for a number of services rendered with legitimate CPT codes, including the medical services associated with the following CPT codes: 93226 (external electrocardiogram

3

recording up to 48 hours) and 93799 (unlisted cardiovascular service or procedure).  (PSR ¶ 28.)  But defendant often billed for these same services on multiple dates of service, when, as the patients and doctors testified, the service associated with that CPT code was only performed on a single date.  (PSR ¶ 28.)

Defendant also billed for services that doctors never ordered, patients never received, and that the holter devices never performed and, in many cases, were incapable of performing.  (PSR ¶ 29.)  The five fraudulent CPT codes were: 93025 (microvolt T-wave alternans for assessment of ventricular arrhythmias); 93229 (remote 30 day electrocardiogram with tech support); 93271 (patient activated external electrocardiogram recording with remote download capability up to 30 days); 95806 (sleep study with simultaneous recording of heart rate, oxygen saturation, respiratory airflow, and respiratory effort); and 95827 (night electroencephalogram for measuring brain waves).  (PSR ¶ 29.)  The patients testified that they never used these services.  The doctors testified that they never prescribed these services.  The doctors' records and the order forms submitted to Holter Labs confirmed that the doctors only prescribed a 24-hour use of the device on a single occasion for each patient.  (PSR ¶ 29.)

**C.  Loss Amount**

Over the course of the scheme, defendant submitted approximately $10.3 million in claims to 26 insurance companies, and the insurance companies paid approximately $3.5 million for those claims.  (PSR ¶¶ 34, 37.)  Approximately $7.3 million of the billed amount represents fraudulent claims that were for tests the holter devices were unable to perform.  (PSR ¶ 34.)  Approximately $1.1 million

4

represents fraudulent claims that were for a duplicate date of service.  (PSR ¶ 34.)   These two amounts total approximately $8.4 million in billings.  (PSR ¶ 34.)   From these amounts, the insurance companies paid approximately $0.3 million for claims for duplicate dates of service and approximately $2.7 million for claims for services the device was unable to perform, for a total of approximately $3 million.  (PSR ¶ 34.)   Specifically, the 26 health care benefit programs paid Holter Labs $3,025,329.47 on defendant's fraudulent claims.  (PSR ¶ 34.)   Defendant was arrested on October 7, 2016, but continued submitting claims using the same CPT codes while released on bond.  ((Declaration of Michael G. Freedman ("Freedman Decl."), Ex. 2 (Tr. Ex. 92).)   At trial, Special Agent Kathleen Kennedy of the Federal Bureau of Investigation testified regarding her analyses of the fraudulent claims defendant submitted over the course of his scheme and her calculation of these loss figures. (Freedman Decl., Ex. 1 (Tr. Ex. 84).)

   D.   **Defendant's Bank Accounts**

   Defendant deposited the majority of the money received from insurance companies into Holter Labs' primary business bank account at Chase Bank, but defendant transferred large amounts of money from this account into a company he created called Murrieta Medical Supply.  (PSR ¶ 36; Freedman Decl., Ex. 3 (Tr. Ex. 90).)   From Murrieta Medical Supply, defendant transferred significant sums of money into personal accounts of his own, and then used that money to invest in real estate around the country and internationally.  (PSR ¶ 36.)

###### E.    Defendant's Obstruction of Justice at Trial

On April 26, 2017, the first day of trial, the Court found that defendant had violated the conditions of his bond by engaging in jury tampering and obstruction of justice.  (PSR ¶ 38; Dkt. 46.)  The Court made these findings after two jurors reported that defendant had approached them and spoken to them in the hallway and bathroom.

### III. GUIDELINES CALCULATIONS

###### A.    The PSR

As set forth below, the Government agrees with the Guidelines calculation set forth in the PSR.[3]  The PSR calculated the applicable Guidelines range as follows:

| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(1)] |
|---|---|---|
| Loss Between $3.5 Million And $9.5 Million: | +18 | [U.S.S.G. § 2B1.1(b)(1)(J)] |
| 10 or More Victims: | +2 | [U.S.S.G. § 2B1.1(b)(2)(A)(i)] |
| Sophisticated Means: | +2 | [U.S.S.G. § 2B1.1(b)(10)(c)] |
| Obstruction of Justice: | +2 | [U.S.S.G. § 3C1.1] |
| Total Offense Level: | 30 | |

(PSR ¶¶ 44-57.)  Based on defendant's apparent lack of prior convictions, the PSR also calculated a criminal history category of I.  (PSR ¶¶ 59-61.)  The resulting Guidelines range corresponding to an offense level of 30 and a criminal history category I is 97 to 121 months.  (PSR ¶ 108.)

---

[3] The PSR was disclosed on September 25, 2017.

**B.   Loss Amount**

   1.   <u>The Amount Billed Constitutes Prima Facie Evidence of</u>
        <u>the Intended Loss Amount</u>

   The loss amount used in these calculations is approximately $8.4
million, the amount in fraudulent claims that defendant billed to
health insurance companies during the course of his fraud scheme
because this amount most accurately reflects the intended loss.
Pursuant to the Guidelines, the loss amount "is the greater of actual
loss or intended loss."  U.S.S.G. § 2B1.1, App. Note 3(A).  The
intended loss means "the pecuniary harm that was intended to result
from the offense; and . . . includes intended pecuniary harm that
would have been impossible or unlikely to occur."  <u>Id.</u> at note
3(A)(ii).

   Based on these principles, the amount billed constitutes prima
facie evidence of the intended loss in a health care fraud case.  The
application note to U.S.S.G. § 2B1.1, which addresses government
health care programs but is also instructive here, explains that "the
aggregate dollar amount of fraudulent bills submitted to the
Government health care program, shall constitute prima facie evidence
of the amount of the intended loss, i.e., is evidence sufficient to
establish the amount of the intended loss, if not rebutted."  <u>Id.</u> at
note 3.F(viii).

   The Ninth Circuit applies this same rule to health care fraud
cases generally, including those involving private health insurers,
as is the case here.  <u>See</u> <u>United States v. Popov</u>, 742 F.3d 911, 916
(9th Cir. 2014) ("In health care fraud cases, the amount billed to an
insurer shall constitute prima facie evidence of intended loss for

1  sentencing purposes.  If not rebutted, this evidence shall constitute

2  sufficient evidence to establish the intended loss by a preponderance

3  of evidence.")  This rule is consistent with the common sense notion

4  expressed by the Fourth Circuit in <u>United States v. Miller</u>, 316 F.3d

5  495 (4th Cir. 2003): "As anyone who has received a bill well knows,

6  the presumptive purpose of a bill is to notify the recipient of the

7  amount to be paid."  <u>Id.</u> at 504.

8        Here, the evidence at trial established that defendant submitted

9  approximately $8.4 million in fraudulent claims for services that

10 either were not performed, and in many cases, could not be performed.

11 Special Agent Kennedy testified regarding the tens of thousands of

12 defendant's claims that she obtained from insurance companies and

13 which she compiled into the charts admitted into evidence.  (Freedman

14 Decl., Ex. 1.)  Special Agent Kennedy's review established that

15 defendant submitted approximately $8.4 million in fraudulent claims

16 for services that either were not performed or could not be peformed.

17 The $8.4 million defendant billed thus constitutes prima facie

18 evidence of the intended loss amount.

19        2.    <u>The Loss Amount Is Determined by a Preponderance of</u>
                <u>the Evidence Standard and Includes All Conduct Within</u>
20              <u>the Scope of Defendant's Fraudulent Scheme</u>

21        The intended loss amount of $8.4 million in this case is

22 established by at least a preponderance of the evidence.  <u>United</u>

23 <u>States v. Armstead</u>, 552 F.3d 769, 776, 1126 (9th Cir. 2008) (Factual

24 findings underlying sentencing enhancements must generally be

25 supported by a preponderance of the evidence.)  This standard applies

26 in fraud cases to loss findings that are based on the extent of the

27 charged scheme to defraud, even where the loss amount will have a

28
                                    8

1   disproportionate effect on the sentence.  See Popov, 742 F.3d at 914

2   (preponderance standard applies to losses from convictions for health

3   care fraud); United States v. Berger, 587 F.3d 1038, 1048 (9th Cir.

4   2009) (preponderance of evidence standard applies where loss based on

5   extent of fraud); United States v. Garro, 517 F.3d 1163, 1168-69 (9th

6   Cir. 2008) (rejecting plain-error claim that clear-and-convincing

7   evidence required for losses associated with wire fraud scheme).

8        Consistent with the Guidelines and case law, the Guidelines loss

9   calculation encompasses conduct within the scope of the charged

10  scheme for which defendant was convicted.  The loss is not dependent

11  on conduct distinct from the crimes of conviction, the health care

12  fraud scheme, but rather arises directly from the scheme.  See United

13  States v. Johnson, 540 Fed. Appx. 573, 576 (2013) (finding that the

14  district court did not err in applying a preponderance-of-the-

15  evidence standard when determining the loss amount since the

16  defendant had been convicted of thirty-four counts of health care

17  fraud all arising from the same scheme); Armstead, 552 F.3d at 778

18  (preponderance-of-the-evidence standard was appropriate because

19  "sentencing enhancements were based entirely on the extent of the

20  conspiracy and do not require the heightened standard of proof");

21  United States v. Riley, 335 F.3d 919, 926 (9th Cir. 2003) (the fact

22  that an enhancement is based on the extent of a conspiracy for which

23  the defendant was convicted weighs heavily against the application of

24  the clear and convincing evidence standard of proof.  Only in

25  situations where the enhancement is based on uncharged or acquitted

26  conduct does the clear and convincing standard of evidence apply).

27

28

                                      9

Here, the indictment specifically charges defendant with participating in a scheme to defraud that encompasses more than merely fifteen claims.  For example, the indictment alleges that defendant "knowingly, willfully, and within intent to defraud, executed a scheme and artifice: (a) to defraud a health care benefit program, namely the HCBPs, as to material matters in connection with the delivery of and payment for health care benefits, items, and services . . ."  (Dkt. 1, ¶ 14.)  The government charged a health care fraud scheme, and the evidence at trial proved the extent of that scheme and the loss amount of $8.4 million.

As discussed, Special Agent Kennedy obtained and reviewed tens of thousands of claims defendant submitted to dozens of insurance companies and analyzed those claims based on the dates and codes defendant submitted.  If anything, Special Agent Kennedy's analysis was conservative because she only included in the loss amount the two categories of duplicate dates of service and services that could not be performed.  Those two categories alone add up to approximately $8.4 million in claims of the course of the scheme, all of which are to be considered in calculating the intended loss amount.  A preponderance of the evidence thus proves that the intended loss was approximately $8.4 million.

    3.   <u>To Rebut the Presumption, Defendant Bears the Burden of Showing His Own Intent</u>

Defendant may attempt to rebut this presumption, but if he seeks to do so, he bears the burden of establishing that he did not intend to be paid on the total amount billed.  See <u>Popov</u>, 316 F.3d at 916 ("the parties may introduce additional evidence to

10

support arguments that the amount billed overestimates or understates the defendant's intent"). He cannot meet this burden, though, because there was no evidence presented at trial that would establish that defendant did not intend to be paid on the full amount that he billed. Defendant fails to meet this burden by submitting an expert report regarding industry practice, because this is irrelevant as to his own intent. The evidence at trial established the amount defendant billed, which is the relevant evidence of the intended loss. Even if defendant were to attempt now to provide a self-serving declaration stating that he never intended to receive the fraudulent claims, any such declaration would not be credible. See Miller, 316 F.3d at 505 (affirming use of billed amount even if the defendant did not have any "reasonable expectation" of receiving the billed amount, because "[e]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can . . . [and noting that defendant] may not have expected to get it all, [but] he could be presumed to have wanted to." (quotation omitted)).

### C.   Victim Enhancement

U.S.S.G. § 2B1.1(b)(2)(A) provides a two-level increase if the offense involved 10 or more victims. Here, defendant submitted fraudulent claims to 26 insurance companies. There were thus 26 victims, so the two-level enhancement applies. See United States v. Vasquez, 673 F.3d 680, 687-88 (7th Cir. 2012) (counting all victims involved in fraud scheme, not just victims on substantive mail fraud counts). As discussed above, defendant's argument that only his

11

1    substantive counts of conviction should be considered fails as a

2    matter of law.

3         **D.   Sophisticated Means**

4         U.S.S.G. § 2B1.1(b)(10) provides for a two-level enhancement if

5    "the offense . . . involved sophisticated means."  The application

6    notes to U.S.S.G. § 2B1.1 provide that conduct such as hiding

7    transactions through the use of fictitious entities ordinarily

8    demonstrates sophisticated means.  Id. at App. Note 9(B).

9         The Ninth Circuit has explained that "[c]onduct need not involve

10   highly complex schemes or exhibit exceptional brilliance to justify a

11   sophisticated means enhancement."  United States v. Jennings, 711

12   F.3d 1144, 1145 (9th Cir. 2013); see also United States v. Lewis, 93

13   F.3d 1075, 1082-83 (2d Cir. 1996) (applying enhancement to scheme

14   involving fake bank accounts of non-existent businesses); United

15   States v. O'Doherty, 643 F.3d 209, 220 (7th Cir. 2011) (affirming

16   enhancement where defendant funneled profits into four corporate bank

17   accounts at two different financial institutions to pay personal

18   expenses).

19        Here, as the PSR notes, defendant formed a company called

20   Murrieta Medical Supply.  (PSR ¶ 36.)  And the evidence at trial

21   showed that he transferred large amounts of funds that had been paid

22   to Holter Labs through the fraud scheme to Murrietta Medical Supply's

23   bank account.  (Freedman Decl., Ex. 2 (Tr. Ex. 90).)  As there is no

24   information that this company existed other than to provide a

25   fictitious entity for these transfers, the two-level increase

26   applies.

27

28
                                    12

1

2     **E.   Obstruction of Justice**

3     U.S.S.G. § 3C1.1 provides for a two-level enhancement "if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct or (B) a closely related offense."  The application notes to U.S.S.G. § 3C1.1 provide the following example of conduct to which this enhancement applies, "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  Id. at App. Note 4.A.

    Defendant did exactly what the application note describes when he attempted to influence two jurors on the first day of trial. Here, as the PSR notes, on April 26, 2017, the Court found that defendant violated the conditions of his bond by jury tampering and obstruction of justice after two jurors reported that defendant approached them and spoken to them in the hallway and bathroom outside the Court.  (PSR ¶ 38; Dkt. 46.)  Thus, the two-level enhancement applies.

**IV.  RESTITUTION**

    The Court should also require defendant to pay restitution in the amount of $3,025.329.47.

    Restitution is mandatory under the Mandatory Victims Restitution Act ("MVRA") because the defendant's crime involved fraud and deceit. See 18 U.S.C. § 3663A(c)(1)(A)(ii); United States v. Gordon, 393 F.3d 1044, 1048 (9th Cir. 2004) ("The MVRA makes restitution mandatory for

13

. . . offenses which involve fraud or deceit"; courts interpreting MVRA may look to and rely upon cases interpreting Victim and Witness Protection Act (VWPA) as precedent); United States v. Lawrence, 189 F.3d 838, 846 (9th Cir. 1999) ("[O]nly when the crime of conviction involves a scheme, conspiracy or pattern of criminal activity . . . may the restitution order include acts of related conduct for which the defendant was not convicted"); United States v. Rutgard, 116 F.3d 1270, 1294 (9th Cir. 1997) (under VWPA, restitution may be ordered for losses to person harmed in the course of defendant's scheme even beyond counts of conviction).

The restitution amount in this case is the amount that insurance companies paid based on the fraudulent billings during the course of the scheme. The Court should require defendant to pay the full amount that was paid during the course of the fraud scheme, namely, $3,025,329.47.

## V.   SENTENCING FACTORS

Each of the applicable sentencing factors demonstrates that a high-end Guidelines sentence of 121 months' imprisonment is warranted in this case.

### A.   Legal Standard

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a). See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006).

To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a

14

specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence.  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

(1)  The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  The need for the sentence imposed:

(A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  To afford adequate deterrence to criminal conduct;

(C)  To protect the public from further crimes of the defendant; and

(D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  The kinds of sentences available;

(4)  The kinds of sentence and the sentencing range established [for the offense and the defendant as set forth in the Sentencing Guidelines];

(5)  Any pertinent policy statement . . . ;

(6)  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  The need to provide restitution to any victims of the offense.

15

18 U.S.C. § 3553(a).

   **B.   Nature and Circumstances of the Offense**

   The nature and circumstances of defendant's offense warrant a high-end sentence of 121 months.  Defendant orchestrated a multi-million-dollar fraudulent scheme over a decade.  He was responsible for submitting the fraudulent claims for services he knew could not be and were not performed.  He created fraudulent claims, using real beneficiaries' and doctors' information, in a superficial attempt to fool insurers.  Defendant was also the scheme's primary beneficiary. He controlled Holter Labs' finances, diverted most of the fraudulent proceeds from his business partner, and paid to himself the majority of the proceeds from fraudulent scheme.  And defendant continued submitting his fraudulent claims even after being indicted and arrested.

   **C.   History and Characteristics of the Defendant**

   Although many of the defendants this Court sees lack the qualifications for legitimate employment, this defendant did not.  He appears to be well educated and has previously held a variety of professional jobs.  This provided him with considerable ability to earn a lawful living.  Rather than putting his skills to good use, he made a decision to engage in premeditated criminal conduct for a decade.  No one compelled defendant to engage in health care fraud – he is responsible for the cynical decision that he made, motivated by greed, to defraud insurance companies of millions of dollars.

   The government anticipates that defendant will point in mitigation to his young child.  (PSR ¶ 75.)  While the government is sympathetic to the hardship that a substantial period of

16

incarceration for defendant will cause for his family, that hardship must be laid at defendant's feet based on the choices he made. Additionally, the child's mother appears to be a suitable guardian in defendant's absence.

Defendant may also point to his lack of criminal history. While laudable, that fact has already been taken into account in calculating the Guidelines range. Moreover, because this fraud scheme continued for nearly a decade and after indictment, defendant's conduct here can hardly be said to be aberrational.

**D. Deterrence, Promoting Respect for the Law, Protecting the Public from the Defendant, and Punishing the Defendant for His Crimes**

The Government's recommended sentence of 121 months reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for defendant's crimes. Defendant devised a premeditated and calculated scheme to submit a massive volume of fraudulent claims. He continued the scheme even after being indicted. A sentence of 121 months is necessary to deter defendant and others from engaging in this kind of criminal activity.

Moreover, defendant's conduct evidences his lack of respect for the law. He did not withdraw from the scheme on his own; he continued engaging in fraud after being indicted; and he engaged in jury tampering and obstruction of justice at trial.

**E. The Need to Avoid Unwarranted Sentencing Disparities**

A sentence within the Sentencing Guidelines range may be the best way to satisfy this factor. See United States v. Mares, 402 F.3d 511, 518-519 (5th Cir. 2005). This Court recently imposed a 121-month sentence for a defendant who ran a two-year scheme to

1   defraud Medicare by submitting approximately $1.5 million in
2   fraudulent claims, and used beneficiaries' identities to submit false
3   claims.   (See United States v. Vahe Tahmasian, 13-313-PA, Dkt. 128.)
4   In this case as in Tahmasian, defendant, as a part of a broader
5   scheme of fraudulent claims, used the identities of beneficiaries
6   (including several who testified at trial) without their knowledge to
7   submit claims for tests the beneficiaries never had and that their
8   doctors never ordered.[4]   Indeed, the duration of defendant's scheme
9   and the losses it caused far exceed those present in the Tahmasian
10  case by a considerable amount, which argues against any lower
11  sentence for defendant here.
12  **VI.   CONCLUSION**
13       For the foregoing reasons, the government recommends a sentence
14  of 121 months in custody, followed by a three-year term of supervised
15  release, payment of a $1,500 special assessment, and payment of
16  restitution in the amount of $3,025,329.47.

---

26       [4] In Tahmasian, the defendant was charged with aggravated
    identity theft, a charge that was not present in this case.
27  Nonetheless, the underlying conduct is similar, meaning that the
    sentences should be as well, irrespective of the specific charges
28  brought.